Nos. 25-11612 & 25-11821

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

BEAR WARRIORS UNITED, INC.,
a Florida Not for Profit Corporation,

*Plaintiff-Appellee,*

v.

SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION,

*Defendant-Appellant.*

---

Appeal from the U.S. District Court for the
Middle District of Florida, No. 6:22-cv-2048 (Mendoza, J.)

---

## BRIEF OF AMICI CURIAE SAVE CRYSTAL RIVER AND
## PACIFIC LEGAL FOUNDATION IN SUPPORT OF
## DEFENDANT-APPELLANT URGING REVERSAL

---

Jeffrey D. Jennings
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(Mailing address only)
(202) 888-6881
jjennings@pacificlegal.org

Mark Miller
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
(561) 691-5000
mark@pacificlegal.org

*Additional counsel on inside cover*

*Of Counsel*:
Charles T. Yates
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
(916) 419-7111
cyates@pacificlegal.org

*Counsel for Amici Curiae*
*Save Crystal River and Pacific Legal Foundation*

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

## CORPORATE DISCLOSURE STATEMENT
## AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, Amici Save Crystal River and Pacific Legal Foundation adopt the Certificate of Interested Persons submitted in Brief of Appellant (filed July 28, 2025). Save Crystal River and Pacific Legal Foundation add the following attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case:

- Jennings, Jeffrey D.– Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

- Miller, Mark – Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

- Pacific Legal Foundation – Amicus Curiae

- Save Crystal River – Amicus Curiae

- Yates, Charles T. – Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel certifies that neither Amicus has a parent corporation. Additionally,

there are no publicly held corporations that hold 10% or more of Amicus Curiae Save Crystal River's stock and no publicly held corporation holds 10% or more of Amicus Curiae Pacific Legal Foundation's stock.

Dated: August 4, 2025 /s/ Jeffrey D. Jennings
Counsel for Amici Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT
AND CERTIFICATE OF INTERESTED PERSONS ........................... C-1

TABLE OF CITATIONS ........................................................iii

STATEMENT OF THE ISSUES ........................................... 1

IDENTITY AND INTERESTS OF AMICI CURIAE .............................. 1

SUMMARY OF ARGUMENT ................................................ 3

ARGUMENT .......................................................... 5

  I.  The term "take" as Congress used it in the ESA contemplates an affirmative action performed directly and intentionally toward a particular species ............................................. 5

      A.  The ESA's plain text compels the conclusion that "take" means an affirmative action performed directly toward a particular animal ............................................. 7

      B.  The ESA's structure further counsels that Congress intended "take" to mean direct actions towards particular animals ............................................................. 13

      C.  The ESA's legislative history shows that "take" was not understood as applying to ordinary land uses that modify habitat ............................................................. 15

      D.  Contrary to the district court's musings, "harass" refers to direct actions and not habitat modification ........................... 17

  II.  Prior interpretations of the term "take" by the Supreme Court and the Service are neither binding, nor persuasive ................... 20

      A.  The Service's "harm" definition is neither binding, nor persuasive ............................................................. 20

      B.  The Supreme Court's prior interpretation of the ESA's take prohibition is neither binding nor persuasive ................ 23

    1.   The Supreme Court decided *Sweet Home* under the *Chevron* framework ........................................................... 23

    2.   *Sweet Home* is not binding because the Supreme Court has rejected *Chevron* ........................................................ 26

    3.   *Sweet Home* is not persuasive .......................................... 28

CONCLUSION ............................................................................ 29

CERTIFICATE OF COMPLIANCE ........................................... 31

# TABLE OF CITATIONS

**Cases**

*Advoc. Health Care Network v. Stapleton*,
   581 U.S. 468 (2017) .................................................................... 12

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
   515 U.S. 687 (1995) ............................... 4, 6, 9, 11-12, 15, 18, 20, 22-28

*BedRoc Ltd., LLC v. United States*,
   541 U.S. 176 (2004) ...................................................................... 7

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) .................................................................... 28

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................. 24-25, 27

*Corley v. United States*,
   556 U.S. 303 (2009) ................................................................. 14-15

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   67 F.4th 1027 (9th Cir. 2023) ...................................................... 29

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .................................................................... 13

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019) .................................................................... 28

*Geer v. Connecticut*,
   161 U.S. 519 (1896) ...................................................................... 8

*In re MCP No. 185*,
   124 F.4th 993 (6th Cir. 2025) ...................................................... 27

*In re Washington Cattlemen's Ass'n*,
   No. 22-70194, 2022 WL 4393033 (9th Cir. Sept. 21, 2022) .................. 3

*Jarecki v. G. D. Searle & Co.*,
   367 U.S. 303 (1961) .................................................................... 10

*King v. Burwell,*
576 U.S. 473 (2015) ............................................................ 13

*\*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................... 4, 23-24, 26-27

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
70 F.4th 582 (D.C. Cir. 2023) .......................................... 28

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ............................................ 23

*McDonnell v. United States,*
579 U.S. 550 (2016) ............................................................ 10

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior,*
952 F.3d 1216 (10th Cir. 2020) .......................................... 3

*Pickens v. Hamilton-Ryker IT Sols., LLC,*
133 F.4th 575 (6th Cir. 2025) ............................................ 9

*Russello v. United States,*
464 U.S. 16 (1983) .............................................................. 15

*Standard Oil Co. of N.J. v. United States,*
221 U.S. 1 (1911) .................................................................. 7

*Tenn. Valley Auth. v. Hill,*
437 U.S. 153 (1978) ............................................................ 25

*Tennessee v. Becerra,*
131 F.4th 350 (6th Cir. 2025) .......................................... 27

*United States v. Hayashi,*
22 F.3d 859 (9th Cir. 1993) ........................................ 18-19

*United States v. Shabani,*
513 U.S. 10 (1994) ........................................................ 7, 10

*United States v. Wong Kim Bo,*
472 F.2d 720 (5th Cir. 1972) ............................................ 15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) ................................................................ 3

**Statutes**

16 U.S.C. § 1362(13) ........................................................... 19

16 U.S.C. § 1532(5) ............................................................. 14

16 U.S.C. § 1532(19) ....................................... 5, 9-10, 12, 14, 17, 20

16 U.S.C. § 1533(b)(2) ......................................................... 14

16 U.S.C. § 1534 ................................................................. 15

16 U.S.C. § 1536(a)(2) ...................................................... 13-14

16 U.S.C. § 1538(a) .............................................................. 5

16 U.S.C. § 1538(a)(1) ......................................................... 14

**Regulations**

50 C.F.R. § 17.3 ............................................................. 20-21

50 C.F.R. § 222.102 ............................................................ 21

**Rules**

11th Cir. R. 28-5 ................................................................. 5

Fed. R. App. P. 29(a)(2) ........................................................ 1

**Other Authorities**

119 Cong. Rec. 25,669 (1973) ................................................ 16

119 Cong. Rec. 30,162 (1973) ................................................ 16

40 Fed. Reg. 44,412 (Sept. 26, 1975) ........................................ 20

46 Fed. Reg. 54,748 (Nov. 4, 1981) ....................................... 20-21

90 Fed. Reg. 16,102 (Apr. 17, 2025) ............................... 22-23, 26-27

11 Oxford English Dictionary (1933) ......................................... 8

American Heritage Dictionary (1985).................................... 10

Black's Law Dictionary (4th ed. 1968) ..................................... 8

Blackstone, William, 2, Commentaries (1766) ........................ 8

Comments of Pacific Legal Foundation, U.S. Fish & Wildlife
    Serv. and Nat'l Marine Fisheries Serv. Proposed Rule:
    Rescinding the Definition of "Harm" Under the Endangered
    Species Act, Docket No. FWS-HQ-ES-2025-0034 (May 19,
    2025), https://www.regulations.gov/comment/FWS-HQ-ES-
    2025-0034-232862 ............................................................... 22

Digest of Justinian ................................................................... 8

Farber, Daniel A., *The Conservative as Environmentalist:*
    *From Goldwater and the Early Reagan to the 21st Century,*
    59 Ariz. L. Rev. 1005 (2017) ............................................... 17

Opdycke, John B., *Mark My Words: A Guide to Modern*
    *Usage and Expression* (1949)..........................................9-10

Webster's New International Dictionary of the English
    Language (2d ed. unabridged 1942) ....................... 8, 11, 18

# STATEMENT OF THE ISSUES

**I.** The Endangered Species Act prohibits the "take" of endangered species. Congress defined "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." The district court held that the Florida Department of Environmental Protection (DEP) was liable for violating this prohibition by issuing permits to private third parties to use septic tanks that allegedly modified seagrass habitats in such a manner as to injure manatees by depriving them of food. Does the ESA's regulation of the "take" of listed species prohibit DEP's permitting scheme?

# IDENTITY AND INTERESTS OF AMICI CURIAE[1]

Amicus Curiae Save Crystal River, Inc. (SCR), is a Florida not-for-profit corporation. It is a nonpolitical organization of citizens from

---

[1] Amici conferred with the parties via email. Defendant-Appellant consents to the filing of this amicus brief. Plaintiff-Appellee consents to the filing of this amicus brief for purposes of Federal Rule of Appellate Procedure 29(a)(2)'s requirement that absent the consent of the parties, amici must seek leave to file. Plaintiff-Appellee, however, takes no position on this amicus brief.

No party or party's counsel authored this brief in whole or in part. No party or party's counsel, or any other person—excepting Amici, their members, and their counsel—contributed money for the brief's preparation or submission.

Crystal River, Citrus County, Florida, who wish to protect their individual property rights and enhance the quality of life for citizens of Crystal River and the surrounding area. SCR's mission is to educate the public regarding current environmental, property, and riparian rights to effectively preserve a proper balance between nature and human activity. Accordingly, SCR successfully petitioned (with free legal aid from Amicus Curiae Pacific Legal Foundation) the United States Fish and Wildlife Service to have manatees downlisted from endangered to threatened. This reduced the amount of Endangered Species Act related red tape SCR faced when pursuing its multi-million dollar restorations to manatee habitat in Crystal River. This case interests SCR because it remains concerned with the overreach of federal government restrictions under current interpretations of the ESA.

Amicus Curiae PLF is the nation's leading public interest legal organization that advocates for limited government, property rights, and the separation of powers, particularly when these causes are threatened by environmental regulation, such as the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-44. PLF attorneys have been

counsel of record in many cases addressing the interaction of the ESA, property rights, and the separation of powers.[2]

## SUMMARY OF ARGUMENT

DEP aptly argues that applying the ESA to the facts of this case stretches the concept of proximate causation beyond any meaningful limit. *See* Br. of Appellant 29-34. Amici submit this brief to amplify a more fundamental argument—the ESA's prohibition of "take" does not cover accidental or indirect injuries to species, such as those brought about by mere habitat modification. Thus, DEP is not liable under the ESA for permitting third-party wastewater discharges that allegedly modified manatee habitat. This is so for two reasons:

*First*, the ESA's text, structure, and history show that it is poor reasoning to rely on the words "harm" and "harass" in the ESA to

---

[2] *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018) (representing private landowners in a challenge to the designation of critical habitat for the endangered dusky gopher frog); *N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216 (10th Cir. 2020) (representing ranchers in a successful challenge to the designation of critical habitat for the endangered jaguar); *In re Washington Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033 (9th Cir. Sept. 21, 2022) (representing ranchers and successfully seeking a writ of mandamus reinstating 2019 ESA implementing regulations).

expand the ESA's take prohibition to cover the type of indirect or accidental injury via habitat modification that the district court determined to be a "take." Instead, "take" as Congress used it in the ESA contemplates an affirmative action performed directly and intentionally toward a particular animal.

*Second*, it is true that the United States Supreme Court previously upheld a rule from the federal agency responsible for administering the ESA with respect to the manatee—the United States Fish and Wildlife Service (Service)—that interprets the ESA as applying to habitat modification. But the Court merely held under the now defunct *Chevron* framework—and over a dissent written by Justice Scalia and joined by Chief Justice Rehnquist and Justice Thomas—that the rule was a *permissible*—but not necessarily *the best*—reading of the ESA. *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 703 (1995); *id.* at 714-36 (Scalia, J., dissenting). The Supreme Court has since abrogated *Chevron* and instructed lower courts to abide by only the best reading of statutory language. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). Thus, neither the Supreme Court's decision in *Sweet Home*, nor the rule it upheld, binds this Court

as to the best reading of the ESA. The district court should be reversed

because the ESA simply does not grant authority to the federal

government to function as a general land use administrator.

## ARGUMENT

### I. The term "take" as Congress used it in the ESA contemplates an affirmative action performed directly and intentionally toward a particular species.

Section 9 of the ESA forbids the "take" of endangered species. 16

U.S.C. § 1538(a). Congress defines "take" as "to harass, harm, pursue,

hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to

engage in any such conduct." *Id.* § 1532(19).

The district court concluded that DEP violated section 9 of the ESA

by committing "take" of manatees in an indirect sense through its

allegedly overly permissive regulatory scheme. R. 172, at 4-5.[3] It

reasoned that DEP was liable for take under the ESA because (1) DEP

has permitting authority over discharges from wastewater treatment

plants and private septic tanks; (2) DEP's allegedly inadequate

regulation of these systems lead to nutrients leaching into groundwater;

---

[3] Pursuant to 11th Circuit Rule 28-5, the references to the record in this brief are the page numbers that appear in the header generated by the district court's electronic filing system.

(3) these nutrient were finding their way via groundwater and occasionally direct discharges into the Indian River Lagoon; (4) an excess of these nutrients in the North Indian River Lagoon—along with other independent factors—was contributing to the growth of algae; (5) this algal growth was shading seagrasses from sunlight, limiting the growth and flourishing of the manatee's seagrass habitats; (6) this was depleting a manatee food source; and (7) this was affecting manatee breeding, reproduction, and feeding, allegedly resulting in "harm" to individual manatees. *See* R. 172, at 4-5, 9, 12-20. This effectively applies the ESA in a way that prohibits disposing of wastewater—i.e., an ordinary land use activity—that indirectly, accidentally, and remotely modifies the habitat of a listed species.

But "take" as Congress used it in the ESA contemplates an affirmative action performed directly and intentionally toward a particular animal. *See Sweet Home*, 515 U.S. at 718 (Scalia, J., dissenting) ("It is obvious that 'take' in this sense . . . describes a class of acts (not omissions) done directly and intentionally (not indirectly and by accident) to particular animals (not populations of animals)."). Purely indirect or accidental activity, like the alleged manatee habitat

modification found by the district court, can never constitute a take. This is borne out by the ESA's text, structure, and history.

## A. The ESA's plain text compels the conclusion that "take" means an affirmative action performed directly toward a particular animal.

A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). The ESA's text shows that "take" means directly harming a species and not accidental or indirect injury such as that caused by habitat modification, for at least three reasons.

***First***, it is well established that when Congress uses a term with a settled meaning at common law, it intends that settled meaning to be incorporated into the statute. *See United States v. Shabani*, 513 U.S. 10, 13 (1994) ("[A]bsent contrary indications," courts presume that "Congress intends to adopt the common law definition of statutory terms."); *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense[.]").

Here, the term "take" is a term of art[4] deeply rooted in the common and statutory law concerning wildlife. Traditionally understood, to "take" wildlife contemplates an affirmative action performed directly and intentionally toward a particular animal. *See Geer v. Connecticut*, 161 U.S. 519, 523 (1896) ("'[A]ll the animals which can be taken upon the earth, in the sea, or in the air, that is to say, wild animals, belong to those who take them[.]'" (quoting the Digest of Justinian bk. 41, tit. 1)); 2 William Blackstone, Commentaries 411 (1766) ("Every man . . . has an equal right of pursuing and taking to his own use all such creatures as are *ferae naturae*[.]"); *Take*, 11 Oxford English Dictionary 37 (1933) ("To catch, capture (a wild beast, bird, fish, etc.)[.]"); *Take*, Webster's New International Dictionary of the English Language (2d ed. unabridged 1942) ("To get possession or control of . . . To seize or capture physically . . . To catch or capture by trapping, snaring, etc., or as prey.").

What all of these treatises and dictionaries have in common is an understanding that to "take" wildlife means reducing an animal—by

_____

[4] *Cf. Take*, Black's Law Dictionary 1625 (4th ed. 1968) ("The word take has many shades of meaning, precise meaning which it is to bear in any case depending on the subject with respect to which it is used.").

killing or capturing—to human control. The district court's application of the ESA's take prohibition to ordinary land use activities that remotely modify habitat is impossible to square with this traditional understanding. R. 172, at 18.

The mere fact that Congress defined "take" in the ESA—and in doing so included the term "harm"[5]—cannot overcome the presumption that Congress intended that the term "take" carry its traditional meaning. To read the ESA in this manner is to commit the fallacy of assuming that once defined, the ordinary meaning of a statutory term loses any significance. *See Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 584 (6th Cir. 2025) ("'[I]t is a fallacy,' as Justice Scalia once explained, 'to assume that once defined,' the defined word 'loses any significance, and it is only the definition that matters.'" (quoting *Sweet Home*, 515 U.S. at 718 (Scalia, J., dissenting))).

And in any event, the term "harm" itself is often understood in a manner consistent with the traditional understanding of "take." *See* John B. Opdycke, *Mark My Words: A Guide to Modern Usage and Expression* 330 (1949) ("*[H]arm* has in it a little of the idea of specially

---

[5] *See* 16 U.S.C. § 1532(19).

focused hurt or injury, as if a personal injury has been anticipated and intended."); American Heritage Dictionary 662 (1985) ("*Injure* has the widest range . . . *Harm* and *hurt* refer principally to what causes physical or mental distress to living things"). Given this fact, the mere inclusion of the term "harm" in a statutory definition, which otherwise comports entirely with the traditional understanding of "take," *see infra* 11-12, can hardly supply the strong "contrary indication[]" necessary to overcome the presumption that Congress legislates against the backdrop of a term's settled meaning. *Shabani*, 513 U.S. at 13.

**Second**, the *noscitur a sociis* canon—which dictates that "a word is known by the company it keeps"—confirms that Congress intended the term "take" to bear its traditional common law meaning. *McDonnell v. United States*, 579 U.S. 550, 568-69 (2016) (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

As noted above, the ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Each of these verbs—with the *possible* exception of harm, *but see supra* 9-10—unquestionably describes an affirmative act directed toward a

particular subject. *See Harass*, Webster's New International Dictionary, *supra* ("to tire with repeated and exhausting efforts"); *Pursue*, Webster's New International Dictionary, *supra* ("To follow with a view to overtake; to follow eagerly, or with haste; to chase; as, to *pursue* a hare[.]"); *Hunt*, Webster's New International Dictionary, *supra* ("To follow or search for (game or prey) for the purpose, and with the means of capturing or killing[.]"); *Shoot*, Webster's New International Dictionary, *supra* ("To strike with anything shot; to hit with a missile; often to kill or wound with a missile discharged from a firearm; as, to *shoot* a deer[.]"); *Wound*, Webster's New International Dictionary, *supra* ("To hurt by violence."); *Kill*, Webster's New International Dictionary, *supra* ("To deprive of life; to put to death; to slay."); *Trap*, Webster's New International Dictionary, *supra* ("To catch, take, or make fall, in or as in a trap . . . as, to *trap* foxes or beaver[.]"); *Capture*, Webster's New International Dictionary, *supra* ("Act of seizing by force, or getting possession of by power or by stratagem; as, the capture of an enemy or a criminal."); *Collect*, Webster's New International Dictionary, *supra* ("To gather into one body or place; to assemble[.]"); *Sweet Home*, 515 U.S. at 719-20 (Scalia, J., dissenting) ("To 'harass, pursue, hunt, shoot, wound,

kill, trap, capture, or collect' are all affirmative acts . . . which are directed immediately and intentionally against a particular animal[.]").

Thus, under the *noscitur a sociis* canon, the term "harm" must likewise be understood as contemplating affirmative action directed towards a particular animal, as opposed to the remote and indirect effects on habitat the district court found DEP liable for.

**Third**, to construe "harm" as broadly as the district court did would conflict with the presumption against surplusage, which dictates "that each word Congress uses is there for a reason." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017). To construe "harm" so broadly as to include "habitat modification," and thus expand the meaning of "take" to encompass all acts and omissions done indirectly and by accident to populations of animals—as the district court did— would render superfluous every term in the statutory definition of "take." Such a broad interpretation of "harm" naturally encompasses every additional term contained within 16 U.S.C. § 1532(19). For example, if "harm" encompasses the effects that habitat modification stemming from wastewater discharges might have on an animal, then it most certainly includes the effects of more direct actions, such as

hunting an animal with a weapon. If that were the case, then, there would be no need for Congress to have added the words "harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect" because "harm" would have already encompassed those actions.

## B. The ESA's structure further counsels that Congress intended "take" to mean direct actions towards particular animals.

The overall structure of the ESA further counsels that Congress intended "take" to bear its traditional meaning, and that the district court's broad interpretation of the ESA must be rejected. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (holding that to determine a statute's plain meaning a reviewing court must "read the words 'in their context and with a view to their place in the overall statutory scheme'" (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))).

Here, the ESA contains a provision that is explicitly concerned with the prevention of habitat modification affecting listed species. Under ESA section 7's consultation requirements:

> Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or

> threatened species or result in the destruction or *adverse modification of habitat* of such species which is determined by the Secretary . . . to be critical[.]

16 U.S.C. § 1536(a)(2) (emphasis added).

The ESA further defines in detail what areas of land qualify as critical habitat for purposes of section 7's consultation requirements. *Id.* § 1532(5) (defining the term "critical habitat"). And it sets forth an intricate regulatory process for designating such land. *Id.* § 1533(b)(2) (setting forth a detailed process by which critical habitat shall be designated, including the requirement that economic impacts be assessed, and consideration be given to the exclusion of such areas where "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat," among other requirements). Thus, the fact that section 7 of the ESA expressly references the prevention of adverse habitat modification, whereas the ESA's provisions concerning "take" do not, *compare id. with* §§ 1538(a)(1), 1532(19), further counsels that Congress did not intend for "take" to be interpreted so broadly as to encompass habitat modification or other purely incidental harm to species. *See Corley v. United States*, 556 U.S. 303, 315 (2009) (presuming that Congress uses "distinct terms . . .

deliberately"); *Russello v. United States*, 464 U.S. 16, 23 (1983)

("[W]here Congress includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion." (quoting *United States v. Wong Kim*

*Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).

At bottom, this structural design shows that "take" does not include

habitat modification.

## C. The ESA's legislative history shows that "take" was not understood as applying to ordinary land uses that modify habitat.

Next, even if legislative history could trump a statute's text or

structure—which it cannot—the ESA's legislative history shows that

"take" does not include habitat modification.

For starters, in describing the land acquisition and funding

provisions which ultimately became section 5 of the ESA, *see* 16 U.S.C.

§ 1534, Senator Tunney, the floor manager of the bill that would become

the ESA, explained that: "[t]hrough [the] land acquisition provisions, we

will be able to conserve habitats necessary to protect fish and wildlife

from further destruction." *Sweet Home*, 515 U.S. at 727 (Scalia, J.,

dissenting) (quoting 119 Cong. Rec. 25,669 (1973) (statement of Senator Tunney)) (emphasis removed). Similarly, Representative Sullivan, the floor manager of the House bill, stated: "[T]he principal threat to animals stems from destruction of their habitat . . . . [The bill] will meet this problem by providing funds for acquisition of critical habitat[.]" *Id.* at 728 (quoting 119 Cong. Rec. 30,162 (statement of Representative Sullivan)) (emphasis removed). Representative Sullivan also noted that the funding provision would allow "the Department of Agriculture to cooperate with willing landowners who desire to assist in the protection of endangered species, but who are understandably unwilling to do so at excessive cost to themselves." *Id.* (quoting 119 Cong. Rec. 30,162) (emphasis removed). These statements show the "clear understanding" of legislators that "habitat destruction on private lands is to be remedied by public acquisition, and *not* by making particular unlucky landowners incur 'excessive cost to themselves.'" *Id.*

Additionally, a legislative committee removed a provision from the bill stating that "take" "includes 'destruction, modification, or curtailment of [the] habitat or range' of fish or wildlife." *Id.* at 693 (majority opinion); *see also id.* at 727 (Scalia, J., dissenting).

This all shows that legislators did not intend to prohibit habitat modification through the ESA's "take" prohibition. It also explains how the ESA "passed the Senate unanimously and the House with a 325 vote margin (336–11)." Daniel A. Farber, *The Conservative as Environmentalist: From Goldwater and the Early Reagan to the 21st Century*, 59 Ariz. L. Rev. 1005, 1024 (2017). Even Senator Barry Goldwater did not vote against the ESA. *Id.* To the extent that legislative history matters, it cuts against a broad reading of the term "take."

## D. Contrary to the district court's musings, "harass" refers to direct actions and not habitat modification.

Next, the district court was wrong when it alternatively suggested that the term "harass" in the ESA's definition of "take" also permits a broad understanding of the "take" prohibition. R. 201, at 12.

Just as "harm" must be read in light of its surrounding words, "harass" must be read in light of its surrounding words ("harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct"). 16 U.S.C. § 1532(19). Thus, given that the words in 16 U.S.C. § 1532(19) all convey a sense of direct action against

an individual injuring member of a species, *see supra* 11-12, "harass" must carry that same meaning.

The dissent in *Sweet Home* makes this point. While "'harass'" does "not require direct *applications of force*," the word still conveys "the sense of affirmative conduct intentionally directed against a particular animal or animals." 515 U.S. at 720 (Scalia, J., dissenting); *see also Harass*, Webster's New International Dictionary, *supra*. Thus, it does not include habitat modification. And it certainly does not include the remote effects of not more strictly regulating wastewater discharges as the district court wrongly concluded. R. 201, at 12.

Even the *Sweet Home* majority is in accord. The majority reasoned that "most" of the ESA's terms defining "take," such as "'harass,'" . . . refer to deliberate actions more frequently than does 'harm.'" 515 U.S. at 698 n.11 (majority opinion). It also noted that "'harass'" was a word describing "actions from which habitat modification does not usually result." *Id.*

What is more, Judge Reinhardt's majority opinion in *United States v. Hayashi* narrowly interpreting "harass" in the related Marine Mammal Protection Act bolsters this reasoning. 22 F.3d 859, 864 (9th Cir. 1993).

There, a federal agency accused a fisherman of violating the MMPA's prohibition on the "take" of "a marine mammal in United States waters" when he fired warning shots at some porpoises with the intention of scaring them off from eating his bait and not with the intention of hitting them. *Id.* at 861. The MMPA defines "take" as "*harass*, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* (quoting 16 U.S.C. § 1362(13)) (emphasis added). The MMPA failed to define "harass." *Id.*

The court held that "harass" could not be applied to trying to scare off porpoises from eating fishing bait. *Id.* at 864. It reasoned that grouping "'harass' with 'hunt,' 'capture,' and 'kill' as forms of prohibited 'taking'" showed that "'harassment'" must also "entail a similar level of *direct* intrusion." *Id.* (emphasis added).

So too with the ESA. Grouping "harass" with terms like "pursue," "hunt," "shoot," "wound," "kill," "trap," "capture," and "collect" shows that it too entails a similar level of direct intrusion on a species. Thus, the district court was incorrect to suggest that "harass" also encompasses habitat modification. R. 201, at 12. When it denied a motion for a stay pending appeal, the district court supplied no

explanation for its off-the-cuff remark regarding "harass[ment]" that "Plaintiff has also shown." *Id.* This Court should reject the district court's unsupported conclusion that "harassment" means habitat modification.

## II. Prior interpretations of the term "take" by the Supreme Court and the Service are neither binding, nor persuasive.

### A. The Service's "harm" definition is neither binding, nor persuasive.

As noted above, the ESA defines "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Amici argue that this means that "take" involves an affirmative action performed directly and intentionally toward a particular animal. *In accord*, *Sweet Home*, 515 U.S. at 714-36 (Scalia, J., dissenting).

Yet in 1975, the Service substantially expanded the scope of conduct subject to the ESA's take prohibition by promulgating a broad regulatory definition of "harm." *See* 40 Fed. Reg. 44,412, 44,416 (Sept. 26, 1975). As amended in 1981, *see* 46 Fed. Reg. 54,748, 54,750 (Nov. 4, 1981), that definition states in full: "*Harm* in the definition of 'take' in the Act means an act which actually kills or injures wildlife."

50 C.F.R. § 17.3. The definition continues: "Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

At the time of promulgation, the Service took the position that this interpretative rule encompasses mere *omissions* leading to the death or injury of species. *See* 46 Fed. Reg. at 54,750. It also noted that "harm" is not limited to "direct physical injury to an individual member of the wildlife species," but also refers broadly to "injury to a population." *Id.* at 54,748-49.[6]

Based on this definition of "harm," the Service has aggressively exercised its authority under the ESA to regulate, punish, and prohibit all manner of ordinary land-use activities on private property that might incidentally affect species (or populations of species) by modifying

---

[6] The Service's sister agency the National Marine Fisheries Service (NMFS) promulgated a materially identical definition of "harm," likewise broadly prohibiting habitat modification. *See* 50 C.F.R. § 222.102. The Service—exercising authority delegated by the Secretary of the Interior—administers the ESA as to most terrestrial and freshwater species. NMFS—exercising authority delegated by the Secretary of Commerce—administers the ESA with respect to most marine and anadromous species.

their habitats. *See generally* Comments of Pacific Legal Foundation, U.S. Fish & Wildlife Serv. and Nat'l Marine Fisheries Serv. Proposed Rule: Rescinding the Definition of "Harm" Under the Endangered Species Act, Docket No. FWS-HQ-ES-2025-0034 (May 19, 2025) (describing this phenomenon with reference to specific examples).[7]

The Service no longer agrees with its prior interpretation of "harm," and has—jointly with NMFS—issued a proposed rule to rescind the interpretative rules for "harm" and proposed adopting Justice Scalia's opinion in *Sweet Home* as the best reading of the ESA. *See* 90 Fed. Reg. 16,102, 16,103 (Apr. 17, 2025) ("[B]ecause our regulations do not accord with the single, best meaning of the statutory text, we propose to rescind the regulatory definition of 'harm' and rest on the statutory definition of 'take.'"). As DEP notes, *see* Br. of Appellant 36-37, this rescission rule may be finalized during the pendency of this appeal. But even if the Service's "harm" definition remains operative, it is neither binding, nor persuasive.

---

[7] *Available at* https://www.regulations.gov/comment/FWS-HQ-ES-2025-0034-232862.

*First*, the Service's interpretation cannot bind this Court given this Court's independent duty to interpret the ESA. *See Loper Bright Enters.*, 603 U.S. at 394 ("[C]ourts must exercise independent judgment in determining the meaning of statutory provisions."); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

*Second*, the Service's interpretation of "harm" as applying to habitat modification (as exemplified by the district court's application of it) is also unpersuasive. As argued above, the ESA's plain text, structure, and history belie the Service's interpretation of "harm," *see supra* 5-17—a position with which even the Service now agrees, *see* 90 Fed. Reg. at 16,103. This Court should likewise reject this broad definition of "harm," and decline to apply it in this action.

## B. The Supreme Court's prior interpretation of the ESA's take prohibition is neither binding nor persuasive.

### 1. The Supreme Court decided *Sweet Home* under the *Chevron* framework.

The Supreme Court's previous approach to the ESA's "take" prohibition likewise does not bind this Court. In 1995, a divided Supreme Court upheld the Service's broad regulatory definition of

"harm." *Sweet Home*, 515 U.S. at 703-04. It determined that the Service's "harm" definition was not unreasonable and therefore should be upheld under the (now defunct) *Chevron* framework. *See id.*

Under *Chevron*, courts would evaluate an agency's interpretation of the statute that it administers by first asking "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), *overruled by Loper Bright Enters.*, 603 U.S. at 412. If a court determined that "the intent of Congress is clear," then it had to "give effect to the unambiguously expressed intent of Congress." 467 U.S. at 843. But if the court determined that the statute was ambiguous, the court would then ask "whether the agency's answer is based on a permissible construction of the statute," and if so, defer to that interpretation. *Id.*

The Supreme Court decided *Sweet Home* at the second step of *Chevron*. It stated: "[w]e need not decide whether the statutory definition of 'take' compels the [Service's] interpretation of 'harm,' because our conclusions that Congress did not unambiguously manifest its intent to adopt respondents' [contrary interpretation] and that the

[Service's] interpretation is reasonable suffice to decide this case." *Sweet Home*, 515 U.S. at 703 (citing *Chevron*, 467 U.S. 837).

In deferring to the Service's "harm" definition under *Chevron*, the majority cited a broad dictionary definition of the term "harm" and applied that definition to the ESA's "context." *Sweet Home*, 515 U.S. at 697. The Court also relied on "the broad purpose of the ESA" to determine that the take prohibition reasonably can include habitat modification. *Id.* at 698-99 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)). And it relied upon subsequent enactments and legislative history to infer congressional endorsement of the Service's definition. *Id.* at 700-01.

Based on this, the Court concluded that we "owe some degree of deference to the [Service's] reasonable interpretation." *Id.* at 704. It also explained: "The proper interpretation of a term such as 'harm' involves a complex policy choice." *Id.* at 708. The Court concluded under the *Chevron* framework that this policy choice was thus entrusted to the Service for the agency to fill in the statutory gaps. *Id.*

Thus, the Court in *Sweet Home* did not definitively interpret the meaning of "take" in the ESA. As the Service itself has now correctly

observed, "*Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading." 90 Fed. Reg. at 16,103.

### 2. *Sweet Home* is not binding because the Supreme Court has rejected *Chevron*.

The Supreme Court has now rejected the *Chevron* framework for evaluating agency interpretations of federal statutes. In *Loper Bright*, the Court overruled *Chevron* and held that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . ." 603 U.S. at 412.

It is true that *Loper Bright* cautioned that overruling *Chevron* does "not call into question prior cases that relied on the *Chevron* framework," and explained that "[t]he holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412. *Sweet Home*, however, has no relevant *stare decisis* effect here. This is because—as a case decided at *Chevron* step two—the sum of *Sweet Home*'s holding is that interpreting "take" in the ESA "involves a complex policy choice," over which "Congress has entrusted the Secretary with broad discretion." *See Sweet Home*, 515 U.S. at 708

(citing *Chevron*, 467 U.S. at 865-66). As the Service has correctly observed "*Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading." 90 Fed. Reg. at 16,103. *Sweet Home* cannot bind this Court as to the best reading of the ESA, because it simply did not determine the ESA's best reading.

Moreover, some courts applying *Loper Bright* have concluded that its *stare decisis* shield preserves only "'specific agency actions' that the Supreme Court has already found lawful" and does not bind courts faced with a distinct agency action—even if it deals with the same statutory subject matter. *In re MCP No. 185*, 124 F.4th 993, 1002-03 (6th Cir. 2025). *Cf. also Tennessee v. Becerra*, 131 F.4th 350, 365 (6th Cir. 2025) ("So, while *Loper Bright* opens the door to new challenges based on *new* agency actions interpreting statutes, specific agency actions already resolved via *Chevron* deference analysis will not automatically fall."). No *specific agency action* is at issue in this case. Instead, this case is a citizen suit that a private plaintiff brought to *enforce* the ESA against DEP—not a facial challenge to the rule upheld in *Sweet Home*.

### 3. *Sweet Home* is not persuasive.

This Court should likewise decline to afford any persuasive weight to the Supreme Court's reasoning in *Sweet Home*. *Sweet Home's* reading is unpersuasive for the reasons discussed above, *see supra* 5-17, and for the reasons discussed in Justice Scalia's dissent in *Sweet Home* (joined by Justice Thomas and Chief Justice Rehnquist) concerning the ESA's text, structure, and history, *see* 515 U.S. at 714-36 (Scalia, J., dissenting). Additionally, *Sweet Home* heavily relied on "broad" statements of "purpose," and upon legislative history, to infer congressional intent. *Id.* at 700-01.

But "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). As the District of Columbia Circuit recently observed in a challenge to ESA regulations promulgated by NMFS, the type of purpose- and legislative-history-driven analysis exemplified by the Supreme Court's decision in *Sweet Home* "is a relic from a bygone era of statutory construction." *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595, 598 (D.C. Cir. 2023) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019)). The Ninth

Circuit has likewise rejected the idea that the ESA should be interpreted more broadly than other federal statutes. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1036, 1038 (9th Cir. 2023) (emphasizing that the ESA's terms, like those of any other statute, are to be interpreted according to their "ordinary or natural meaning" and rejecting "[t]he 'extremely broad[ ]' construction that the FWS, the Center, and the dissent advance[d]"). This Court should too.

## CONCLUSION

At bottom, the ESA's text, structure, and history show that it does not apply to mere habitat modification. Accordingly, DEP's purported *omissions* in insufficiently regulating *third-party* wastewater discharges, circuitously leading to habitat modification harming manatee *populations*, cannot, as a matter law, constitute a "take." Therefore, the district court's conclusion to the contrary should be reversed and the case remanded with instructions for the district court to enter summary judgment in favor of Defendant-Appellant. Congress

never intended the ESA to empower the federal government to regulate

all manner of ordinary land-use activities on private lands.

Dated: August 4, 2025    Respectfully submitted,

            /s/ Jeffrey D. Jennings

*Of Counsel*:        Jeffrey D. Jennings
Charles T. Yates      Pacific Legal Foundation
Pacific Legal Foundation   3100 Clarendon Blvd., Suite 1000
555 Capitol Mall, Suite 1290  Arlington, VA 22201
Sacramento, CA 95814   (Mailing address only)
(916) 419-7111      (202) 888-6881
cyates@pacificlegal.org    jjennings@pacificlegal.org

            Mark Miller
            Pacific Legal Foundation
            4440 PGA Blvd., Suite 307
            Palm Beach Gardens, FL 33410
            (561) 691-5000
            mark@pacificlegal.org

*Counsel for Amici Curiae*
*Save Crystal River and Pacific Legal Foundation*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,781 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Jeffrey D. Jennings
Jeffrey D. Jennings