No. 25-11612 & 25-11821

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

BEAR WARRIORS UNITED, INC., a Florida Not for Profit Corporation,

*Plaintiff-Appellee,*

v.

ALEXIS LAMBERT, in her official capacity as Secretary of the
DEPARTMENT OF ENVIRONMENTAL PROTECTION,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 6:22-cv-02048-CEM-LHP
Honorable Carlos E. Mendoza

**BRIEF OF APPELLEE**

Jessica L. Blome • Cal. Bar No. 314898
GREENFIRE LAW P.C.
2748 Adeline St., Suite A
Berkeley, California 94703
Telephone: (510) 900-9502 ext. 703
jblome@greenfirelaw.com

## Certificate of Interested Persons

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 and 26.1-2, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Bear Warriors United, Inc. – Appellee

2. Blackner, Lesley, G. – Counsel for Appellee Bear Warriors United, Inc.

3. Blome, Jessica L. – Counsel for Appellee Bear Warriors United, Inc.

4. Brown, Jeffrey – Counsel for Appellant Secretary Lambert

5. Corbani, Kelley F. – Counsel for Appellant Secretary Lambert

6. Consovoy McCarthy PLLC – Counsel for Appellant Secretary Lambert

7. Greenfire Law, PC – Counsel for Appellee Bear Warriors United, Inc.

8. Harris, Jeffrey M. – Counsel for Appellant Secretary Lambert

9. Lambert, Alexis, in her official capacity as Secretary of the FDEPartment of Environmental Protection – Appellant

10. Mendoza, Honorable Carlos E. – Judge for the United States District Court of the Middle District of Florida

11. Price, Honorable Leslie H. – Magistrate Judge for the United States District Court for the Middle District of Florida

12. Venable, Nicholas B. – Counsel for Appellant Secretary Lambert

13. Weir, Bryan – Counsel for Appellant Secretary Lambert

Dated: September 26, 2025          */s/ Jessica L. Blome*
                                    Jessica L. Blome
                                    *Counsel for Plaintiff-Appellee*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 28-1(b), the undersigned counsel of record for Appellee certifies that Bear Warriors United, Inc., a 501(c)(3) nonprofit corporation, as of this date, does not have a corporation and that no publicly held corporation holds 10% or more of its stock.

Dated: September 26, 2025       */s/ Jessica L. Blome*
                                         Jessica L. Blome
                                         *Counsel for Plaintiff-Appellee*

## Statement Regarding Oral Argument

Plaintiff-Appellee Bear Warriors United, Inc. believes the dispositive issue or issues involved in this case have been authoritatively decided by the Eleventh Circuit and the United States Supreme Court. Appellee nevertheless requests oral argument so that counsel for both parties may answer questions the justices may have about questions of procedural history, evidence, and law.

# Table of Contents

I.     Introduction and Summary of the Argument ................................................1

II.    Statement of the Issues..............................................................................3

III.   Statement of the Case.................................................................................6

     A.      Procedural History ...........................................................................6

     B.      Statement of the Facts.....................................................................11

         1.      FDEP has complete regulatory control over wastewater discharges into the North Indian River Lagoon.......................11

         2.      FDEP authorizes the discharge of nutrients to the North Indian River Lagoon, causing its hyper-eutrophication. ..........13

         3.      FDEP harms and harasses Florida Manatees in the North Indian River Lagoon...............................................17

IV.   Argument....................................................................................................21

     A.      Plaintiff had standing to pursue its citizen suit for unlawful take in violation of Section 9 of the Endangered Species Act against the State of Florida...................................................................21

         1.      Bear Warriors' members have suffered and continue to suffer aesthetic and economic injuries that are concrete and particularized. ...........................................................24

         2.      FDEP caused Bear Warriors' injuries. .....................................27

         3.      The district court's injunction is designed to remedy Bear Warriors' injuries. ...................................................35

     B.      Appellee pled and proved that FDEP has violated Section 9 of the Endangered Species Act and is likely to violate Section 9 in the future if not enjoined......................................................38

     C.      The U.S. Fish & Wildlife Service's "Proposed Harm Rescission Rule" does not warrant vacatur of the district court's decision, but at most, a remand to district court or supplemental briefing. .......42

     D.      This action does not violate the Tenth Amendment...........................46

     E.      The injunction is narrowly tailored to bring FDEP into compliance with the Endangered Species Act. ..................................51

V.     Conclusion .................................................................................................54

**Table of Citations**

## Cases

*American Bird Conservancy v. Harvey*,
  232 F.Supp.3d 292 (E.D.N.Y. 2017) ...................................51

*Animal Legal Def. Fund v. Glickman*,
  154 F.3d 426 (D.C. Cir. 1998) ..........................................22

*Animal Prot. Inst. v. Holsten*,
  541 F.Supp.2d 1073 (D. Minn. 2008) ........................28, 51

*Animal Welfare Institute v. Martin*,
  588 F.Supp.2d 70 (D. Maine 2008)...................................51

*Aransas Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014).............................................41

*BBX Cap. v. FDIC*,
  956 F.3d 1304 (11th Cir. 2020).........................................34

*Burban v. City of Neptune Beach, Fla.*,
  920 F.3d 1274 (11th Cir. 2019).........................................48

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016)................................................27

*Citizens for Resp. & Ethics in Washington v. Trump*,
  593 F.3d 178 (2d Cir. 2019)..............................................35

*Ephraim Freightways, Inc. v Red Ball Motor Freight, Inc.*,
  376 F.2d 40 (10th Cir. 1967).............................................52

*FDA v. Alliance for Hippocratic Oath*,
  602 U.S. 367 (2024)...........................................................23

*Florida Key Deer v. Paulison*,
  522 F.3d 1133 (11th Cir. 2008) .........................................52

*Florida Panthers v. Collier County*,
  2016 WL 1394328 (M.D. Fla. 2016) .................................41

*Friends of the Earth, Inc. v. Laidlaw Env'tl Services*,
  528 U.S. 167 (2000)...........................................................22

*Gibbs v. Babbitt*,
  214 F.3d 483 (4th Cir. 2000)...............................................1

*Jacobson v. Fla. Sec'y of State,*
  974 F.3d 1236 (11th Cir. 2020)..........................................................................37

*Japan Whaling Association v. American Cetacean Society,*
  478 U.S. 221 (1986)..........................................................................................23

*Kuehl v. Sellner,*
  887 F.3d 845 (8th Cir. 2018)............................................................................22

*Larson v. Valente,*
  456 U.S. 228 (1982)..........................................................................................36

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.,*
  148 F.3d 1231 (11th Cir. 1998)......................................1, 30, 37, 40, 49

*Loggerhead Turtle. Cnty. Council of Volusia Cnty, Fla.,*
  92 F.Supp.2d 1296 (M.D.Fla. 2000)..............................................................47

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)....................................................................................22, 23

*Marcum v. United States,*
  621 F.2d 142 (5th Cir. 1980)..............................................................................9

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)..........................................................................................36

*Missouri v. Holland,*
  252 U.S. 416 (1920)............................................................................................1

*MSPA Claims 1, LLC v. Tene Fla., Inc.,*
  918 F.3d 1312 (11th Cir. 2019)......................................................................22

*Murphy v. NCAA,*
  584 U.S. 453 (2018)..........................................................................................49

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
  894 F.3d 95 (2d Cir. 2018)..............................................................................27

*National R.R. Passenger Corp. v. State of Florida,*
  929 F.2d 1532 (11th Cir. 1991)......................................................................46

*Palila v. Hawaii Dept. of Land & Natural Resources,*
  852 F.2d 1106 (9th Cir. 1988)........................................................................51

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,*
  879 F.3d 1142 (11th Cir. 2018)................................................................23, 39

*Reno v. Condon,*
  528 U.S. 141 (2000)..........................................................................................48

*Seattle Audubon Society v. Southerland*,
  2007 WL 1300964 (D. W.D. Washington 2007)................................................50

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976).......................................................................................27

*Singleton v. Wulff*,
  428 U.S. 106 (1976).....................................................................................46

*Smith v. State of Georgia*,
  684 F.2d 729 (11th Cir. 1982) .......................................................................8

*Strahan v. Coxe*,
  127 F.3d 155 (1st Cir.1997) .................................................29, 47, 48, 49, 50, 52

*Strahan v. Secretary, Mass. Executive Office of Energy*,
  458 F.Supp.3d 76 (D. Mass 2020) .................................................................50

*Summers, et al. v. Earth Island Institute, et al.*,
  555 U.S. 488 (2009).....................................................................................23

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978).....................................................................................53

*Travis v. Reno*,
  163 F.3d 1000 (7th Cir. 1998) ......................................................................49

*TVA v. Hill*,
  437 U.S. 153 (1978).......................................................................................1

*Wash. Toxics Coal. Envtl. Prot. Agency*,
  413 F.3d 124 (9th Cir. 2005).........................................................................53

*Wooden v. Bd of Regents of Univ. Sys. of Georgia*,
  247 F.3d 1262 (11th Cir. 2001) ....................................................................26

## Statutes

16 U.S.C. § 1531(b)...................................................................1, 42, 43, 44, 53

16 U.S.C. § 1532 ..............................................................................2, 38, 50

16 U.S.C. § 1532(13)..................................................................................47

16 U.S.C. § 1538 ...................................................................................6, 47

16 U.S.C. § 1538(a)(1)(B).............................................................................2

16 U.S.C. § 1539(1)(B) ...............................................................................10

16 U.S.C. § 1539(a)(1) .................................................................................2

16 U.S.C. § 1539(a)(1)(B).................................................45, 51

16 U.S.C. § 1539(a)(2)(A)(ii)..............................................51

16 U.S.C. § 1540(g)(2)(A)(i)...............................................6

16 U.S.C. §§1531-1544......................................................1

26 U.S.C. 1313(d...........................................................13

28 U.S.C. § 2201...........................................................6

Fla. Statute § 381.0065(3)(a).............................................12

Fla. Statute § 403.061....................................................11

Fla. Statute § 403.061(8).................................................12

Fla. Statute § 403.067(1).................................................11

Fla. Statute § 403.067(7).................................................12

Fla. Statute § 403.086....................................................12

Fla. Statute § 403.088....................................................12

Laws of Florida, Ch. 2020-150, § 2 .......................................12

## Regulations

40 Fed. Reg. 44,412.......................................................43

50 C.F.R § 17.95..........................................................13

50 C.F.R. § 17.11.........................................................17

50 C.F.R. § 17.3......................................................38, 42, 44

50 C.F.R. pt. 17..........................................................43

Fla. Admin. Code R. 62-4.030..............................................12

Fla. Admin. Code R. 62-4.070..............................................12

Fla. Admin. Code R. 62-6.005..............................................12

## Rules

Fed. R. Civ. P. 56(g).....................................................8

# I. Introduction and Summary of the Argument

"In response to growing concern over the extinction of many animal and plant species, Congress enacted the Endangered Species Act of 1973." *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000). Congress' response was "powerful and substantially unequivocal." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1246 (11th Cir. 1998). In the years following adoption of the Endangered Species Act, 16 U.S.C. §§1531-1544 (ESA), it has been considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and embodies Congress's "commitment to 'halt and reverse the trend toward species extinction, whatever the cost.'" *TVA v. Hill*, 437 U.S. 153, 180, 184 (1978). The stated purpose of the ESA is to:

> Provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

16 U.S.C. §1531(b).[1] To that end, Section 9 of the ESA prohibits the "take" of threatened or endangered species unless specifically authorized in an Incidental

---

[1] Subsection (a) incorporates the Convention on International Trade in Endangered Species of Wild Fauna and Flora, or CITES, adopted pursuant to the Treaty Clause, Article II, Section 2, Clause 2 of the U.S. Constitution. *See also Missouri v. Holland,* 252 U.S. 416 (1920) (upholding the constitutionality of the Migratory Bird Treaty Act, which Congress adopted to implement a treaty).

Take Permit (ITP). 16 U.S.C. §§1538(a)(1)(B), 1539(a)(1). "Take" means to

"harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

attempt to engage in any such conduct." 16 U.S.C. §1532(19).

Nobody disputes that the North Indian River Lagoon (North IRL) is critical

habitat for Florida Manatees, principally because it historically supplied 70,000

acres of healthy seagrass for manatee forage. Through a broad grant of statutory

authority set forth in Chapter 403 of the Florida Statutes and their implementing

regulations, FDEP regulates, permits, and authorizes human wastewater disposal

via septic tanks and wastewater treatment plant infrastructure, including through

thousands of miles of pipes, lift stations, and wastewater treatment plants, into the

North IRL watershed. The district court concluded, after fact-finding and argument

on cross motions for summary judgment and a two-day bench trial, that FDEP's

entire sewage regulatory regime caused and continues to cause the degradation of

seagrass and other food sources Florida Manatees require for survival. The district

court concluded that FDEP has unlawfully taken Florida Manatees in the North

IRL by harm and harassment and enjoined FDEP to end its unlawful take of

manatees. Plaintiff-Appellee Bear Warriors United, Inc. now asks this Court to

uphold the district court's thoughtful, well-supported decision to end FDEP's

violations of federal law.

## II.     Statement of the Issues

The issues before the Court are whether Bear Warriors' members aesthetic, recreational, conservation, and economic injuries confer standing to sue FDEP as a citizen enforcer of Section 9 of the ESA; whether FDEP's sewage regulatory regime has caused the death of seagrasses in the North IRL, the Florida Manatees principal forage, thereby interfering with manatees' natural feeding and reproduction and causing malnourishment, starvation, and death; whether the Tenth Amendment bars Bear Warriors from suing FDEP for violating Section 9 of the ESA; and whether the district court properly enjoined FDEP to obtain an ESA permit to remedy its ongoing violations of federal law.

However, in its Statement of the Issues and throughout Appellant's Brief, FDEP mischaracterizes Bear Warriors' underlying case and this appeal as only concerning septic tanks. In fact, Bear Warriors' lawsuit challenged FDEP's entire sewage regulatory regime, which governs septic tanks as well as municipal, industrial, privately-owned package plants, and commercial wastewater treatment facilities. From the moment Bear Warriors notified FDEP of its intent to file this citizen suit challenging the State's ongoing violations of the ESA, FDEP has mounted a fulsome defense of its woefully under-protective sewage regulations.

Doc.24-1 at 99, ¶6; R.59-1 (60-day Notice of Intent to Sue, dated Nov. 17, 2021).[2]

Bear Warriors' lawsuit, in each of its iterations, unequivocally challenged every way regulated untreated, under-treated, and treated sewage enters the North IRL pursuant to FDEP authorizations. Doc. 24-1 at 33, ¶¶1-4 (original complaint); 49, ¶¶1-4 (amended complaint); 97, ¶¶1-4 (second amended complaint); *see also id.* at p. 192 (order on summary judgment).

Moreover, there can be no doubt that the district court specifically considered whether sources other than septic tanks caused the collapse of the North IRL's seagrasses. *See, e.g.* Doc.24-1 at 198. In its order granting Plaintiff's motion for summary judgment, the district court acknowledged FDEP's argument that the "adverse effects on seagrasses are the product of 'perturbations' by hurricanes and tropical storms" and "anthropogenic climate change." *Id.* (citing R.102 at 8). But, the court explained, "Defendant provides no independent evidence to support its theory. Instead, Defendant misconstrues the testimony of Plaintiff's expert, Dr. Peter Barile." *Id*. In finding for Plaintiff on summary judgment, the district court found, without reservation, that: "[E]utrophication from OSTDS *and* wastewater treatment plant discharges can be predicted as a function of population growth and is not solely caused by natural weather events." Doc.24-1 at 202 (citing R.103 at

---

[2] Appellee's citation format matches Appellant's Brief. Citations to the district court docket are in the format R.X at Y. Citations to this Court's docket are in the format Doc.X at Y.

97). Ultimately, the district court concluded that, "discharges [of wastewater from wastewater treatment plants and OSTDS] made pursuant to FDEP regulations have resulted in an excess of nutrients in the North IRL," which ultimately caused the "taking of manatees under the ESA." Doc.24-1 at 204.

Despite this clear record of allegations, evidence, and district court findings, Appellant's Brief erroneously states that Bear Warriors challenged FDEP's regulation of septic tanks only. Examples include FDEP's mischaracterization of the scope of the litigation and issues on appeal in its Statement of Issues: "Plaintiff . . . sued the [FDEP] under the [ESA] to prevent [F]DEP from issuing permits for septic tanks that are allegedly contributing to manatee deaths in the [IRL]." Doc.22 at 1. In its discussion of "alleged harm to manatees in the [IRL]," Appellant's Brief fixates exclusively on septic tanks: "Plaintiff is an environmental group whose members claim to be concerned about the effects of excess nutrients released by septic tanks on the manatee population in the [IRL]." Doc.22 at 4. In the next paragraph, FDEP incredulously attributes legal error to Plaintiff for its alleged—but untrue—failure to challenge FDEP for authorized wastewater discharges from sources other than septic tanks: "But septic systems are far from the only source of nitrogen in the Lagoon . . . ." *Id.* at 5. It is hard to square FDEP's characterization of the scope of this litigation and appeal with reality.

## III. Statement of the Case

### A. Procedural History

Bear Warriors brought this action against FDEP under Section 9 of the ESA, 16 U.S.C. §1538, to challenge FDEP's ongoing take of Florida Manatees in the North IRL. As required by the ESA, 16 U.S.C. §1540(g)(2)(A)(i), Bear Warriors sent FDEP a detailed sixty-day notice letter setting forth Plaintiff's allegations, including that FDEP's inadequate sewage regulatory regime had caused the death of seagrasses, the Florida Manatees primary and preferred forage, in the North IRL. R.59-1 (60-day Notice of Intent to Sue, dated Nov. 17, 2021). Due to the death of seagrasses, Bear Warriors alleged that threatened manatees in the North IRL suffered harm and harassment in the form of malnourishment, starvation, and death in violation of the ESA's prohibition on the take of threatened and endangered species. *Id.* Plaintiff filed its original two-count complaint on November 4, 2022, alleging a single violation of the ESA, 16 U.S.C. §1538, and requesting declaratory relief, 28 U.S.C. §2201. Doc.24-1 at 52-56. Bear Warriors twice amended the complaint. *Id.* at 58, 96.

FDEP moved to dismiss Bear Warriors' complaint for lack of standing, Eleventh Amendment immunity, pursuant to the anti-commandeering doctrine, and for failure to adequately demonstrate that FDEP proximately caused the take of manatees in the North IRL. R.64. Bear Warriors had included standing declarations

from its members as exhibits to its second amended complaint, which it re-filed in connection with its motion for summary judgment. *See* R.91-1 (Bear Warriors); R. 91-6 (Pflug); R.91-7 (Thompson). The district court considered these standing declarations and held that Bear Warriors had demonstrated standing as a matter of law. Doc.24-1 at 150-156. The district court denied FDEP's motion to dismiss on all remaining grounds, concluding that the Eleventh Amendment does not bar citizen suits against the State of Florida under the ESA, Doc.24-1 at 156-160; that Bear Warriors' request for injunctive relief does not violate the anti-commandeering doctrine, Doc.24-1 at 161-164; and that Bear Warriors sufficiently pled facts demonstrating that FDEP's sewage regulatory regime caused the taking of manatees in violation of Section 9 of the ESA, Doc.24-1 at 164-175.

Both parties moved for summary judgment. R.91, 92, 101, 102, 108, 109. The district court granted Bear Warriors' motion in part and denied FDEP's motion. Doc.24-1 at 205. The district court held that Bear Warriors had standing to sue under Section 9 of the ESA, Doc.24-1 at 194; that the Eleventh Amendment does not insulate Florida from suit under the ESA, Doc.24-1 at 195; and that FDEP unlawfully took Florida Manatees in the North IRL by harm and harassment in violation of Section 9 of the ESA, Doc.124-1 at 195-205.

In its order on summary judgment, the district court explicitly adopted

certain findings as a matter of law: "As set forth at length above, most of the facts

of this case are not in dispute. Plaintiff has established,"

> (1) FDEP has regulatory authority over the wastewater discharge from wastewater treatment plants and OSTDS [septic tanks];
> (2) discharges made pursuant to FDEP regulations have resulted in an excess of nutrients in the North IRL;
> (3) those nutrients led to the death of seagrasses and promoted harmful algae blooms; and
> (4) previously, the death of seagrasses has caused the taking of manatees under the ESA.

*Id.* (citing Fed. R. Civ. P. 56(g)). "As such, the <u>only remaining issue of fact for the</u>

<u>jury</u> is whether there is an ongoing risk of manatee takings under FDEP's

regulatory regime." *Id.* at 204 (emphasis added).

After entering its order on summary judgment, the district court set a status

conference to ask the parties how they would like to handle the "one remaining

issue" before the court. Doc.24-1 at 22 (*see* R.135—139); R.149 at 3:14-22; *see*

*also* Doc.24-1 at 203. FDEP's counsel moved to re-open expert discovery, so

FDEP could retain a manatee expert to support its position at trial. R.149 at 9:12-

23; 18:23-19:8. Plaintiff objected. Tr.9:2-8. The court took the questions under

advisement and took a short break. R.149 at 9:12-23.[3] Following the break, the

---

[3] After the break, the district court advised the parties that it, found a case in the Eleventh Circuit from 1982, *Smith v. State of Georgia,* 684 F.2d 729 at 733 (11th Cir. 1982), and here's the relevant language applicable to the matter at hand: Quote, 'Although the

court denied FDEP's request to reopen discovery and set a trial. R.140, 141, 144, 145.

The parties appeared for trial in March, on the "only remaining issue" of ongoing take. Doc. 24-1 at 25-26, R.164, 165. After hearing from Bear Warriors' experts, the Florida Fish & Wildlife Conservation Commission's (FWC) manatee veterinarian, and FDEP's water quality regulators, the district court entered judgment for Bear Warriors. Doc.124-1 at 207. In its opinion, the district court again found that Bear Warriors had standing, Doc.124-1 at 212-216; that the anticommandeering doctrine did not bar the action, Doc.124-1 at 216-218; and that there is an ongoing risk that FDEP will "take" Florida Manatees in violation of the ESA, Doc.124-1 at 218-226. The district court ordered Bear Warriors "to file a proposed injunction detailing the relief it seeks." Doc.124-1 at 227.

The district court entered judgment in favor of Bear Warriors on April 14, 2025, Doc.124-1 at 229. Bear Warriors filed a proposed injunction, which it supported with expert declarations. R.174-1-174-6. FDEP requested leave to

---

district court's findings of fact will be upheld unless clearly erroneous, Federal Rule of Civil Procedure 52(a), we note that the burden of demonstrating clear error is not so great when the finding is based solely on documentary evidence, as is the case here.' And they were citing a case from the Fifth Circuit in 1980 that went into it with a bit more detail styled at *Marcum v. United States,* 621 F.2d 142 (5th Cir. 1980).

R.149 at 11:3-20.

oppose Bear Warriors' proposed injunction. R.175, 179. FDEP used its opposition

to re-assert its constitutional and causation arguments; it did not counter any of

Bear Warriors' expert opinions regarding the necessity or effectiveness of the

injunction. R.180. The district court entered its permanent injunction on May 19,

2025, ordering FDEP to:

1.   Apply for an Incidental Take Permit (ITP) pursuant to 16 U.S.C. §1539(1)(B).

2.   Until FDEP obtains an ITP permit, establish a biomedical monitoring program for manatees within the North IRL modeled on an established program in Crystal River, Florida.

3.   Until FDEP obtains an ITP permit, establish a supplemental feeding program for manatees in the North IRL.

4.   Until FDEP obtains an ITP permit, submit quarterly reports to the district court documenting adult and neonatal manatee mortalities and strandings.

5.   Until FDEP obtains an ITP permit, submit quarterly reports to the district court regarding water quality, harmful algae blooms, seagrass data and macroalgae conditions in the North IRL.

6.   Until FDEP obtains an ITP permit and effective July 17, 2025, cease to issue new septic tank permits in the North IRL watershed.

Doc.124-4 at 175-178. The district court retained jurisdiction over the matter until

FDEP complied with the district court's order to obtain its ITP. Doc.124-4 at 177.

The district court rejected FDEP's motion to stay injunction pending appeal

on June 9, 2025. Doc.124-4. Yet again the district court rejected FDEP's arguments

on standing, Doc.124-4 at 182-187; the anticommandeering doctrine, Doc.124-4 at

187-190; and causation, Doc.124-4 at 190-192. FDEP then moved the Eleventh

Circuit for a stay of the district court's injunction pending appeal, Doc.6, but this

Court denied FDEP's motion. Doc.16. The Eleventh Circuit panel rejected three

arguments raised by FDEP in support of the stay, finding that FDEP failed to

establish a substantial likelihood of success on the merits. Doc.16 at 4 (*see, e.g.*

"We see no likely clear error" in the district court's finding as to causation.)

**B.     Statement of the Facts**

As a preliminary matter, FDEP did not produce any evidence to contradict

the following Statement of Facts, whether through declaration, live witness

testimony, or documentary evidence. Thus, these facts are all that exist in the

record:

**1.     FDEP has complete regulatory control over wastewater discharges into the North Indian River Lagoon.**

Chapter 403 of the Florida Statutes unambiguously assigns to FDEP "the

power and the duty to control and prohibit pollution of [ ] water." §403.061, Fla.

Stat. Pursuant to Chapter 403, FDEP is the "lead agency" charged with

administering the state's regulatory programs established to "promote

improvements in water quality throughout the state through the coordinated control

of point and nonpoint sources of pollution." §403.067(1), Fla. Stat. As such, FDEP

is authorized to establish and allocate total maximum daily loads (TMDLs) for

discharge of pollutants into the state's impaired waters, and to implement these

through rules adopted by the Secretary, *id*. §403.067(6), and through basin management action plans (BMAPs) and permits. §403.067(7),, §403.088.

FDEP also has primary responsibility for regulating wastewater treatment plants and is authorized to "issue such orders as are necessary to effectuate the control of air and water pollution." §§403.061(8), 403.067(7), 403.086, Fla. Stat. In 2021, FDEP assumed primary responsibility for administering the state's regulatory program for septic tanks. *See* Ch. 2020-150, §2, Laws of Fla.; §381.0065(3)(a), Fla. Stat.

Departmental rules further underscore the FDEP's authority to issue and deny permits and place conditions in permits to ensure that "[a]ny stationary installation which will reasonably be expected to be a source of pollution" will comply with water quality standards. Fla. Admin. Code R. 62-4.030, 62-4.070. FDEP regulations addressing the placement and installation of Onsite Sewage Treatment and Disposal Systems (OSTDS) or "septic tanks" further provide that "[s]ewage waste and effluent from onsite sewage treatment and disposal systems must not be discharged onto the ground surface or directly or indirectly discharged into ditches, drainage structures, ground waters, surface waters, or aquifers." Fla. Admin. Code Ann. R. 62-6.005. FDEP has the authority to revoke and deny permits that violate water quality standards and a duty to establish rules and conditions that effectively prevent discharges of human sewage into surface waters

that flow into the IRL under §381.0065(3)(a), Fla. Admin. Code R. 62-6.005. It

also has exclusive enforcement authority over Florida's sewage regulatory regime.

### 2. FDEP authorizes the discharge of nutrients to the North Indian River Lagoon, causing its hyper-eutrophication.

The North IRL comprises the part of the Indian River Lagoon that stretches

from Turnbull Creek to the Melbourne Causeway in East-Central Florida. R.91-30

at 3; *see also* R.91-23. The entire IRL, including the North IRL, is designated as

"critical habitat" for the Florida Manatee under the ESA. 50 C.F.R §17.95. The

U.S. Fish & Wildlife Service's Manatee Recovery Plan recognizes the North IRL

as "the most important spring habitat on the East Coast of Florida[.]" R.91-16 at

18. According to Dr. Martine deWit, D.V.M., an associate research scientist with

the FWC with primary responsibility over Florida manatee health, "[A]ll of the

manatees on the Atlantic coast . . . will spend time in the Indian River Lagoon at

some time in the year." R.93 at 79. The North IRL provides "vital habitat for

manatees in all seasons and is central in manatee migration on [the Florida] coast."

R.91-26 at 1.

FDEP has designated the North IRL as an "impaired water" under the Clean

Water Act, 26 U.S.C. §1313(d). R.91-30 at 2. Since 1996, the National Oceanic

and Atmospheric Administration (NOAA) has characterized the North IRL as a

"hypereutrophic estuary with degraded water quality and harmful algal blooms that

no longer support significant seagrass coverage." R.91-17 at 40; R.91-30 at 6; *see*

*also* R.91-17 at 6. According to Plaintiff's expert Dr. Peter Barile, Senior Scientist with Marine Research & Consulting, Inc., "eutrophication is the overabundance of nutrients in a body of water that results in harmful algal blooms, fish kills, and in some cases ecosystem collapse. Eutrophication is among the most serious threats to the function and services supported by coastal ecosystems." R.91-4. at 6 (citing NOAA).

The primary cause of hyper-eutrophication in the North IRL is the transport of human-wastewater-derived nitrogen from septic tanks and wastewater treatment plants regulated by FDEP into the lagoon. *See* R.91-30 at 4 ("Human wastewater including septic tanks is the major source of excess nitrogen in the Indian River Lagoon and is underestimated in past nutrient loading models.") (citing R.91-20); R.91-33; R.91-32; R.91-35. Twenty-five years ago, the Florida Legislature enacted the Indian River Lagoon System and Basin Act of 1990 (IRL Act). In its findings, the Legislature recognized that human wastewater discharges into the North IRL from both septic tanks and human wastewater treatment plants have destroyed the lagoon's water quality. R.91-22. The preamble to the IRL Act provides, in part:

> WHEREAS, studies related to developing the Indian River Lagoon SWIM Plan have established that the physical and ecological characteristics of the system, in combination with threats posed by storm water discharges and urbanization within the drainage basin, make the Indian River Lagoon System unsuitable for future disposal of sewage effluent even if advanced waste treatment is provided, and

> WHEREAS, restoration of the Indian River Lagoon System cannot be accomplished without achieving reductions in nutrient loadings from existing sewage treatment facilities, and
>
> WHEREAS, package sewage treatment plants and improper use of septic tanks in certain areas pose a continuing threat to the water quality of the Indian River Lagoon System …

*Id.* Thus, FDEP-authorized, sewage-induced eutrophication is uniformly regarded as the primary cause of the North IRL's collapse and resulting seagrass loss. *Id.*; R.91-33 at 84; R.91-32 at 1, 13; R.91-35 at 1.

To reverse eutrophication in the North IRL, FDEP developed and published the North IRL Basin Management Action Plan, or BMAP, with the goal of restoring water quality by reducing the total maximum daily load, or TMDL, of nitrogen and phosphorus loading into the lagoon sufficient to limit harmful algae blooms (HABs) and restore historic seagrass coverage. R.91-30 at 12, 14; *see also* R.91-23 at 12. According to the North IRL BMAP, "The excessive loading to the [North IRL], as described [in] the FDEP's 2021 [North IRL] BMAP report, indicates that ecosystem disruption has occurred, and that nutrient loads of both nitrogen and phosphorus must be reduced by nearly 50% or more for the restoration of the [North IRL] ecosystem." R.91-30 at 6 (citing R.91-23).

On April 25, 2024, FDEP publicly announced that nitrogen and phosphorus loading reduction levels established in the 2021 BMAP are now predicted to flatline through the year 2031; therefore, FDEP will not meet the BMAP's nutrient

reduction goals. *Cf.* R.91-23 to R.91-24 at 38; *see also* R.91-30 at 19 ("The most recent seagrass survey by the [St. Johns River Water Management District] . . . indicates that seagrass coverage in the [North IRL] continues to be low (1-3%), and "ecologically irrelevant" in the [North IRL] for at least the past 8 years.").

At trial in March 2025, Dr. Barile summarized his review of FDEP's research into North IRL rehabilitation as follows:

> The FDEP's own data suggests that they are not mitigating nutrient loads adequately and quickly enough to mitigate the macroalgal blooms and cause a result in seagrass recovery quick enough in the near future. So their own data shows that through 2030, we cannot expect the water quality improvements that would result in the recovering of the health of the northern Indian River Lagoon.

Doc.24-3 at 218:14-20. In its order after trial, the district court observed, "Plaintiff has offered evidence that excess nutrients led to depletion of the seagrass [in the North IRL], and [FDEP] has not submitted any evidence to create an issue of fact." Doc.24-1 at 199; *see e.g.* Plf's Tr. Exh. 9 at 1("it could take 12-17 years to start seeing [seagrass] recovery"). "In [Dr. Barile's] opinion, extensive nutrient loading and pollution in the North IRL is continuing to result in significant habitat modification that would harm manatees by destroying seagrasses—their primary food source." *Id.* "What all this means is that FDEP would have to reduce nutrients entering the IRL to a low enough level and for a long enough time for nutrients to cycle out of the system to allow seagrasses to return at significant levels." *Id.* at 223.

### 3. FDEP harms and harasses Florida Manatees in the North Indian River Lagoon.

The Florida Manatee (*Trichechus manatus latriostris*) is a subspecies of the West Indian Manatee found in the coastal and associated waters of Florida. R.91-38 at 4; *see also* R.91-17 at 21. The West Indian Manatee is a federally listed threatened species. 50 C.F.R. §17.11. Florida Manatees "are herbivores that feed opportunistically on a wide variety of submerged, floating, and emergent vegetation." R.91-16 at 21 (U.S. Fish & Wildlife Service, Florida Manatee Recovery Plan). But seagrass is the Florida Manatee's preferred forage. *Id.* The average adult manatee weighs 2,200 pounds but can weigh as much as 4,000 pounds and consumes between 4% and 15% of its weight in aquatic plants daily. *Id.* at 6; *see generally* R.91-31.

Historically, extensive seagrass beds covered the Indian River Lagoon, including the North IRL. Through baseline surveys in 1943, the St. Johns River Water Management District documented seagrass coverage in the IRL at 70,000 acres. R.91-30 at 9-10; *see also* R.91-36 at 2. Seagrass used to be the manatees' primary food in the North IRL. R.91-16 at 21, 96; R.91-31 at 2 (A change in seagrass availability "would create a measurable change in the diet of manatees in the IRL.").

The North IRL lost 50-to-90% of its historical seagrass cover between 2009 and 2019. R.91-30 at 14. Predictably, as seagrass disappeared from the North IRL,

and the manatees' diet shifted to forage with poor nutritional value—including toxic macroalgae—malnutrition, starvation, other health problems have manifested in North IRL manatees. R.91-38 at 5; R.91-30 at 17; R.91-31 at 5 ("The results of our study confirm that IRL manatees experienced a dietary shift from primarily consuming seagrasses to mainly feeding on algae . . .," resulting in a mass die-off of manatees in 2013).

Two Unusual Mortality Events, or UMEs, involving manatees have occurred in the North IRL, one from 2011 to 2013 (R.91-38 at 3) and one from 2020 to 2022 (R.91-28 at 2). A UME is "mass mortality. So high numbers of mortality and morbidity in manatee rescues that need further investigation and require a [ ] response." R.93 at 23. FWC and its federal partners attributed the 2013 UME to manatees' consumption of harmful toxic algae that flourished in the North IRL after the death of seagrasses. Doc.24-3 at 69-71; *see also* Plf's Tr. Exh. 11. FWC and its partners "attributed the [2020-2022] UME to starvation due to the lack of seagrasses in the Indian River Lagoon. In recent years, poor water quality in the Lagoon led to harmful algal blooms and widespread seagrass loss." R.91-28 at 2.

The effects of malnutrition and starvation on Florida Manatees have been documented in manatees all along the Atlantic Coasts. R.91-26. "Colder temperatures during the winter add extra health stressors to manatees that are already compromised by chronic malnutrition." *Id*. Indeed, the negative health

impacts of malnutrition are "long-lasting" and have been documented in Atlantic coast manatee carcasses during warmer months as well, according to FWC. *Id.*

Bear Warriors expert zoologist and manatee veterinarian Dr. Ray Ball, D.V.M. has worked with manatees since 1992. Doc.24-1 at 219. Dr. Ball testified that macroalgae is a nutritionally deficient food for manatees. Doc.24-3 at 31, 38-39. A prolonged diet of macroalgae leads to clostridium, a fatal infection in the gut. *Id.* He further testified that adequate diet and nutrition are part of a manatee's natural feeding behavior. *Id.* at 31. Dr. Ball testified that manatee malnutrition results from the absence of food and the consumption of food (like macroalgae) that manatees are not adapted to:

> Well, if you look at malnutrition as either not enough food or the wrong kind of food. So, if you don't have enough food, even if you know animals are seeking normal food, you're going to end up with the chronic wasting, the starvation, emaciation, those kind of things. That's detrimental, on, for life. You don't have energy for immune function. You certainly don't have enough for reproduction. If you have only access to foods that you're not adapted to, then you get into the realm of things we were just talking about, very soluble carbohydrates causing clostridium overgrowth, toxins, and death.

Doc.24-3 at 36:13-23. He considers malnutrition to be a chronic condition. *Id.* at ln. 24-25. Dr. Ball further testified that a diet of macroalgae interferes with a manatee's successful reproduction and weaning of young, resulting in reproductive interference. Doc.24-3 at 40-43; *see also* Doc.24-1 at 220 (discussion of Dr. Ball's testimony related to unusually high perinatal manatee deaths in the North IRL.)

Dr. Martine de Wit, a veterinarian employed by FWC, testified that a shift in diet from seagrass to macroalgae can make manatees "susceptible to an upset in their gut." Doc.24-3 at 55:6-15. She agreed that some, though not all, manatees can die from the shift, while others survive. *Id.* She testified that, "in 2013, when we had a mortality event with increased number of mortalities that had macroalgae in their digestive system, and we researched that cause of that and determined it was from a gut upset, dysbiosis, it's caused from clostridial bacteria." Doc.24-3 at 56:21-57:2. According to Dr. de Wit, when manatees shift their diet from seagrass to toxic macroalgae, they may appear outwardly healthy but still suffer and ultimately die from a gut infection caused by consuming the wrong forage. *Id.* at 69. Dr. de Wit further expounded that FWC saw this in 2013, as the 2013 UME:

> …reflects the whole cascade of what happened in the [North IRL], and it actually goes back to 2010 when we had two cold mortality events, and since then, the conditions have changed in the [IRL], and we saw that loss of seagrass starting early, but at the time macroalgae were taking over, the surface vegetation, so manatees turned to that and then the macroalgae that manatees probably got used to because we saw it in 2013 and not in high numbers afterwards, so they may have adapted to eating macroalgae, but then the macroalgae disappeared as well over the years and then we had our starvation event. So, I would say it's all connected.

Doc.24-3 at 72:1-12. According to several peer-reviewed studies, Dr. de Wit is correct: "sewage-driven eutrophication [has] resulted in dietary shifts" in manatees and other marine mammals in the North IRL. R.91-30 at 20-23.

At trial, Dr. Ball, Dr. deWit, and Dr. Barile each testified about the impacts of lack of seagrass on manatee health, reproduction, and mortality. The district court agreed that "healthy manatees require seagrass." Doc.24-1 at 219; Plf's Tr. Exhs. 18, 19 (showing elevated levels of deaths among juvenile manatees in the North IRL in 2025). The district court agreed that Plaintiff proved that the dietary shift from seagrass to macroalgae 1) causes health problems and can be lethal; 2) impacts pregnancy; and 3) complicates calves weaning from their mother's milk. *Id.* These manifestations of present and ongoing manatee take are separate and apart from the mass starvation documented by the UME during 2020-2022, which occurred when the North IRL was devoid even of macroalgae. *Id.*

## IV.    Argument

### A.    Plaintiff had standing to pursue its citizen suit for unlawful take in violation of Section 9 of the Endangered Species Act against the State of Florida.

The district court considered standing three times, and each time the court found that Bear Warriors had standing. Doc.24-1 at 150-156 (order denying motion to dismiss), 194 (order on summary judgment), 211-216 (order after trial). This Court should, too.

Article III standing requires a plaintiff to show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent; (2) the injury is traceable to the challenged action of the defendant; and (3) it is

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env'tl Services*, 528 U.S. 167 (2000). An economic injury is the "epitome of 'concrete'" injuries. *MSPA Claims 1, LLC v. Tene Fla., Inc.,* 918 F.3d 1312, 1318 (11th Cir. 2019). An associational plaintiff, like Bear Warriors, has standing if it can show at least one of its "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw Env'tl Services*, 528 U.S. at 180-181.

Though the district court found that Bear Warrirors' members suffered economic injuries, the United States Supreme Court has repeatedly made clear that injury to an aesthetic, conservation, and environmental interest is sufficient to satisfy the demands of Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–563 (1992); *see also Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (individual who has formed an emotional bond with particular animals has standing to challenge regulations allowing those animals to be kept in inhumane conditions); *see also Kuehl v. Sellner*, 887 F.3d 845 (8th Cir. 2018) (upholding the lower court's finding that ESA citizen enforcers had a legally cognizable interest in viewing animals in humane conditions at a roadside zoo). As *Defenders of Wildlife* states explicitly, "the desire to use or observe an animal

species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." 504 U.S. at 562-563. Similarly, in *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221 (1986), the Supreme Court found that the plaintiffs had "undoubtedly . . . alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting." *Id.* at 231 n. 4.

Justice Kavanaugh, writing for a unanimous Supreme Court, recently upheld this bedrock principle of citizen enforcement in *FDA v. Alliance for Hippocratic Oath*, 602 U.S. 367 (2024). Rather than significantly altering standing jurisprudence, *FDA v. Alliance* solidified that, "When the government regulates parks, national forests, or bodies of water, . . . the regulation may cause harm to individual users." *Id.* at p. 12 (citing *Summers, et al. v. Earth Island Institute, et al.,* 555 U.S. 488, 494 (2009)). The Supreme Court continued:

> In the cases of alleged future injuries to unregulated parties from government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap. Both target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?

*Id.* at p. 12, fn 2; *see also People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1146, fn 5 (11th Cir. 2018) (finding that PETA had standing to challenge Miami Seaquarium's care of endangered, captive orcas

under Section 9 of the ESA). Bear Warriors established each element of standing at every stage of the underlying litigation.

      **1.**    **Bear Warriors' members have suffered and continue to suffer aesthetic and economic injuries that are concrete and particularized.**

Bear Warriors United, Inc., a Florida not-for-profit corporation established in 2016, has associational standing to sue on behalf of its members. Bear Warriors advocates for peaceful coexistence, respect, and protection of Florida wildlife, including the iconic Florida Manatee. R.91-2. at ¶¶ 3-4. Bear Warriors' members have decades-long relationships of appreciation, awe, and compassion for manatees in the North IRL and throughout Florida. *Id.* at ¶ 5 ("I have been fascinated and in love with manatees my entire life…I have regularly traveled to see manatees… "); R.91-7, ¶ 1 ("[I have] spent the majority of life rooting around the Indian River – enjoying it, observing it…including its most famous resident, the manatee."); R.91-6, ¶ 6 ("I have kayaked on the Indian River Lagoon for decades."); R.91-6, ¶ 7 ("For decades I observed and enjoyed manatees in the lagoon.").

Bear Warriors and its members are interested in the conservation, recreation opportunities, aesthetic value, observation, enjoyment, preservation, protection, and recovery of the manatee population in the North IRL. R.91-6, ¶¶ 1, 4, 9; R.91-7, ¶¶ 1-2, 12, 20, 25, 45; R.91-2, ¶ 8 ("I feel an overwhelming need to protect

manatees and keep them safe from harm."). But some Bear Warriors members also suffer financial loss due to the loss of manatees in the North IRL. Bear Warriors' supporter and member Gregory Lee Roy Pflug, for example, has owned and operated Adventures in Florida, a kayaking and eco-tourism company, since 1995. *See* R.91-6, ¶¶ 4-5. Mr. Pflug has experienced countless encounters with manatees in the North IRL and other Florida waters over the decades, as he has lead tourists through the North IRL. *Id.* at ¶ 2. He notes the fact that the most popular kayaking tour he offers is to see manatees. *Id.* at ¶¶ 4-5. The destruction of the North IRL has hurt Mr. Pflug's business, as "the lagoon is so polluted, there is nothing to see but dead water." *Id.* at ¶6. He is devastated over the lagoon's collapse, together with the extirpation of manatees and other marine life in the North IRL, which has caused him significant financial loss. *Id.* at ¶¶ 3, 6-10.

Bear Warriors member Laurilee Thompson's seafood catching operation and restaurant has similarly suffered financial loss, as tourism in the North IRL has declined. *See generally* R.91-7. She attributes the decline in tourism almost entirely to the pollution in the North IRL and absence of viewing opportunities for manatees. *Id.* These injuries have been, and will continue to be, directly harmed by FDEP's unlawful take of manatees in the North IRL. R.91-6, ¶ 6; R.91-7, ¶¶ 19-20, 25, 42.

Bear Warriors agrees with FDEP that this Court reviews the district court's

underlying factual findings as to standing for "clear error." Doc.22 at 12 (citing

*Wooden v. Bd of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1271, n.9 (11th

Cir. 2001). Though the district court made numerous factual findings on the

question of standing across its decisions and orders, this summary from the court's

order on summary judgment summarizes the court's repeated findings:

> While Plaintiff has presented evidence that its members have suffered
> emotional harm from, among other things, experiencing the
> deterioration of the IRL and seeing many dead and decomposing
> manatees, (*see generally* Shadix Decl., [R.91-2]; Pflug Decl., [R.91-
> 6]; Thompson Decl. [R.91-7]), it also provides evidence that at least
> one of its members has suffered financial injury, (*see* Pflug Decl.,
> [R.91-6] at 2-3 (describing how he has 'lost significant income' and
> the damage to his kayaking tour business because of pollution and
> absence of manatees in the IRL))."

Doc.24-1 at 213-214. After trial, the district court observed that the "evidence

presented at trial established that Plaintiff's members are likely to encounter dead

manatees again," because of FDEP's take of Florida Manatees in the North IRL is

ongoing. *Id.* at 214.

In its Brief, FDEP claims that the judge's finding regarding the likelihood of

seeing dead manatees is inadequate to establish standing. Doc.22 at18. But as the

district court observed in its order denying FDEP's request for a stay of the

injunction, "[FDEP] continuously refers to the likelihood of Plaintiff's members

encountering dead manatees. That is but one form of injury they have suffered."

Doc.24-1 at 184. Accordingly, this Court should ignore FDEP's bizarre attempts to use the testimony of Bear Warriors' expert Dr. Peter Barile to undermine Bear Warriors' members' aesthetic injuries in this case. Doc.22 at 18. The Court should instead accept Bear Warriors' members unimpeached testimony regarding their aesthetic and economic injuries to affirm that Bear Warriors suffered injury in fact.

## 2. FDEP caused Bear Warriors' injuries.

Establishing causation for the purpose of standing "does not create an onerous standard," and "a plaintiff's injury need not be 'directly' attributable to a defendant to show the causation element of standing to sue that defendant." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55, 59 (2d Cir. 2016). Moreover, a plaintiff "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even in cases where the injury hinges on the reactions of the third parties." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). As is the case here, "the required nexus" may be "established by the agency's own pronouncements." *Id.* Additionally, "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976)).

Under the ESA, interference with a protected species' natural behaviors, including feeding, reproduction, and degradation of critical habitat, represents an unlawful take by harm and harassment. *Animal Prot. Inst. v. Holsten,* 541 F.Supp.2d 1073, 1079 (D. Minn. 2008). The undisputed, uncontroverted facts here demonstrate that FDEP's authorization of nutrient loading into the North IRL has caused malnutrition, reproductive harm, starvation, and death of manatees through near-total seagrass loss. R.91-28; R.91-30 at 14, 17; R.91-32 at 1; R.91-38 at 7. The chain of causation is neither speculative nor remote; rather, it is direct and explicit. Yet, FDEP asks the Court to ignore the only evidence in the record and reverse the district court's multiple orders. *See* Doc.24-1 at 146 (denying motion to dismiss), 18 (order on summary judgment), 207 (order after trial); Doc.24-3 at 180 (order denying; *see also* R.91-30, R.91-38 (Bear Warriors' expert reports). F

DEP attempts to break a simple chain of causation establishing its liability under the ESA by pointing to third parties, such as local governments, which FDEP claims are responsible for the contamination of the North IRL. R.92 at 3-4. But FDEP alone is vested with "all powers, duties, [and] functions" to regulate water quality in the North IRL, including the power to prevent the discharge of pollutants like human wastewater from non-point and point sources alike. R.91-11 at 15; §403.131, Fla. Stat. And Dr. Barile, Dr. Ball, and FWC manatee veterinarian Dr. de Wit testified that malnutrition and starvation from lack of seagrass in the North

IRL was the "main cause for the elevated mortality numbers" during the 2020-2022 UME. R.91-15 at 75:2-5; R.91-30; R.91-38. Each testified at trial that manatees in the North IRL continue to suffer from malnutrition because of seagrass loss, which has not recovered. *Id.* Dr. Ball and Dr. de Wit also testified that young manatees are dying at unusually high rates, likely due to lack of seagrass during the weening period, a fact the district court weighed heavily in its final order:

> It is no wonder then that in recent years, the lack of seagrass and abundance of macroalgae in North IRL affected manatee breeding and reproduction, with almost no live calves begin found from 2020 to 2022. While there was return of manatees observed with calves in 2023 and 2024, 2024 was also marked by a spike in manatee calf mortality. Of these unusual perinatal manatee deaths, the highest concentration was in Brevard County, home of the North IRL, where the previous record for such deaths was set during the last UME in 2013. The Court does not find credible Dr. de Witt's speculation that this could have been caused by a higher percentage of pregnant manatees in the North IRL given the abundance of evidence connecting the lack of seagrass with manatee mortality and breeding problems.

Doc.24-1 at 220. Again, this evidence of ongoing take is uncontroverted.

Despite FDEP's best effort to misconstrue *Loggerhead Turtle,* the case and its progeny support a finding of liability under the ESA. *Loggerhead Turtle*, 148 at 1253. In *Loggerhead Turtle,* the Eleventh Circuit indisputably found that a "governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species" shares responsibility for that taking. *Id.* (citing *Strahan v. Coxe*, 127 F.3d 155, 158, 163 (1st Cir.1997)). In that case, a county

ordinance regulating beachfront lighting established minimum standards that were insufficiently protective to prevent harm to threatened and endangered sea turtles.[4] *Id*. at 1250-51. The fact that some beaches were also subject to city jurisdiction and enforcement did not eliminate the county's liability. *Id*. at 1249-50. Noting that the ESA "encompasses *indirect* as well as direct injuries," this Court held that the county's indirect control over lighting was sufficient to establish causation for the purposes of standing. *Id*. at 1251 (citing *Babbitt v. Sweet Home,* 515 U.S. 687, 697-98 (1995)).

Deflecting its own authority, FDEP repeatedly attempts to make this appeal about septic tanks, for which it assumed regulatory responsibility in 2021, and "legacy pollutants," but FDEP's own witnesses bely its concerted effort to recast history. In fact, a clear reading of the trial transcript demonstrates that FDEP mounted a robust defense of its entire sewage regulatory regime. FDEP began the second day of trial by calling Kenneth Weaver, deputy director of FDEP's Division of Environmental Assessment and Restoration, to testify about the State's efforts to reduce nitrogen loading from every nitrogen source in the North IRL watershed. Doc.24-4 at 19-42. Mr. Weaver agreed that his office's remediation efforts, if left alone, would take between 12 and 17 years before they yielded sufficient seagrass

---

[4] Artificial lighting misorients turtles, causing the take of hatchlings and impeding successful breeding. *Loggerhead Turtle*, 148 F.3d at 1235, 1248.

restoration, a fact the district court noted in its final order and FDEP did not dispute. Doc.24-1 at 224.

FDEP next called Moira Homann, program administrator for the Water Quality Restoration Program within the Division of Environmental Assessment and Restoration at FDEP. *Id.* at 54. At trial, Ms. Homann testified she was working with stakeholders to update the North IRL BMAP to reduce nitrogen loading from all sources, including septic tanks and wastewater treatment plants. *Id.* at 96-97. But the BMAP is not a habitat management plan, nor does it even mention manatees or seagrass; the district court explicitly found, "nowhere does the BMAP address manatee mortality." Doc.24-1 at 223. Ms. Homann admitted she had authority to consult with FWC about seagrass restoration and impacts to manatees for consideration in the BMAP but had not done so. *Id.* at 87:1-11. FDEP's misguided attempt to point its regulatory finger at FWC must be taken for what it is—a dishonest pretense for its own failures. There is no dispute that, FWC is not authorized to regulate water pollution in the North IRL and could not do anything to reduce nitrogen loading into the North IRL or hasten its restoration.

Ms. Homann also explained that FDEP is solely responsible for removing legacy pollutants from the North IRL, which she defined as "pollutants that remain in a water body for longer periods of time, that have been accumulating over longer periods of time because of different activities that happen in the watershed

itself, and then they tend to accumulate either in the water column or in the sediments of the water body." *Id.* at 87-88. The North IRL BMAP, according to Ms. Homann, accounts for the removal of these legacy pollutants from the watershed through voluntary cleanup projects like muck removal. *Id* at 88-89; Plf's Tr. Ex. 9.

On the topic of legacy pollution, the district court explicitly considered FDEP's effort to deflect blame for the North IRL's collapse and found, "even if all nutrients ceased to enter the IRL, seagrasses would only return after at least a decade because of the sheer level of extensive nutrient loading and pollution" that is ongoing. Doc.24-1 at 222 (finding Dr. Barile's testimony to be "credible"). Citing Dr. Barile's testimony, the district court further found, "[d]uring the wet season, . . . there is a significant mobilization of human wastewater containing those nutrients from OSTDS (septic tanks) and wastewater treatment plants that support algal blooms throughout the IRL." Doc.24-1 at 221 (citing Plf's Tr. Exh. 5 at 2 ("linking [harmful algal] blooms to the influence of humane waste")); *see also* R.91-30 at 5. According to the district court, the North IRL BMAP purports to restore the North IRL by 2030, but it is simply insufficient to bring back seagrass. Doc.24-1 at 207, et seq.; R.91-30 at 19.

FDEP next called Central District Office Assistant Director Nathan Hess to testify about his water quality enforcement efforts. Doc.24-4 at 109. Mr. Hess

highlighted his office's investigation and enforcement procedures for point sources, like wastewater treatment plants, and non-point sources, like septic tanks. *Id.* at 113. According to Mr. Hess, FDEP assessed civil penalties in the total amount of $6,083.75 against Cape Canaveral for unauthorized discharges of many thousands of gallons of untreated or under-treated humane wastewater from its wastewater treatment plant into the IRL in 2020. Doc.24-4 at 116:11-118:21. Mr. Hess testified that treatment plant upgrades required to prevent future discharges cost many millions of dollars, *id.* at 118. The trial reasonably inferred that it is more cost efficient for Cape Canaveral to use the North IRL as a wastewater treatment lagoon than upgrade its plant to guard against future FDEP enforcement efforts.

As its last witness, FDEP called Kim Duffek, an environmental consultant in the onsite sewage program of FDEP's Division of Water Resource Management. Doc.124-4 at 123:2-5. Ms. Duffek gave an overview of FDEP's regulatory and enforcement program for septic tanks, which FDEP assumed in 2021. *See* R.97-1. Ms. Duffek could not say whether her office had enforced the regulations against anyone in or around the North IRL. Doc.124-4 at 144.

The district court considered these FDEP regulators' testimony and concluded, "These efforts, perhaps not so much admirable as legally required, are imperative to reverse the damage done to the North IRL. Compliance with the Clean Water Act, however, is just one piece of the regulatory puzzle the state must

solve." Doc.24-1 at 224-225. That fewer adult manatees died in 2024 is, therefore, a red herring.

In the Appellant's Brief, FDEP relies on *BBX Cap. v. FDIC,* 956 F.3d 1304, 1313 (11th Cir. 2020), which is misguided. FDEP cites *BBX Cap* for the proposition that standing is not present where a defendant cannot prevent plaintiff's injuries. Doc.22 at 31. *BBX Cap* concerned severance payments that BBX Capital wanted to make to five former executives of BankAtlantic, a federally insured savings bank that BBX's predecessor-in-interest used to own. *BBX Cap.*, 956 F.3d at 1308. At the time of the sale, BankAtlantic was operating in a "troubled condition," and both BankAtlantic and BBX's predecessor were operating under consent orders with the FDIC that prohibited them from making any "so-called golden parachute payments" absent approval by the Federal Reserve Bank and concurrence by the Federal Deposit Insurance Corporation (FDIC). *Id.* After the sale was finalized, FDIC notified the Federal Reserve Bank that the BBX that the severance payments violated the consent orders. *Id.* But the Federal Reserve Bank had already some, but not all, of the payments. *Id.* BBX then filed a request for judicial review arguing that the FDIC's decision and Federal Reserve Bank's refusal to approve of the remaining payments were arbitrary and capricious and violated due process. *Id.* This Circuit affirmed the district court's dismissal of BBX's lawsuit against the Federal Reserve Bank for lack of standing because, after

extensive fact-finding, the district court properly concluded that FDIC—not the Federal Reserve—had caused BBX's injuries. *Id.* Unlike the two independent agencies involved in *BBX Cap,* no state agency shares responsibility or has concurrent responsibility over the State of Florida's sewage regulatory regime. FDEP's attempt to blame FWC or unspecified third parties for its sewage regulations must not be rewarded, as FDEP points to no substantive or procedural mechanism FWC could use to restore seagrasses in the North IRL. Only FDEP has caused Bear Warriors' members injuries, and only FDEP can remedy them.

Bear Warriors respectfully asks the Court to defer to the district court's findings of fact and affirm that FDEP's entire regulatory regime is responsible for the harm and harassment of Florida Manatees in the North IRL.

### 3. The district court's injunction is designed to remedy Bear Warriors' injuries.

Redressability "is closely related to the question of causation. When the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury." *Citizens for Resp. & Ethics in Washington v. Trump*, 593 F.3d 178, 194 (2d Cir. 2019), *as amended* (Mar. 3, 2020), *vacated as moot*, *Trump v. Citizens for Resp. & Ethics in Washington,* 141 S. Ct. 1262 (2021). Because Bear Warriors proved at least a "plausible likelihood that [FDEP] caused their injuries, and the injury is

ongoing, it logically follows that relief would redress their injury—at least to some extent, which is all that Article III requires." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

FDEP's reliance on *Massachusetts v. EPA,* to defeat the redressability prong of the standing analysis is misguided. In *Massachusetts v. EPA,* the Supreme Court rejected the Environmental Protection Agency's argument that its decision to refrain from regulating greenhouse gas emissions could not cause injury to the State of Massachusetts or its residents. *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007). According to the EPA, predicted increases in greenhouse gas emissions from developing nations would have offset any "marginal" domestic decrease achieved through EPA regulation. *Id.* at 524. The Supreme Court held that this argument "rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum." *Id.* at 524. Additionally, the Supreme Court noted policy considerations, including that agencies must be subject to challenges even if their regulations "do not generally resolve massive problems in one-fell regulatory swoop." *Id.* Ultimately, the Supreme Court held that judicial intervention in some form could redress the state's injuries because regulation of U.S. motor vehicle emissions would make a "meaningful contribution" to reductions in greenhouse gas concentrations and impact global warming. *Id.* at 525. Much like the State of Massachusetts, the

district court's injunction will make a "meaningful contribution" to Florida's ESA compliance obligations.

FDEP also cites *Jacobson* in support of their claim that plaintiffs failed to include nonparties who are not under DEP's control, and as a result there is no redressability. Doc.22 at 33, 36 (citing *Jacobson v. Fla. Sec'y of State,* 974 F.3d 1236, 1253 (11th Cir. 2020). In *Jacobson*, voters sued the Secretary of State to challenge a law governing the ordering of candidates on election ballots. *Id.* at 1241. This Circuit upheld the district court's dismissal of the litigation for lack of standing because the Secretary of State did not have the power to implement the new law; rather, Florida's 67 supervisors of elections were responsible for implementation. *Id.* at 1253. The Secretary simply could not remedy the voters' alleged injuries. *Id.* Unlike the voters in *Jacobson,* Bear Warriors has sued the only entity with regulatory authority over Florida's sewage regulatory regime. That third-party homeowners and municipalities own and operate the wastewater treatment infrastructure regulated by FDEP does not render them independently liable for take of manatees in the North IRL. Indeed, it would be factually impossible to pin the eutrophication of the North IRL on a single plant or septic tank owner, and it would be equally impossible to sue them all. One agency has absolute regulatory control, and under Circuit precedent, that control makes the agency liable for take under the ESA. *Loggerhead Turtle*, 148 F.3d at 1253

("governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species" shares responsibility for that taking).

As to Defendant's assertion that the court's order requiring FDEP to apply for an ITP somehow thwarts Bear Warriors' standing, FDEP forgets that Bear Warriors' prayer for relief included this precise request to bring FDEP into compliance with the ESA. Doc.24-1 at 126-127. An ITP includes a habitat management plan, as well as measures to minimize and mitigate take. Bringing FDEP into compliance with the ESA would redress Bear Warrior's members' injuries, and the district court's order compelling equitable relief does not obviate Bear Warriors' standing to bring the case at the outset.

**B.     Appellee pled and proved that FDEP has violated Section 9 of the Endangered Species Act and is likely to violate Section 9 in the future if not enjoined.**

As explained in Section I, *infra,* the ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532(19). The U.S. Fish & Wildlife Service administers the ESA and defines "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. §17.3. "Harm" is defined as "an act which actually kills or injures wildlife." *Id.* Harm "may include

significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. §17.3.

"[A]ctivities not [specifically] intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 701 (1995). In *People for Ethical Treatment of Animals v. Miami Seaquarium*, the Eleventh Circuit affirmed that, "The plain intent [of the ESA] was to halt and reverse the trend toward species extinction, whatever the cost. Therefore, the [Supreme] Court declined to exclude all indirect action from coverage, recognizing that activities like habitat destruction cause the precise harms that Congress enacted the statute to avoid." 879 F.3d 1142, 1148-49 (11th Cir. 2018).

In Section III(B) *infra,* Appellee "connects the dots" to demonstrate that the record conclusively establishes that FDEP's sewage regulatory regime proximately caused and continues to cause a variety of catastrophic harms to manatees in the North IRL, including malnutrition, reproductive harm, starvation, and death. Based on this uncontroverted evidence, the district court concluded that FDEP has violated and continues to violate Section 9 of the ESA. Contrary to FDEP's claim that the chain of causation is "attenuated," FDEP did not refute any of the

overwhelming evidence produced at trial, which includes peer reviewed studies, state and federal findings, as well as expert testimony that sewage-based pollution pushed the North IRL to a hyper-eutrophic "new normal" consisting of a shift from seagrass, which is the manatee's historic forage, to algae blooms and macroalgae. The documented, undisputed and devastating consequences of the absence of seagrass on manatees are manatee malnutrition, starvation, reproductive harm, and death.

The district court followed this Court's holding in *Loggerhead Turtle* in its evaluation of proximate cause, stating, "This case…involves a regulatory entity that exerts control over the use of something that allegedly takes protected wildlife…[And] the regulatory entity purports to make lawful an activity that allegedly violates the ESA." Doc.24-1 at 200 (quoting *Loggerhead Turtle,* 148 F.3d at 1251). On summary judgment, the district court found that Bear Warriors established unlawful take in the past, but the question remained as to whether such take would continue: "Does there still exist a risk that a manatee taking could occur even if all activity was conducted pursuant to existing FDEP regulations under the Clean Water Act." *Id.* at 201 Following the bench trial, the district court answered that question in the affirmative.

The district court paid special attention to the need to prove a "'close connection between the liable actor's conduct and habitat destruction or killing of

endangered species'" to find that FDEP's regulatory regimes results in ESA liability. Doc.24-1 at 209 (citing *Florida Panthers v. Collier County*, 2016 WL 1394328, * 22 (M.D. Fla. 2016)). FDEP relies heavily on *Aransas Project v. Shaw,* 775 F.3d 641 (5th Cir. 2014) in support of its argument that the connection between manatee harm and FDEP's conduct is too attenuated. That case concerned the impacts of state authorized water withdrawals on federally protected whooping cranes. The Fifth Circuit held that the whooping crane deaths "occurred during a year of extraordinary drought." Doc.24-1 at 202.

Extraordinary circumstances are not the source of the North IRL's eutrophication and seagrass disappearance. It occurred and continues to occur because of FDEP's decision to continue allowing the daily loading of nitrogen into the lagoon from wastewater treatment plants and septic tanks. As Dr. Barile explained at trial, "while events like hurricanes can temporarily cause a loss of seagrass, if the system is healthy, it can recover and re-grow the grasses without significant long-lasting impacts. But a eutrophied system does not have the same ability to recover." Doc.24-1 at 199 (record citations omitted). The district court concluded, "Here, hyper-eutrophication of the North IRL was not an unpredictable event . . . Unlike the extraordinary conditions in *Aransas Project*, eutrophication from [septic tanks] and wastewater treatment plant discharges can be predicated as a function of population growth and is not solely caused by natural weather

events." *Id.*; *see also* R.91-30 at 5; R.103 at 95-97. This Court should affirm the

district court's findings.

### C. The U.S. Fish & Wildlife Service's "Proposed Harm Rescission Rule" does not warrant vacatur of the district court's decision, but at most, a remand to district court or supplemental briefing.

FDEP argues that the U.S. Fish & Wildlife Service may rescind the current

regulatory definition of "harm," which would undermine this case. Doc.22 at 34-

37. That has yet to happen, but FDEP made the same argument to the district

court, which declined to "speculate" about the future, stating:

> Moreover, "harm" is just part of the definition of "take." The proposed change says nothing of "harass[ment]," which Plaintiff has also shown. This new definition of "harm" Defendant advances is not the law nor is the proposed interpretation of the ESA.

Doc.24-4 at 191 (emphasis added).

Nevertheless, should the Court take up FDEP's invitation to evaluate the

implications of the Service's Proposed Harm Recission Rule, it should take note

that the ESA, over 50 years and through twenty-five congressional terms and ten

presidential administrations, has prohibited "take" of endangered fish and wildlife,

that includes significant modification or degradation of habitat that "actually kills

or injures" the species. 50 C.F.R. §17.3; *see also Sweet Home,* 515 U.S. at 701. The

Court must ignore FDEP's half-hearted invitation to overturn this settled ESA law

because of a pending regulatory change that does not remove the statutory

prohibition on "harm" to endangered species from the ESA. 16 U.S.C. §1531(b).

The Court should, moreover, reject FDEP's suggestions that if the Service finalizes the Proposed Harm Rescission Rule, the Rule could serve as an independent basis to vacate the district court's judgment and injunction. Doc.22 at 35-36.[5] The ESA statute itself prohibits take by "harm," and the Supreme Court has already found that the ESA's statutory text and context strongly support reading "harm" to encompass significant habitat modification, firmly rejecting the interpretive arguments FDEP advances here (and upon which the Service relies in its proposed rulemaking). *Sweet Home*, 515 U.S. at 695 (interpreting 16 U.S.C. §1531(b)).

Legislatively, within months of passage of the ESA in 1973, the Service promulgated a regulation defining "harm" to include "significant environmental modification or degradation" "which actually kills wildlife." 40 Fed. Reg. 44,412, 44,413 (Sept. 26, 1975) (codified at 50 C.F.R. pt. 17). In promulgating this definition, the Service explained that it was consistent with the ESA's emphasis on "the habitat needs of listed species," as "Congress specifically acknowledged these needs by stating . . . '[t]he purposes of this Act are to provide a means whereby the

---

[5] *Amici* go further and encourage the Court to ignore the explicit direction of Congress in enacting the ESA to prohibit harm from habitat modification, to disregard the Service's longstanding definition of prohibited harm to endangered animals that implements congressional direction, and to overrule a Supreme Court precedent upholding that definition. These requests, centered on a proposed rule, should be summarily rejected.

ecosystems upon which endangered and threatened species depend may be conserved[.]'" *Id.* (quoting 16 U.S.C. §1531(b)). The Service amended the definition of "harm" in 1981, and that definition has remained since: "[h]arm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns including breeding, feeding or sheltering." 50 C.F.R. §17.3.

Thirty years ago, the Supreme Court upheld the Service's 1981 definition of harm. In *Sweet Home*, the Court concluded that the ESA's text, context, and purpose fully support an interpretation of "take" that includes habitat modification within the definition of harm. *Sweet Home*, 515 U.S. at 695. As noted above, the Supreme Court recognized in *TVA v. Hill*, and again in *Sweet Home*, that the ESA is intended to "halt and reverse the trend toward species extinction." *Sweet Home,* 515 U.S. at 699 (quoting *Hill*, 437 U.S. at 184). The Court explained that the ordinary meaning of "harm" supported the Service's longstanding regulatory definition of the term. *Sweet Home*, 515 U.S. at 697. Harm means to "cause hurt or damage to: injure," according to the Court, "which certainly includes habitat modification that *actually kills or injures* wildlife." *Id.* Nothing in the dictionary definition of "harm," the Court reasoned, included a requirement that it be limited to direct or willful action. *Id.* Moreover, the Court noted that to limit "harm" to

such direct or willful actions would result in a statutory surplusage given that direct harm is already encompassed by the other terms used to define "take." *Id*. at 697–98.

As for statutory context, the Supreme Court reasoned that Congress's 1982 amendment of the ESA to add incidental-take authority—which authorizes the Service to issue a permit for any taking otherwise prohibited by Section 9(a)(1)(B) "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity, 16 U.S.C. §1539(a)(1)(B)—"strongly suggests that Congress understood §9(a)(1)(B) to prohibit indirect as well as deliberate takings." *Sweet Home*, 515 U.S. at 700; *see id.* at 701 ("Congress' addition of the §10 permit provision supports the Secretary's conclusion that activities not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them.").

FDEP concedes that the Proposed Harm Recission Rule effects this case only if the Proposed Rule is finalized. Doc.22 at 37. As such, neither FDEP nor Bear Warriors have fully brief the effect of the Proposed Rule on this litigation or the pending appeal, but mere rescission of a clarifying regulatory definition does not and cannot alter statutory text and Supreme Court precedent finding that ordinary tools of statutory interpretation support reading "harm" in the ESA to

include significant habitat modification that actually kills or injures endangered animals.

What's more, even if the Proposed Harm Rescission Rule becomes final, "where changes in fact or law occur during the pendency of a case on appeal, 'the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances.'" *National R.R. Passenger Corp. v. State of Florida*, 929 F.2d 1532, 1538 (11th Cir. 1991); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976). That is precisely the situation here. If the Proposed Harm Rescission Rule becomes final, the district court should have the opportunity to "pass on the changed circumstances" and determine what the statutory term "harm" means and whether it includes harm manatees under the facts established on summary judgement and at trial. At minimum, should the Proposed Rule become final before reply briefs are filed and before oral argument in this case, the Court should require supplemental briefing on the impact of this rule before any decision is issued by this Court.

### D. This action does not violate the Tenth Amendment.

FDEP has repeatedly argued that this case violates the Tenth Amendment because Bear Warriors' request for injunctive relief compels FDEP "to implement that piece of federal legislation by regulating private parties." Doc.24-1 at 146. In

denying FDEP's motion to dismiss, the district court considered FDEP's

anticommandeering argument for this first time, observing:

> The ESA imposes a general obligation on all "persons," making it
> unlawful to take any listed species. 16 U.S.C. §1538. The term
> "persons" includes "any officer, employee, agent, department, or
> instrumentality of …any State, municipality, or political subdivision
> of a State." *Id.* 1532(13). But the ESA…places no obligation on states
> to enact or administer a federal regulatory program. "The Act requires
> no affirmative conservation by states or local governments. The
> [ESA] neither compels nor precludes local regulation; it preempts that
> which is in conflict." *Loggerhead Turtle. Cnty. Council of Volusia
> Cnty, Fla.*, 92 F.Supp.2d [1296], 1308 (M.D.Fla. 2000).]

Doc.24-1 at 162. The district court concluded that the ESA does not raise Tenth

Amendment concerns. *Id.* at 163. At trial, FDEP move for judgment based on its

anti-commandeering argument, which the district court found "holds no water, but

its reasoning is worth repetition and elaboration here." Doc.24-1 at 216. The

district court discussed the Tenth Amendment and reiterated that,

> [t]]he anticommandeering doctrine does not apply when Congress
> evenhandedly regulates an activity in which both States and private
> actors engage." *Murphy,* 584 U.S. at 475-86, 138 S.Ct. 1461. The ESA
> applies to "*any person* subject to the jurisdiction of the United States."
> 16 U.S.C. §1538 (emphasis added).

*Id.* at 217

The district court concluded that evidence procured on summary judgment

and at trial established that "FDEP regulations are inconsistent with the federal

ESA, [so] they will be preempted." *Id.* (citing *Strahan,* 127 F.3d at 170).

"Therefore, Defendant's nonsensical anticommandeering argument will be rejected." *Id.* at 218.

FDEP again raised its Tenth Amendment anticommandeering argument in its motion to stay injunction. R.191. In its order denying FDEP's motion to stay, the district court cited to *Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274, 1281 (11th Cir. 2019) for the principle that, "anticommandeering principles do not bar federal laws that '<u>regulate state activities</u>, rather than seeking to control or influence the manner in which states regulate private parties.'" Doc.24-4 at 188 (emphasis added) (quoting *Burban* (quoting *Reno v. Condon,* 528 U.S. 141 (2000)). The district court found that FDEP, as the sole agency responsible for maintain water quality in the North IRL, "'ha[d] the choice of either regulating in this area according to federal ESA standards or having its regulations preempted by the ESA standards or having its regulations preempted by the federal ESA provisions and regulations.'" *Id.* at 189 (citing *Strahan*, 127 F.3d at 170). "It chose the latter. So, the injunction requires that FDEP cease its action that violates the ESA until it obtain an incidental take permit." *Id.*

This Court also rejected FDEP's anticommandeering argument in its motion to stay injunction to this Court. Doc.16-1 ("Our precedent authorizes district courts to order regulators to cease the permitting or licensing of activities that take animals in violation of the Act and to require regulators to apply for Incidental

Take Permits under the Act. *See Loggerhead Turtle,* 148 F.3d 1231, 1253-55 (11th Cir. 1998).").

FDEP cites *Travis v. Reno,* 163 F.3d 1000 (7th Cir. 1998) to support its argument that the district court's injunction requires FDEP to unconstitutionally "establish a mechanism" to comply with federal law. But in that case, which did not involve the ESA, the Seventh Circuit acknowledged that 'federal regulation demands compliance," and that a state wishing to engage in certain federally regulated activity must take "administrative and sometimes legislative action to comply with federal standards regulating that activity." *Id.* at 1004. *Travis v. Reno* does not help FDEP.

Similarly, in *Murphy v. NCAA,* the U.S. Supreme Court struck down a law prohibiting states from authorizing sports gambling as unconstitutionally infringing on state's legislative powers to regulate. 584 U.S. 453 (2018). "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 472. The ESA is exactly what the Supreme Court referenced when it required Congress' "direct" regulation. Congress has prohibited take, and even state officials can be held liable.

*Strahan v. Coxe* provides a detailed analysis of the intersection of the Tenth Amendment with an ESA claim brought against a state official for authorizing an activity that results in take of a listed species. *Strahan,* 127 F.3d at 167-168.

Rejecting the application of the Tenth Amendment to thwart injunctive relief, the First Circuit noted that the plain language of the ESA's take prohibition "extends to all private entities and to 'any officer, employee, agent, department, or instrumentality of the Federal Government, of any state, municipality, or political subdivision of a State…' 16 U.S.C. §1532." *Strahan,* 127 F.3d at 162. Based on the ESA's plain language, the First Circuit held that, "[b]y including the states in the group of actors subject to the Act's prohibitions, Congress implicitly intended to preempt any action of a state inconsistent with and in violation of the ESA." *Id.* In *Seattle Audubon Society v. Southerland,* 2007 WL 1300964 *14 (D. W.D. Washington 2007), the district court reviewed *Strahan* and held that with respect to an ESA claim seeking injunctive relief, "[t]he Tenth Amendment does not bar a federal court from ordering state officials to comply with federal law." Because Plaintiff seeks only declaratory and injunctive relief in this action, the Tenth Amendment similarly does not bar this action.

Courts, moreover, consistently hold government agencies and officials liable under Section 9 of the ESA for authorizing activities that result in the taking of a listed species. *See, e.g., Strahan* 127 F.3d at 167-168 (suit against state official for authorizing gillnet and lobster pot fishing that took listed Northern Right whale); *Strahan v. Secretary, Mass. Executive Office of Energy,* 458 F.Supp.3d 76 (D. Mass 2020) (suit against state official over permitting of buoy ropes that took listed

whales); *Animal Prot. Inst. v. Holsten,* 541 F.Supp.2d 1073 (D. Minn. 2008) (suit

against state official over trapping regulations that took listed Canadian Lynx);

*American Bird Conservancy v. Harvey*, 232 F.Supp.3d 292 (E.D.N.Y. 2017) (suit

against state official over authorization of feral cat colony that took listed birds);

*Animal Welfare Institute v. Martin*, 588 F.Supp.2d 70 (D. Maine 2008), *aff'd,* 623

F.3d 19 (1st Cir. 2010) (suit against state official over trap permits that took

Canadian Lynx); *Palila v. Hawaii Dept. of Land & Natural Resources*, 852 F.2d

1106 (9th Cir. 1988) (suit against state agency over maintaining sheep that caused

Palila habitat destruction). The instant case is no different.

FDEP's anticommandeering argument should be rejected by this Court.

### E.     The injunction is narrowly tailored to bring FDEP into compliance with the Endangered Species Act.

The ESA authorizes the Secretary of the Interior to issue an "Incidental Take

Permit" (ITP) authorizing "takes" that are "incidental to, and not the purpose of,

the carrying out of an otherwise lawful activity." 16 U.S.C. §1539(a)(1)(B). An ITP

is issued by the U.S. Fish & Wildlife Service after the development and approval

of a Habitat Conservation Plan (HCP). *Id.* HCPs must include, among other things,

information regarding the applicant's plan to "minimize and mitigate" the impacts

likely to result from incidental takes. 16 U.S.C. §1539(a)(2)(A)(ii). FDEP does not

have an ITP for Florida Manatees nor the North IRL, critical habitat for the Florida

Manatee. R.91-13, p. 000039 (Answer to Request No. 14). Absent explicit

authorization in the form of an ITP, FDEP is liable for the ongoing, foreseeable "take" of Florida Manatees.

Setting aside the ESA's explicit authorization to require that certain persons to apply for an ITP, "The ESA does not limit the injunctive power available in a citizen suit, and thus, we understand the Act to grant a district court the full scope of its traditional equitable injunctive powers." *Strahan v. Coxe,* 127 F.3d at 155, 170. "Equitable injunction includes the power to provide complete relief in light of the statutory purpose.'" *Id.* (quoting *Ephraim Freightways, Inc. v Red Ball Motor Freight, Inc.,* 376 F.2d 40, 41 (10th Cir. 1967)).

FDEP complains that court's injunction is overbroad. *See* Section III(A), *infra* (setting forth the elements of the injunction); *see also* Doc.24-1 at 175. FDEP is particularly unhappy with the temporary moratorium on the issuance of septic tanks to facilities that would drain into the North IRL. Doc.22 at 43-44. FDEP's attack on the district court's equitable powers under the ESA is without merit and should be rejected.

In *Florida Key Deer v. Paulison,* 522 F.3d 1133 (11th Cir. 2008), this Court upheld a district court's injunction prohibiting the Federal Emergency Management Agency (FEMA) from issuing flood insurance to property owners located in the Florida Keys if those owners proposed new construction in habitat occupied by federally listed species listed under the ESA:

The [ESA] is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It's stated purposed were "to provide a means whereby the ecosystems upon which endangered species and threated species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. §1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.* 437 U.S. at 184, 98 S.Ct. 2279. In short, the preservation of endangered species was to be considered "the highest of priorities." *Id. at 194, 98 S.Ct. 2279.*

*Id.* at 1137-1138. To that end, after reviewing the district court's order entering summary judgment against FEMA for violating the ESA, this Court held:

Where a federal agency fails to comply with the ESA, it is settled that a court may enjoin the agency from further noncompliant action pending satisfaction of the ESA's requirements. *See Tenn Valley Auth, 437 U.S. at 193-195, 98 S.Ct. 2279; Wash. Toxics Coal. Envtl. Prot. Agency*, 413 F.3d 124, 1034 (9th Cir. 2005).

*Id.* at 1147.

Like FEMA, the district court had the authority to compel FDEP to cease and desist activities that further exacerbate the take of manatees in the North IRL, including the issuance of permits for new septic tanks that would only increase daily nitrogen loading into the lagoon. The temporary moratorium expires upon FDEP's procurement of an ITP. Given the magnitude of the harm facing manatees in the North IRL, the district court's injunction is appropriate and within the scope of the ESA.

## V.      Conclusion

For the foregoing reasons, Bear Warriors United, Inc. respectfully requests

that this Court affirm the district court's final judgment.

Dated: September 26, 2025,              Respectfully submitted,

*/s/ Jessica L. Blome*
Jessica L. Blome • Cal. Bar No. 314898
GREENFIRE LAW P.C.
2748 Adeline St., Suite A
Berkeley, California 94703
Telephone: (510) 900-9502 ext. 703
jblome@greenfirelaw.com

**Certificate of Compliance**

This motion complies with Eleventh Circuit Rule 31-1(a) because it contains 12,992 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced font using Microsoft Word in 14-point Times Roman font.

**Certificate of Service**

I hereby certify that on September 26, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.

Dated: September 26, 2025

*/s/ Jessica L. Blome*
Jessica L. Blome
Counsel for Plaintiff-Appellee