# United States Court of Appeals
# for the Eleventh Circuit

BEAR WARRIORS UNITED, INC.,

*Plaintiff-Appellee,*

v.

SECRETARY, FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the
Middle District of Florida
No. 6:22-cv-2048 (Mendoza, J.)

**BRIEF OF AMICI CURIAE CONSERVATION
ORGANIZATIONS IN SUPPORT OF PLANTIFF-
APPELLEE URGING AFFIRMANCE**

Ragan Whitlock
CENTER FOR
BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
(727) 426-3653
rwhitlock@biologicaldiversity.org

Caroline A. Flynn
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
cflynn@earthjustice.org

*Counsel for Amici Curiae Center for Biological Diversity, Florida Springs
Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas
Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club,
and Waterkeepers Florida*

Nos. 25-11612 & 25-11821

Sierra B. Weaver*
Victoria Molyneaux*
DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, DC 20036
(202) 669-7327
sweaver@defenders.org
vmolyneaux@defenders.org

*Appearing pro hac vice

*Counsel for Amicus Curiae Defenders of Wildlife*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. Bear Warriors United, Inc – Appellee

2. Blome, Jessica L. – Counsel for Appellee Bear Warriors United, Inc.

3. Bradford, Susann M. – Counsel for Appellee Bear Warriors United, Inc.

4. Brown, Jeffrey – Counsel for Appellant Secretary Lambert

5. Brown, Karma B. – Counsel for Amicus Curiae Florida Onsite Wastewater Association, National Onsite Wastewater Association, and Florida Home Builders Association

6. Center for Biological Diversity – Amicus Curiae and Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

7. Clements, Elizabeth Carter Chandler – Counsel for Amicus Curiae Florida Onsite Wastewater Association, National Onsite Wastewater Association, and Florida Home Builders Association

8. Colton, Brian E. – Counsel for Appellee Bear Warriors United, Inc.

9.  Consovoy McCarthy PLLC – Counsel for Appellant Secretary Lambert

10. Corbari, Kelley F. – Counsel for Appellant Secretary Lambert

11. Defenders of Wildlife – Amicus Curiae

12. Earthjustice – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

13. Florida Onsite Wastewater Association – Amicus Curiae

14. Florida Springs Council – Amicus Curiae

15. Flynn, Caroline A. – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

16. Harris, Jeffrey M. – Counsel for Appellant Secretary Lambert

17. Indian Riverkeeper – Amicus Curiae

18. Jennings, Jeffrey – Counsel for Amici Curiae Pacific Legal Foundation and Save Crystal River

19. Kissimmee Waterkeeper – Amicus Curiae

20. Lambert, Alexis, in her official capacity as Secretary of the Florida Department of Environmental Protection – Appellant

21. Leopold, Matthew Z. – Counsel for Amicus Curiae Florida Onsite Wastewater Association, National Onsite Wastewater Association, and Florida Home Builders Association

22. Matanzas Riverkeeper – Amicus Curiae

23. Mendoza, Honorable Carlos E. – Judge for the United States District Court for the Middle District of Florida

24. Miami Waterkeeper – Amicus Curiae

25. Miller, Mark – Counsel for Amici Curiae Pacific Legal Foundation and Save Crystal River

26. Molyneaux, Victoria – Counsel for Amicus Curiae Defenders of Wildlife

27. Pacific Legal Foundation – Amicus Curiae

28. Peterson, Erica N. – Counsel for Amicus Curiae Florida Onsite Wastewater Association, National Onsite Wastewater Association, and Florida Home Builders Association

29. Price, Honorable Leslie H. – Magistrate Judge for the United States District Court for the Middle District of Florida

30. Property and Environment Research Center – Amicus Curiae

31. Rivo, Lily A. – Counsel for Appellee Bear Warriors United, Inc.

32. Save Crystal River – Amicus Curiae

33. Save the Manatee Club – Amicus Curiae

34. Sierra Club – Amicus Curiae

35. Soares, Dylan – Counsel for Amicus Curiae Property and Environment Research Center

36. Turner, Andrew J. – Counsel for Amicus Curiae Florida Onsite Wastewater Association, National Onsite Wastewater Association, and Florida Home Builders Association

37. Venable, Nicholas B. – Counsel for Appellant Secretary Lambert

38. Waterkeepers Florida – Amicus Curiae

39. Weaver, Sierra B. – Counsel for Amicus Curiae Defenders of Wildlife

40. Weir, Bryan – Counsel for Appellant Secretary Lambert

41. Whitlock, Ragan – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

Dated: October 3, 2025

*/s/ Caroline A. Flynn*
Caroline A. Flynn
*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and Eleventh Circuit Rules 26.1-1(a)(1) and 27-1(a)(10), undersigned counsel attests that Amici Curiae Center for Biological Diversity; Defenders of Wildlife; Florida Springs Council; Intelligentsia International, Inc. (doing business as Kissimmee Waterkeeper); Matanzas Riverkeeper; Miami Waterkeeper; Save the Manatee Club; Sierra Club; Treasure Coast Environmental Defense Fund Inc. (doing business as Indian Riverkeeper); and Waterkeepers Florida are all nonprofit organizations, and no publicly held corporation has any ownership in any of those organizations.

Dated: October 3, 2025

/s/ Caroline A. Flynn
Caroline A. Flynn

*Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, Waterkeepers Florida*

/s/ Sierra B. Weaver
Sierra B. Weaver*

*Appearing pro hac vice

*Counsel for Amicus Curiae Defenders of Wildlife*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ....................................................... iii

INTEREST OF AMICI CURIAE ................................................. 1

STATEMENT OF ISSUES .......................................................... 3

SUMMARY OF ARGUMENT ................................................. 3

ARGUMENT ........................................................................ 5

I. This Court Should Reject FDEP's Proposed Departures From The Well-Established Framework For Article III Standing ......................... 5

    A. Plaintiffs May Show Injury In Fact Without Seeing Dead Wildlife .. 6

    B. Traceability May Exist Where A Causal Chain Has Multiple Steps And There Are Other Sources Of Harm ......................................... 8

    C. Redressability Does Not Require Showing That An Injunction Would Eliminate All Nutrient Pollution, Let Alone All Threats To Manatees, In The Indian River Lagoon .................................. 10

II. The Proposed Rescission Of The Regulatory Definition Of "Harm" Has No Bearing On This Appeal ....................................... 11

    A. Any Assertion That "Harm" Does Not Include Habitat Modification Is Not Properly Presented ............................................ 11

    B. Section 9's Prohibition Of "Harm" Encompasses Significant Habitat Modification That Kills Or Injures Protected Animals .................. 16

III. FDEP's Authorization Of Pollution In The Indian River Lagoon Proximately Causes Manatee Take ................................... 23

CONCLUSION .......................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Adams v. Star Enter.*,
  51 F.3d 417 (4th Cir. 1995) ..................................................... 28

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ............................................................... 22

*Am. Dredging Co. v. Lambert*,
  153 F.3d 1292 (11th Cir. 1998) ............................................. 24

*Aransas Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014) .............................................24, 27

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995) .......................... 12, 13, 16, 17, 18, 19, 20, 21, 22, 23, 28

*Banks v. Secretary, Dep't of Health & Human Servs.*,
  38 F.4th 86 (11th Cir. 2022) ................................................... 9

*BBX Cap. v. FDIC*,
  956 F.3d 1304 (11th Cir. 2020) ............................................. 10

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) .......................................... 7, 10

*Bothwell v. RMC Ewell, Inc.*,
  226 F. App'x 925 (11th Cir. 2007) ......................................... 15

*Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*,
  98 F.4th 178 (5th Cir. 2024) ................................................... 8

*Ctr. for Biological Diversity v. EPA*,
  56 F.4th 55 (D.C. Cir. 2022) ................................................. 6, 8

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  146 F.4th 1144 (D.C. Cir. 2025) ............................................. 7

*Day v. Persels & Assocs., LLC*,
  729 F.3d 1309 (11th Cir. 2013) .........................................13, 16

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) ............................................................... 21

*Dep't of Commerce v. New York*,
  588 U.S. 762 (2019) ............................................................... 8

*Diamond Alt. Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025) ..................................................... 5, 9

*Doe v. DeWine*,
    910 F.3d 842 (6th Cir. 2018) ................................................ 11

*Feliciano v. Dep't of Transp.*,
    145 S. Ct. 1284 (2025) ....................................................... 18

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
    534 U.S. 124 (2001) ........................................................... 23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ............................................................. 7

*Larson v. Valente*,
    456 U.S. 228 (1982) ........................................................... 11

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
    148 F.3d 1231 (11th Cir. 1998) ....................................... 10, 25

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ....................................................... 13, 17

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992) ............................................................. 6

*Nat'l Fam. Farm Coal. v. U.S. EPA*,
    966 F.3d 893 (9th Cir. 2020) ................................................ 7

*Nat'l R.R. Passenger Corp. v. State of Fla.*,
    929 F.2d 1532 (11th Cir. 1991) ........................................... 15

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ........................................................... 19

*Paroline v. United States*,
    572 U.S. 434 (2014) ....................................................... 25, 27

*S. River Watershed All., Inc. v. DeKalb Cnty.*,
    69 F.4th 809 (11th Cir. 2023) ............................................. 11

*S.D. Warren Co. v. Me. Bd. of Env't Prot.*,
    547 U.S. 370 (2006) ........................................................... 22

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ............................................... 11

*Sierra Club v. Yeutter,*
926 F.2d 429 (5th Cir. 1991) ........................................................ 24

*Strahan v. Coxe,*
127 F.3d 155 (1st Cir. 1997) .................................................24, 25

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1978).................................................................17, 18

*Thorpe v. Hous. Auth. of City of Durham,*
386 U.S. 670 (1967) ..................................................................... 15

*Travelers Prop. Cas. Co. of Am. v. Kan. City Landsmen, L.L.C.,*
592 F. App'x 876 (11th Cir. 2015) .............................................. 15

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
592 U.S. 261 (2021).................................................................... 14

*United States v. Town of Plymouth,*
6 F. Supp. 2d 81 (D. Mass. 1998) ............................................... 25

*Utah v. Evans,*
536 U.S. 452 (2002)...................................................................... 11

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.,*
714 F.3d 414 (6th Cir. 2013) ....................................................... 28

*Walters v. Fast AC, LLC,*
60 F.4th 642 (11th Cir. 2023) .................................................... 8, 9

## Statutes

16 U.S.C. § 1531(a)-(b)................................................................. 18
16 U.S.C. § 1531(b) ........................................................................ 2
16 U.S.C. § 1532(19) ............................................... 4, 12, 14, 21
16 U.S.C. § 1532(3) ...................................................................... 18
16 U.S.C. § 1532(5) ...................................................................... 23
16 U.S.C. § 1536(a) ...................................................................... 22
16 U.S.C. § 1536(a)(2).................................................................. 23
16 U.S.C. § 1536(b)(4).................................................................. 19
16 U.S.C. § 1538 ............................................................................. 3
16 U.S.C. § 1538(a)(1)(B) ......................................................... 3, 12

16 U.S.C. § 1539(a)(1)(B) ............................................................... 19

16 U.S.C. § 1539(a)(2) ................................................................... 21

16 U.S.C. § 1540(g) ........................................................................ 2

16 U.S.C. §§ 1531-1544 ................................................................. 1

50 C.F.R. § 17.3 ...................................................................... 4, 12

**Other Authorities**

40 Fed. Reg. 44412 (Sept. 26, 1975) ........................................... 12

46 Fed. Reg. 54748 (Nov. 4, 1981) .............................................. 17

90 Fed. Reg. 16102 (Apr. 17, 2025)................................. 14, 16, 18

H.R. Rep. No. 93-412 (1973) ....................................................... 19

Restatement (Second) of Torts § 433 (1965)................................ 26

Restatement (Third) of Torts: Phys. & Emot. Harm § 29 (2010) ................... 27

S. Rep. No. 93-307 (1973) ........................................................... 19

U.S. Fish & Wildlife Serv., Species Status Assessment Report for the Florida
    Manatee, App. A (Apr. 2024) (draft),
    https://www.regulations.gov/document/FWS-R4-ES-2024-0073-0006...... 9

*Webster's Third New International Dictionary* (1966) ........................ 18

# INTEREST OF AMICI CURIAE

Amici are conservation organizations who share a common goal to restore and protect Florida's waters and wildlife for the benefit of all Floridians.[1] They work to enforce environmental laws, including the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544 (ESA), to ensure that government officials fulfill their duties to responsibly steward Florida's unique wildlife and the aquatic and marine habitats they inhabit.

For more than three decades, Amici have continuously sought compliance with the requirements of the ESA to protect Florida manatees and their habitat. Those efforts include procuring a landmark settlement with the Florida Fish and Wildlife Conservation Commission to reduce boat strikes, as well as petitioning the U.S. Fish and Wildlife Service (FWS) to update and expand the outdated critical-habitat protections for manatees—including for crucial foraging grounds like the Indian River Lagoon system. Amici have also challenged the failure of the U.S. Environmental Protection Agency (EPA) to reinitiate federal interagency consultation on water-quality standards for the Indian River Lagoon.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person—other than Amici and their counsel—contributed money for the brief's preparation and submission. The parties consented to this brief's filing.

In addition, Florida's sustained failure to regulate pollution in state waters has repeatedly required Amici to take other action to protect local water quality and imperiled species. For example, Amici have challenged: the release of polluted, algae-laden water from Lake Okeechobee into the Caloosahatchee and St. Lucie rivers, which coated Florida's coasts in green slime and injured manatees and other vulnerable species; the toxic wastewater discharge from the poorly regulated Piney Point facility, which killed 600 tons of marine life, including manatees, in Tampa Bay; and the refusal of Florida and EPA to regulate dozens of priority toxic pollutants endangering the health of Floridians and wildlife alike.

Amici accordingly have a paramount interest in ensuring that the ESA's commitment to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U.S.C. § 1531(b), does not become a hollow promise. The integrity of the ESA's protections, and Congress's clear provision for citizen enforcement, *id.* § 1540(g), are critical to Amici's work nationally and locally.

This appeal—in which the Florida Department of Environmental Protection (FDEP) seeks to significantly weaken the public's ability to enforce fundamental ESA safeguards—directly affects Amici's interest in conserving

protected species and in holding the State accountable for pollution threatening the Florida manatee.

## STATEMENT OF ISSUES

1.  Whether an organizational plaintiff has Article III standing to challenge wildlife "take" by showing that its members have aesthetic or recreational interests in observing that wildlife in a particular area, that the defendant causes the discharge of pollution that injures that wildlife, and when a favorable decision would reduce the likelihood of injury.

2.  Whether this appeal presents the argument that the ESA's prohibition on causing "harm" to listed wildlife does not include significant habitat modification.

3.  Whether the district court was legally foreclosed from finding that FDEP's activity is the proximate cause of manatee take in the Indian River Lagoon.

## SUMMARY OF ARGUMENT

Plaintiff Bear Warriors United brought this action on behalf of its members to remedy FDEP's ongoing violations of Section 9 of the ESA, which prohibits any person, including a government regulator, from causing a "take" of a listed species. 16 U.S.C. § 1538(a)(1)(B). Having failed to rebut Bear Warriors' proof of liability under well-established law, FDEP now asks this

Court to shift the playing field on appeal and embrace far-reaching changes to the ESA's protections and operation. This Court should reject that invitation.

I. In asserting that Bear Warriors lacks standing, FDEP proposes litmus tests that have no basis in ordinary Article III standards. Plaintiffs suffer cognizable injuries to their concrete interests in observing wildlife in a particular place when a defendant's wrongdoing increases the likelihood that the wildlife will not be there. Traceability is met even when a chain of causation—such as straightforward scientific processes in a habitat-modification case—can be characterized as having multiple steps. And there is no Article III requirement that Bear Warriors show that an injunction against FDEP would completely eliminate all pollution in the Indian River Lagoon, or all external threats to manatee health, in one fell swoop.

II. FDEP notes that FWS recently proposed to rescind its 50-year-old regulatory definition of the statutory term "harm," 16 U.S.C. § 1532(19), *see* 50 C.F.R. § 17.3, such that the federal agency would no longer interpret ESA Section 9 to prohibit significant habitat modification that kills or injures protected wildlife. But FDEP did not contest the prevailing regulatory definition in the proceedings below, and the meaning of "harm" is therefore not properly before this Court. At most, *if* FWS finalizes its proposed rescission of that definition—which would contravene the ESA's language and the Supreme

Court's prior extensive analysis of the same—this Court should remand the case for the district court to assess the rescission's effect in the first instance.

III. Without identifying any clear error in the district court's factfinding, FDEP argues that the court was nonetheless foreclosed from finding proximate cause on this record as a matter of law. But FDEP offers no authority for its contention that because individual septic-tank owners and wastewater treatment plants may not be liable for manatee take, FDEP cannot be held liable for the cumulative—and foreseeable—effects of its permitting and regulatory activity. And the summary-judgment and trial records clearly supported the court's finding that those effects were indeed foreseeable to FDEP. The ESA's common-law proximate-cause inquiry demands nothing more.

## ARGUMENT

### I. This Court Should Reject FDEP's Proposed Departures From The Well-Established Framework For Article III Standing

The "irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (citation modified). In challenges to actions harming wildlife, courts have found each element met where plaintiffs seek to protect their concrete interests in observing species in an affected area. FDEP repeatedly attempts, however, to depart from the ordinary rules of standing analysis and their application in analogous cases. This Court should reject that

effort and instead adhere to black-letter law regarding injury in fact, causation, and redressability.  *See* Doc.16-1, at 3 (stay panel finding likelihood of standing based on precedent).[2]

## A. Plaintiffs May Show Injury In Fact Without Seeing Dead Wildlife

FDEP contends that Bear Warriors must prove that its members are "likely to encounter dead manatees" to establish an Article III injury.  FDEP Br. 18 (citation modified).  That is incorrect.[3]

It is hornbook law that "the desire to . . . observe an animal, even for purely esthetic purposes," is "a cognizable interest for purpose of standing." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 562-63 (1992); *see, e.g.*, *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022) (finding injury in fact based on conservation organization member's "enjoy[ment]" of "observ[ing] rare plants and animals" in "their natural habitat").  Although a person's aesthetic, recreational, and educational interests in observing wildlife are undoubtedly harmed when those animals are killed, plaintiffs need not have seen a dead

---

[2] Entries on the district court docket are cited as R.X.  Entries on this Court's docket are cited as Doc.X.

[3] Bear Warriors independently established standing based on economic harms.  *See* Doc.16-1, at 3 (stay panel ruling); R.201, at 4 (district court stay ruling); R. 172, at 7-8 (post-trial ruling); *see also* BW Br. 22, 25-27.  Amici nonetheless focus on the noneconomic injuries to highlight FDEP's attempts to shift existing law on cognizable aesthetic and recreational interests.

animal in the past or be likely to see one imminently—and FDEP does not cite a single decision so holding. To the contrary, it is well established that a person's interests in observing wildlife are harmed by the absence of animals or habitat features that support them. *See, e.g.*, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986) (conservation organizations had standing to challenge "continued whale harvesting" where members' "whale watching . . . will be adversely affected").

Courts of appeals have accordingly found injury in fact where challenged actions "increase the risk of loss of the [animal] and, in turn, [the plaintiff's] ability to see and enjoy it in its natural habitat." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025); *see, e.g.*, *Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 909 (9th Cir. 2020) (rejecting argument that plaintiffs must prove the challenged action "caused a decline in the [species]" because "a credible threat of harm is sufficient to constitute actual injury for standing purposes" (citation modified)). This includes actions that increase the risk of habitat destruction in an affected area. *See, e.g.*, *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (finding standing where pollution from agency action "impaired habitats for wildlife [plaintiff's members] like to observe and study"); *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 188 (5th Cir.

2024) (finding standing based on organization member's concern that challenged project "will carry increased risks of . . . habitat destruction"). Consistent with those decisions, Bear Warriors may establish injury by identifying a member who has a decreased likelihood of observing manatees due to the risk nutrient pollution poses to their habitat in the Indian River Lagoon. *See Ctr. for Biological Diversity v. EPA*, 56 F.4th at 67-68.

### B. Traceability May Exist Where A Causal Chain Has Multiple Steps And There Are Other Sources Of Harm

FDEP next attacks the traceability element by emphasizing (1) the causal chain between FDEP's authorization of polluting sewage discharges and manatee harm, and (2) the fact that FDEP took over permitting authority from another state agency in 2021, and there may be "legacy pollutants" from before the handover or from sources that FDEP does not regulate. FDEP Br. 19-21. Neither circumstance renders the harmful effects of FDEP's permitting too speculative or attenuated for purposes of standing.

*First*, FDEP is mistaken that traceability cannot be shown merely because there is a multi-step chain of causation. This Court has been clear that "the defendant's challenged conduct need not be the very last step in the chain of causation," and "even harms that flow indirectly from the action in question" qualify. *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (citation modified); *see also Dep't of Commerce v. New York*, 588 U.S. 762, 767-68 (2019)

(finding standing based on predictable chain). And in the scientific context specifically, focusing on the sheer number of links in a chain risks conflating a predictable natural process containing multiple phases—like photosynthesis or mitosis—with an indefinite outcome that depends on "several *contingencies*," such as "several decisions by . . . independent actors." *Banks v. Secretary, Dep't of Health & Human Servs.*, 38 F.4th 86, 95 (11th Cir. 2022) (emphasis added).

Natural processes like eutrophication follow a formulaic chain of succession, where each step inexorably leads to the next once certain thresholds are met. *See, e.g.*, U.S. Fish & Wildlife Serv., Species Status Assessment Report for the Florida Manatee, App. A, at 15-16, 75 (Apr. 2024) (draft) (discussing how nutrient pollution, including from septic systems, causes declines in seagrass, which "cause[s] stress to manatee populations by limiting foraging habitat"), *available at* https://www.regulations.gov/document/FWS-R4-ES-2024-0073-0006. The authorization of third-party action contributing to such processes therefore causes "downstream . . . injuries to others in the chain" that are sufficiently "predictable" to find traceability. *Diamond Alt. Energy*, 145 S. Ct. at 2136 (citation modified).[4]

---

[4] FDEP's threshold arguments also elide the distinction between standing and the merits of an ESA claim. This Court has clarified that "traceability is not an exacting standard" and imposes "less stringent" requirements than "proximate cause." *Walters*, 60 F.4th at 650 (citation modified); *see also*

*Second*, Bear Warriors' standing "is not defeated merely because the complained of injury can fairly be traced to the actions of both parties and non-parties." *Loggerhead Turtle*, 148 F.3d at 1247; *accord BBX Cap. v. FDIC*, 956 F.3d 1304, 1312 (11th Cir. 2020). Plaintiffs harmed by water pollution "need not prove that their injury can be traced to specific molecules of pollution emitted by the alleged polluter." *Black Warrior Riverkeeper*, 781 F.3d at 1280. So long as the FDEP-permitted discharges contribute to Bear Warriors' members' injuries, any other sources of nutrient pollution or presence of legacy pollutants does not sever traceability. *See id.* There can be no doubt that such contributions are present here: FDEP itself admits that "septic systems" constitute one of "the primary sources of anthropogenic nutrient loading" that must be reduced to prevent "adverse effects on wildlife" in the Indian River Lagoon. R.91-23, at 32, 47.

### C. Redressability Does Not Require Showing That An Injunction Would Eliminate All Nutrient Pollution, Let Alone All Threats To Manatees, In The Indian River Lagoon

Finally, there is no requirement that Bear Warriors prove that a favorable decision "would prevent any . . . members from encountering a dead manatee" in the future. FDEP Br. 21.

---

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1250-51 & n.23 (11th Cir. 1998).

Whether manatees (and in turn, Bear Warriors) might still suffer an injury because of other sources of pollution or other hazards like boat strikes (FDEP Br. 22) does not determine Bear Warriors' standing to obtain relief in this action. A plaintiff "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982). Instead, the "removal of even one obstacle to" the endurance of the lagoon's manatees, "even if other barriers remain, is sufficient." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018); *see also Doe v. DeWine*, 910 F.3d 842, 851 (6th Cir. 2018). In other words, redressability exists "when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief." *S. River Watershed All., Inc. v. DeKalb Cnty.*, 69 F.4th 809, 820 (11th Cir. 2023) (citation modified); *see Utah v. Evans*, 536 U.S. 452, 464 (2002). Thus, Bear Warriors need only show that an appropriate remedy is likely to significantly mitigate—not wholly eliminate—eutrophication and resulting harm to its members' interests in observing manatees.

## II.    The Proposed Rescission Of The Regulatory Definition Of "Harm" Has No Bearing On This Appeal

### A.    Any Assertion That "Harm" Does Not Include Habitat Modification Is Not Properly Presented

In this suit, Bear Warriors asserted a claim for a violation of ESA Section 9, which makes it unlawful for any person to "take" any endangered or

threatened species. 16 U.S.C. § 1538(a)(1)(B); *see* R.59, at 27. The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or "attempt" to do any of those things. 16 U.S.C. § 1532(19). Bear Warriors proceeded on the theories that FDEP's authorization of pollution into the Indian River Lagoon "harm[s]" and "harass[es]" manatees by destroying their food source, resulting in starvation and disruption of behavioral patterns. R.59, at 27-29.

Like Bear Warriors, a FWS regulation interprets the statutory term "harm" to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. For 50 years, FWS has interpreted "harm" to include habitat modification. *See* 40 Fed. Reg. 44412, 44416 (Sept. 26, 1975).

Thirty years ago, the Supreme Court upheld the agency's harm regulation. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995). The Court identified numerous reasons why text, context, and other traditional tools of statutory interpretation weigh strongly in favor of interpreting "harm" to include habitat modification. *Id.* at 697-703. The Court ultimately did not decide whether the ESA "compels" that interpretation of harm, however, because it is clear that Congress did not "unambiguously manifest" a

contrary understanding and the FWS interpretation was reasonable under *Chevron* step two. *Id.* at 703-04.

At no point during the motion-to-dismiss briefing, summary-judgment briefing, or trial below did FDEP dispute that "harm"—and thus Section 9's take prohibition—encompasses habitat modification. *See, e.g.*, R.27, 53, 64, 92, 102.[5] FDEP may not raise such an argument on appeal now. *See Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1325 (11th Cir. 2013).

FDEP may explain—and we would agree—that it was foreclosed from contesting that understanding of harm because *Sweet Home* upheld the (still-current) FWS regulation reflecting the same interpretation. The Supreme Court's abandonment of the *Chevron* framework "do[es] not call into question prior cases that relied on [that] framework," and decisions deeming agency action lawful under *Chevron* step two "are still subject to statutory *stare decisis*." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Indeed, for the same reason, FDEP is foreclosed from challenging the regulation's interpretation before this Court. *See id.*

And FDEP does not actually advance any such challenge. Its appellate brief merely emphasizes that recently—after trial in this case—FWS proposed

---

[5] FDEP only raised the "harm" definition in its motion to stay the injunction, after FWS proposed to rescind its definition. R.191, at 23-24.

to rescind the agency's longstanding regulatory definition of "harm"; that proposal signaled that the agency may stop interpreting the term to include habitat modification. FDEP Br. 34-37; *see* 90 Fed. Reg. 16102, 16102-03 (Apr. 17, 2025). FDEP now endorses the agency's newly proposed understanding of harm and argues that if FWS were to finalize the rescission while this appeal is pending, vacatur and remand would be appropriate. FDEP Br. 37.

While FDEP is incorrect about the proper interpretation of "harm," it is correct that this appeal is not the proper venue for that dispute. A proposed rulemaking is just that: a proposal. *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) ("Sometimes a proposal dies on the vine."). Unless and until any rescission is finalized, FWS's current definition governs.[6] And any regulatory action by FWS cannot change the statutory text. *See* 16 U.S.C. § 1532(19).

*If* FWS were to move forward with the proposed rescission during this appeal, this Court should at most remand for the district court to assess the effect of that action in the first instance. Again, FDEP and Bear Warriors agree that a remand would be appropriate. FDEP Br. 37; BW Br. 46. And that approach is consistent with precedent. For instance, in a case where a regulatory

---

[6] Nor has FDEP asked this Court to await finalization of the proposed rescission. FDEP instead requested that this appeal be expedited, which this Court granted. Docs. 23, 38.

development potentially had relevance to not-yet-final appellate proceedings, the Supreme Court explained that the lower courts should determine the validity of the agency action and its applicability in the first instance. *See Thorpe v. Hous. Auth. of City of Durham*, 386 U.S. 670, 672-74 & n.4 (1967) (per curiam).

This Court likewise routinely remands in cases where a development arguably affects a pending appeal, even when the development implicates a question of law.[7] It should follow the same course here. On remand, the district court could determine whether a rescission of the FWS definition affects the outcome of Bear Warriors' case—especially in light of the ESA's unaltered text—and decide how to proceed in light of any pending challenges to the rescission itself.[8]

---

[7] *See, e.g.*, *Nat'l R.R. Passenger Corp. v. State of Fla.*, 929 F.2d 1532, 1538 (11th Cir. 1991) ("[W]here changes in fact or law occur during the pendency of a case on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances." (citation modified)); *Bothwell v. RMC Ewell, Inc.*, 226 F. App'x 925, 926 (11th Cir. 2007) (per curiam); *cf. Travelers Prop. Cas. Co. of Am. v. Kan. City Landsmen, L.L.C.*, 592 F. App'x 876, 887 (11th Cir. 2015) (finding remand appropriate where statutory-interpretation question arose on appeal and resolution would "benefit from the parties' and the district court's focused attention in the first instance").

[8] At a minimum, if a final rule were to issue eliminating the regulatory definition, and if this Court were inclined to consider the rescission's validity and application in the first instance, it should permit supplemental briefing—including from amici stakeholders—and argument.

**B.    Section 9's Prohibition Of "Harm" Encompasses Significant Habitat Modification That Kills Or Injures Protected Animals**

Although FDEP has not asked this Court to consider FWS's proposed reinterpretation of harm to resolve this appeal, *see supra* at 13-14, that has not stopped its amici from doing so.  Save Crystal River Br. 3-5 (SCR Br.).  This Court does not address arguments developed only in an amicus brief that the party did not preserve in the district court.  *See Day*, 729 F.3d at 1326-27.  Even so, the proposed reinterpretation cannot be squared with the ESA's text and Supreme Court precedent.

In the preamble to the proposed rescission, FWS submits that the word "harm" in Section 9 "require[s] an affirmative act directed immediately and intentionally against a particular animal," and excludes acts or omissions that "indirectly and accidentally cause[] injury to a population of animals."  90 Fed. Reg. at 16103 (citation modified).  But as the Supreme Court already explained in its thorough analysis of the same statutory provision in *Sweet Home*, the ESA's language, structure, context, and purpose all point toward the opposite conclusion: that "harming" an animal includes taking actions that indirectly cause injury by significantly degrading the habitat the animal needs to survive.  515 U.S. at 697-707.

On point after point, the reading advanced in the proposed rescission (and referenced by FDEP, Br. 35) contravenes *Sweet Home*'s specific interpretative

16

conclusions.  And while the *Sweet Home* Court had no need to decide whether Section 9 *compels* FWS's longstanding interpretation, *see* 515 U.S. at 703, 708, the Court's extensive analysis "based on the traditional tools of statutory construction" nevertheless demonstrates that reading harm to encompass significant habitat degradation is the "best" reading of the ESA, *Loper Bright*, 603 U.S. at 403, 408-09.

To begin with, FWS's interpretation was "issued roughly contemporaneously with enactment of the statute and [has] remained consistent over time." *Loper Bright*, 603 U.S. at 386; *see id.* at 394 (such interpretations are "especially useful in determining the statute's meaning"); *see also Sweet Home*, 515 U.S. at 691.[9]  Indeed, the Supreme Court referenced the agency's interpretation with seeming approval only a few years later, in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n.30 (1978) (*TVA v. Hill*).  *See Sweet Home*, 515 U.S. at 699 (noting this).

And it makes sense that *TVA v. Hill* treated the agency's understanding as unremarkable, because the word "harm" comfortably encompasses significant habitat modification that causes injury or death.  The familiar word's ordinary

---

[9]  In 1981, FWS revised the regulation to clarify that the habitat modification must cause actual death or injury to the species.  46 Fed. Reg. 54748, 54750 (Nov. 4, 1981).

meaning is "to cause hurt or damage to: injure." *Webster's Third New International Dictionary* 1034 (1966); *see Sweet Home*, 515 U.S. at 697; *see also Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025) (statutory terms are to be construed according to their "ordinary meaning," not "hidden messages"). Just as one damages or injures an animal by shooting it, one damages or injures an animal by destroying the habitat it needs to survive—including, as here, habitat providing an essential food source. Unsurprisingly, FDEP and its amici fail to locate a single dictionary definition of "harm" that excludes "indirect[]" causation of injury. 90 Fed. Reg. at 16103 (citation omitted); *cf. Sweet Home*, 515 U.S. at 719 (Scalia, J., dissenting) (only offering as a "narrower" definition " 'to do hurt or damage' " (citation omitted)).

The text's plain meaning aligns with statutory purpose. As the Court recognized shortly after the ESA's enactment, the legislation is unprecedentedly "comprehensive," and Congress's "plain intent" was "to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. at 180, 184. The ESA's statement of findings and purpose accordingly focuses on "*conservation*"—defined as "the use of all methods and procedures which are necessary" for species recovery—of both species and "*the ecosystems*" upon which they depend. 16 U.S.C. §§ 1531(a)-(b), 1532(3) (emphasis added). The ESA's legislative history likewise "ma[kes] clear that Congress intended 'take' to apply

broadly to cover indirect as well as purposeful actions." *Sweet Home*, 515 U.S. at 704.[10]

If Section 9's text left any doubt, statutory background and context would resolve it. Most tellingly, in 1982, Congress amended the ESA to add Section 10, which authorizes FWS to issue a permit for any taking otherwise prohibited by Section 9(a)(1)(B) "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B); *see also id.* § 1536(b)(4) (enabling FWS to authorize "incidental" take by a federal agency).

When Congress added Section 10—and when it revisited the ESA in 1978, immediately after *TVA v. Hill*—Congress was "of course fully aware" of the agency's habitat-modification regulation. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 685 (2025); *see* Br. for United States at 30-40, *Sweet Home*, No. 94-859, 1995 WL 89293 (discussing congressional awareness). Yet in those amendments, "Congress did not disturb" the agency's well-known interpretation. *Nuclear Regul. Comm'n*, 605 U.S. at 685 (finding it significant that

---

[10] The ESA's House and Senate Reports explain that Congress defined "take" in "the broadest possible terms." S. Rep. No. 93-307, at 7 (1973); *see* H.R. Rep. No. 93-412, at 11, 15 (1973). The House Report also includes an unintended effect as an example of a take. H.R. Rep. No. 93-412, at 11.

after Congress was aware of an agency interpretation of a statute, Congress "left the law where it was" in later legislation on the same subject).

And Congress would have had little need to create Section 10's incidental-take-permit authority if Section 9 prohibited only direct and intentional forms of harm. *See Sweet Home*, 515 U.S. at 700; *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258-59 (2004) (courts should presume that when Congress amends a statute, "it intends its amendment to have real and substantial effect" (citation modified)). The *Sweet Home* dissent speculated that Congress added this major new provision to address the unusual situation where the lawful hunting of one animal accidentally kills an endangered one too. 515 U.S. at 729-30. But such circumstances likely would not qualify as "intentional[]"—and would not fall within FWS's proposed understanding of "take" in the first place. 90 Fed. Reg. at 16103. Moreover, Section 10 requires the incidental-take permittee to prepare a "*conservation* plan" describing the "*impact* which will likely result from such taking," "what steps the applicant will use to *minimize* and *mitigate*" such impact, and what "*funding*" the applicant will use for mitigation efforts—language reinforcing Congress's understanding that

Section 10 would have particular application in habitat-modification cases. 16 U.S.C. § 1539(a)(2) (emphasis added); *see Sweet Home*, 515 U.S. at 700.[11]

FDEP's and its amici's counterpoints are not persuasive. Focusing on the term "take" instead of "harm," FDEP asserts that with respect to wild animals, the word ordinarily means to kill or capture; amici similarly argue that "take" carried that meaning at common law. FDEP Br. 35; SCR Br. 7-9. But the ESA expressly defines "take," and that definition includes the broader verb "harm." 16 U.S.C. § 1532(19). "When Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive" and may "not deviate from an express statutory definition merely because it varies from the term's ordinary meaning." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (citation modified); *see Sweet Home*, 515 U.S. at 697 n.10. Further demonstrating that Congress deviated from whatever more limited connotations "take" may have had in other contexts, the ESA's definition includes "harass"—which fits FDEP's definition of take "no better than does

---

[11] Moreover, there is on-point legislative history establishing that the 1982 Congress "had habitat modification directly in mind" when adding the incidental-take provision. *Sweet Home*, 515 U.S. at 707; *see also id.* at 730 (Scalia, J., dissenting) (acknowledging that the 1982 amendments' Senate Report and House Conference Report "clearly contemplate that [the incidental-take-permit authority] will enable the Secretary to permit environmental modification").

'significant habitat modification or degradation.'" *Sweet Home*, 515 U.S. at 697 n.10 (citation omitted).

FDEP and its amici also argue that the regulatory interpretation of harm violates the *noscitur a sociis* canon, on the view that the other verbs in the take definition "describe[] an affirmative act directed toward a particular subject." SCR Br. 10-12; *see* FDEP Br. 35. But that argument fails at its premise, because "harass" likewise does not necessarily involve an affirmative act directed at a particular animal. Indeed, *Sweet Home* rejected a similar version of the *noscitur a sociis* argument—there, that "harm" "must refer to a direct application of force." 515 U.S. at 701 (observing that several terms in the list do not necessarily involve force). Where "it is not apparent what common attribute connects the specific items," the *noscitur a sociis* canon is not probative. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). The Court has also cautioned against the "uncritical use of interpretive rules" in "making sense of a complicated statute" with "technical definitions" that were "worked out with great effort in the legislative process." *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 380 (2006); *see Sweet Home*, 515 U.S. at 705 (noting that "harm" was specifically added to the take definition during the legislative process).

Finally, that another ESA provision also protects habitat—the federal consultation requirement in Section 7—is of no moment. 16 U.S.C. § 1536(a);

*see* SCR Br. 13-14. As *Sweet Home* pointed out, Section 7's critical-habitat protection and Section 9's take prohibition are not coextensive in many respects, even if take includes habitat modification. 515 U.S. at 702-03. For example, only Section 9 protects habitat from actions that are not undertaken or funded by the federal government. And even with respect to federal actions, Section 9 does not protect habitat that has not been designated "critical." 16 U.S.C. § 1536(a)(2); *see* 16 U.S.C. § 1532(5) (defining critical habitat). The limited overlap between these provisions does not warrant giving "harm" an unnaturally narrow meaning. *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001) ("[T]his Court has not hesitated to give effect to two statutes that overlap, so long as each reaches some distinct cases."). Such overlap "simply reflects the broad purpose of the Act set out in § 2 and acknowledged in *TVA v. Hill*." *Sweet Home*, 515 U.S. at 703.

## III. FDEP's Authorization Of Pollution In The Indian River Lagoon Proximately Causes Manatee Take

In *Sweet Home*, the Court held that Section 9 incorporates a requirement of proximate cause. 515 U.S. at 696 n.9, 700 n.13. This requirement asks whether the take—*i.e.*, the habitat modification that results in death or injury—is a "foreseeabl[e]" consequence of the defendant's action. *Id.* at 713 (O'Connor, J., concurring). It serves to "eliminate[] the bizarre" as a basis for ESA liability. *Id.* (citation modified).

Proximate cause is a factual finding subject only to clear-error review. *Am. Dredging Co. v. Lambert*, 153 F.3d 1292, 1295 (11th Cir. 1998). Yet FDEP does not even attempt to identify any clear error in the district court's factfinding. *Cf.* Doc.16-1, at 4 (stay panel identifying "no likely clear error"). Instead, FDEP attempts two arguments for why, in its view, the proximate-cause finding fails as a matter of law. Both are unavailing.

*First*, FDEP provides no authority for its assertion (Br. 31) that a government regulator cannot violate Section 9 unless the regulated entity has itself committed a take. To the contrary, the Fifth Circuit found take liability in *Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991), where a federal agency permitted timber companies to cut down trees that provided habitat for woodpeckers. *See id.* at 431-33; *see also Aransas Project v. Shaw*, 775 F.3d 641, 656 n.9, 659 (5th Cir. 2014) (discussing *Yeutter*). The Fifth Circuit made no determination that the timber companies' individual acts of tree removal had taken woodpeckers. Rather, the court recognized that "regulatory acts" may result in ESA liability "where a close connection exist[s] between the liable actor's conduct and habitat destruction." *Aransas Project*, 775 F.3d at 659 (discussing *Yeutter*).

FDEP relies (Br. 31) on a statement deriving from *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997), that "a governmental third party pursuant to whose

authority an actor directly exacts a taking of an endangered species may be deemed to have violated the [ESA]." *Id.* at 163. But the First Circuit was describing the fact pattern in *Strahan*—in which the agency had authorized fishing equipment that entangled whales—to conclude that those facts sufficed. *See id.*; *see also Loggerhead Turtle*, 148 F.3d at 1253 (similar, in standing analysis). Neither *Strahan* nor *Loggerhead Turtle* held that take liability could attach *only* in such a scenario, and the decisions have not been so interpreted. *See, e.g.*, *United States v. Town of Plymouth*, 6 F. Supp. 2d 81, 86, 90-91 (D. Mass. 1998) (town's permitting of off-road vehicle use likely constituted take where cumulative effect of heavy traffic impaired habitat of piping plovers).

The artificial limitation that FDEP proposes defies common sense—especially for takes based on habitat degradation, where aggregation of numerous small-scale incursions predictably leads to large-scale impacts. Consider a regulator that permits twenty individuals to each pour a cup of bleach into a pond, which inevitably kills the endangered fish within. FDEP would apparently find no proximate cause as a matter of law unless the cup poured by each individual, standing alone, were sufficient to kill—even if the regulator knew to a virtual certainty that the fish could not survive the total amount authorized. That cannot be right. And FDEP identifies no other instance in which proximate cause operates that way. *See Paroline v. United States*, 572 U.S.

434, 445 (2014) ("Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."); *cf.* Restatement (Second) of Torts § 433 (1965) (listing, as relevant consideration in determining legal cause, "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it").

*Second*, FDEP is mistaken that the district court was foreclosed from finding proximate cause on these facts. FDEP Br. 32-33. The summary-judgment record showed "a clear, definitive causal link" between FDEP's authorization of wastewater discharges into the lagoon—which resulted in an excess of nutrients in that waterbody, which led to eutrophication, harmful algal blooms, and seagrass destruction—and manatees' resulting starvation. Doc.16-1, at 4; *see also* R.134, at 9-15 (finding each step in chain met); R.201, at 11-12 (finding FDEP's take "entirely foreseeable"). And at trial, officials from FDEP and the Florida Fish and Wildlife Conservation Commission testified to the known connection between nutrient pollution in the lagoon and loss of the manatees' food source, as well as the need to reduce that pollution. *See* R.187, at 82-85; R.188, at 18-19, 29, 34, 63; *accord* R.91-23, at 13, 51. As the court concluded after hearing that testimony and other evidence firsthand, "if FDEP does not reduce nutrient levels, there will continue to be harmful algal blooms and, in turn, no seagrass recovery and more manatee takings." R.172, at 17.

This is not a case "where the causal link between conduct and result is so attenuated that the so-called consequence is more akin to mere fortuity." *Paroline*, 572 U.S. at 448. Again, the fact that causation takes the form of a predictable and well-known scientific process—rather than direct, instantaneous effect—does not preclude a proximate-cause finding. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 29 cmt. b (2010) ("[T]ortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause.").

FDEP argues (Br. 32-34) that this case resembles the Fifth Circuit's *Aransas Project* decision, where the court held that an agency's authorization of water withdrawals from rivers was not the proximate cause of whooping crane deaths in a nearby bay. *See* 775 F.3d at 657-63. The Fifth Circuit's conclusion that the short and unusual crane die-off was not reasonably foreseeable to the agency defendant was based on specific record evidence establishing that there was "a fortuitous confluence of adverse factors" outside the agency's control— including the "unpredictable and uncontrollable . . . forces of nature" that led to an exceptionally severe drought. *Id.* at 662-63. As the district court observed here, "[u]nlike the extraordinary conditions in *Aransas Project*, eutrophication from [septic tank] and wastewater treatment plant discharges can be predicted as a function of population growth and is not solely caused by natural weather events." R.134, at 14.

FDEP also argues (Br. 30, 32) that the facts here resemble a hypothetical in the *Sweet Home* concurrence involving "a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby injures protected fish." 515 U.S. at 713 (O'Connor, J.) (citation modified). Justice O'Connor referred to that hypothetical only in a parenthetical quoting the *Sweet Home* dissent; neither the concurrence nor the majority adopted it as reflecting their view or analyzed it in any depth. But to the extent Justice O'Connor suggested that proximate cause might be lacking, that would appear to be based on an assumption that injury to fish in the river was not "foreseeabl[e]" to the farmer taking action on land. *See id.* Here, as discussed, the harm to manatees from FDEP's permitting of pollution into the waterbody was entirely foreseeable and, in fact, foreseen. *See supra* at 9, 26-27.

Proximate cause "must be assessed on a case-by-case basis." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013). Given the inherently "fact-specific" nature of the inquiry, *Adams v. Star Enter.*, 51 F.3d 417, 424 n.9 (4th Cir. 1995), surface-level comparisons to other habitat-modification cases—which may involve different types of regulation, geographic areas, species, and time horizons—are not illuminating. The relevant inquiry here is whether it is foreseeable that authorizing sewage discharges into the Indian

River Lagoon will destroy seagrass that manatees depend on for food.  And the answer—based on the record below—is yes.

## CONCLUSION

The judgment of liability should be affirmed.

Dated:  October 3, 2025

Respectfully submitted,

*/s/  Caroline A. Flynn*

Ragan Whitlock
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
(727) 426-3653
rwhitlock@biologicaldiversity.org

Caroline A. Flynn
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
cflynn@earthjustice.org

*Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida*

Sierra B. Weaver*
Victoria Molyneaux*
DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, DC 20036
(202) 669-7327
sweaver@defenders.org
vmolyneaux@defenders.org

*Appearing pro hac vice

*Counsel for Amicus Curiae Defenders of Wildlife*

## CERTIFICATE OF COMPLIANCE

I certify that: (1) this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 6,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Eleventh Circuit Rule 32-4; and (2) this brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in Microsoft Word in double-spaced format using a proportionally spaced typeface in 14-point Calisto MT font.

Dated:  October 3, 2025                    */s/  Caroline A. Flynn*
                                           Caroline A. Flynn
                                           *Counsel for Amici Curiae*