Nos. 25-11612 & 25-11821

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

BEAR WARRIORS UNITED, INC., a Florida Not for Profit Corporation,
*Plaintiff-Appellee,*
v.
SECRETARY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Defendant-Appellant.*

---

Appeal from the U.S. District Court for the
Middle District of Florida, No. 6:22-cv-2048
The Honorable Carlos Mendoza

---

## CORRECTED BRIEF OF AMICI CURIAE LAW PROFESSORS
## IN SUPPORT OF PLAINTIFF-APPELLEE

---

ALYSSA HUFFMAN
JACLYN LOPEZ
RACHAEL CURRAN
Jacobs Public Interest Law Clinic
for Democracy and the Environment
Stetson University College of Law
1401 61st St. S.
Gulfport, FL 33707
(813) 773-6810
ahuffman3@law.stetson.edu
(727) 490-9190
jmlopez@law.stetson.edu
(727) 537-0802
rcurran1@law.stetson.edu

*Counsel for Amici Curiae Law Professors*

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29, as well as Eleventh Circuit Rules 26.1, 28-1(b), and 29-2, the undersigned counsel hereby certifies:

Amici are American law professors. The Amici-Law Professors have no parent corporations and no publicly held corporation owns any portion of any amicus law professor.

The following is a complete list of all the known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of the case:

1.  Babcock, Hope – Law Professor Amicus Curiae

2.  Bear Warriors United, Inc. – Appellee

3.  Blackner, Lesley G – Counsel for Appellee Bear Warriors United, Inc.

4.  Blackner, Stone & Associates – Counsel for Appellee Bear Warriors United, Inc.

5.  Blome, Jessica L. – Counsel for Appellee Bear Warriors United, Inc.

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

6.      Boudreaux, Paul – Law Professor Amicus Curiae

7.      Bradford, Susann M. – Counsel for Appellee Bear Warriors United, Inc.

8.      Brown, Jeffrey – Counsel for Appellant Secretary Lambert

9.      Brown, Karma B. – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

10.     Center for Biological Diversity – Amicus Curiae and Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

11.     Clements, Elizabeth Carter Chandler – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

12.    Colton, Bryan E. – Counsel for Appellee Bear Warriors United, Inc.

13.    Consovoy McCarthy PLLC – Counsel for Appellant Secretary Lambert

14.    Corbari, Kelley F. – Counsel for Appellant Secretary Lambert

15.    Courchesne, Christophe – Law Professor Amicus Curiae

16.    Curran, Rachael – Counsel for Amici-Law Professors

17.    Defenders of Wildlife – Amicus Curiae

18.    Doremus, Holly – Law Professor Amicus Curiae

19.    Earthjustice – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

20.    Florida Home Builders Association – Amicus Curiae

21.    Florida Onsite Wastewater Association – Amicus Curiae

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

22.   Florida Springs Council – Amicus Curiae

23.   Flynn, Caroline A. – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

24.   Greenfire Law, PC – Counsel for Appellee Bear Warriors United

25.   Harris, Jeffrey M. – Counsel for Appellant Secretary Lambert

26.   Houck, Oliver – Law Professor Amicus Curiae

27.   Huffman, Alyssa – Counsel for Amici-Law Professors

28.   Hunton Andrews Kurth, LLP – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

29.   Indian Riverkeeper – Amicus Curiae

30.   Jennings, Jeffrey D. – Counsel for Amici Save Crystal River

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

and Pacific Legal Foundation

31. Kissimmee Waterkeeper – Amicus Curiae

32. Lambert, Alexis, in her official capacity as Secretary of the Florida Department of Environmental Protection – Appellant

33. Leopold, Matthew Z. – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

34. Lopez, Jaclyn – Counsel for Amici-Law Professors

35. Matanzas Riverkeeper – Amicus Curiae

36. Mendoza, Honorable Carlos E. – Judge for the United States District Court for the Middle District of Florida

37. Miami Waterkeeper – Amicus Curiae

38. Miller, Mark – Counsel for Amici Save Crystal River and Pacific Legal Foundation

39. Molyneaux, Victoria – Counsel for Amicus Curiae Defenders of Wildlife

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

40.  National Onsite Wastewater Recycling Association – Amicus Curiae

41.  Nowlin, Michelle – Law Professor Amicus Curiae

42.  Pacific Legal Foundation – Amicus Curiae

43.  Parenteau, Patrick – Law Professor Amicus Curiae

44.  Peterson, Erica N. – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

45.  Plater, Zygmunt – Law Professor Amicus Curiae

46.  Price, Honorable Leslie H. – Magistrate Judge for the United States District Court for the Middle District of Florida

47.  Property and Environment Research Center (PERC) – Amicus Curiae

48.  Rohlf, Daniel – Law Professor Amicus Curiae

49.  Rivo, Lily A. – Counsel for Appellee Bear Warriors United

50.  Save Crystal River – Amicus Curiae

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

51.  Save the Manatee Club – Amicus Curiae

52.  Sierra Club – Amicus Curiae

53.  Snape, William J., III – Law Professor Amicus Curiae

54.  Soares, Dylan P. – Counsel for Amicus Curiae PERC

55.  Stetson University College of Law's Jacobs Public Interest Law Clinic for Democracy and the Environment – Counsel for Amici-Law Professors

56.  Turner, Andrew J. – Counsel for Amici Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

57.  Venable, Nicholas B. – Counsel for Appellant Secretary Lambert

58.  Waterkeepers Florida – Amicus Curiae

59.  Weaver, Sierra B. – Counsel for Amicus Curiae Defenders of Wildlife

60.  Weir, Bryan – Counsel for Appellant Secretary Lambert

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Secretary, Florida Department of Environmental Protection*

61.    Whitlock, Ragan – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

62.    Winders, Delcianna – Law Professor Amicus Curiae

63.    Wood, Jonathan – Counsel for Amicus Curiae PERC

64.    Yates, Charles T. – Counsel for Amici Save Crystal River and Pacific Legal Foundation

Dated: October 9, 2025              /s/ *Alyssa Huffman*
                                    ALYSSA HUFFMAN
                                    *Counsel for Amici-Law Professors*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....................................................................1

TABLE OF CITATIONS ............................................................................ii

INTERESTS OF THE AMICI CURIAE ...................................................1

STATEMENT OF THE ISSUES................................................................8

SUMMARY OF ARGUMENT ..................................................................8

ARGUMENT ...........................................................................................10

    I.  The Endangered Species Act's cooperative federalism framework supports the scope of the district court's injunctive relief. ................13

    II.  The district court's injunctive relief is consistent with the body of caselaw that upholds enforcement of the Endangered Species Act against state actors as compatible with the Tenth Amendment. .......21

    III. The district court's injunction does not violate the anti-commandeering doctrine.....................................................................28

CONCLUSION .......................................................................................33

CERTIFICATE OF COMPLIANCE........................................................35

# TABLE OF CITATIONS

## Cases

*Animal Welfare Inst. v. Martin,* 588 F. Supp. 2d 70 (D. Me. 2008)..27, 31

*Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274 (11th Cir. 2019) ....................................................................................................29, 30

*Ctr. for Biological Diversity v. Little*, 724 F. Supp. 3d 1113 (D. Idaho 2024)....................................................................................................26

*Ex Parte Young*, 209 U.S. 123 (1908)....................................................29

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024)...................................................................................32

*Loggerhead Turtle v. Cty. Council of Volusia Cty.*, 148 F.3d 1231 (11th Cir. 1998)...........................................................................................22

Memorandum and Order, 2, *Strahan v. Durand*, No. 95-10927-DPW (D. Mass. 2001) ......................................................................................25

*Murphy v. NCAA*, 584 U.S. 453 (2018) ...........................................29, 30

*New York v. United States*. 505 U.S. 144 (1992) ..............................28, 29

*Palila v. Haw. Dep't of Land & Natural Res.*, 649 F. Supp. 1070 (D. Haw. 1986), *aff'd,* 852 F.2d 1106 (9th Cir. 1988)................................23

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142 (11th Cir. 2018) ............................................................. 14

*Printz v. U.S.*, 521 U.S. 898 (1997) ............................................... 29, 31, 32

*Red Wolf Coal. v. N.C. Wildlife Res. Comm'n,* No. 2:13-CV-60-BO, 2014 U.S. Dist. LEXIS 65601, 2014 WL 1922234 (E.D.N.C. May 13, 2014) ................................................................................................................ 22

*Reno v. Condon*, 528 U.S. 141 (2000) ............................................... 29, 30

*South Carolina v. Baker*, 485 U.S. 505 (1988) ...................................... 32

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ...................... 23, 24, 25, 31

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ................................ 13, 21

*U.S. v. Darby*, 312 U.S. 100 (1941) ......................................................... 16

**Statutes**

U.S. Const. art. VI, cl. 2 ........................................................................... 22

16 U.S.C. § 1532 ...................................................................................... 14

16 U.S.C. § 1535(a) .................................................................................. 16

16 U.S.C. § 1535(c)(1)(B) ........................................................................ 14

16 U.S.C. § 1538(a) ............................................................................. 13, 31

16 U.S.C. § 1539(a)(1)(B) ........................................................................ 21

42 U.S.C. § 7409 ...................................................................................... 16

iii

Fla. Stat. § 373.414(1)(a)2 ....................................................................... 20

Fla. Stat. § 379.2431(2) ........................................................................... 20

Fla. Stat. § 1535(d)(2) ............................................................................. 16

## Other Authorities

Cong. Rsch. Serv., *A Legislative History of the Endangered Species Act
Of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980*, 410 (1982)
................................................................................................................. 12

*Endangered Species: 6 Stories of Success*, Nat'l Wildlife Fed.,
https://www.nwf.org/Educational-Resources/Wildlife-
Guide/Understanding-Conservation/endangered-species-success-
stories (last visited Sep. 19, 2025) ....................................................... 15

ERP Applicant's Handbook Vol. I, § 10.2.2(a) ....................................... 20

FDEP, FWC, & FWS, *Memorandum of Understanding Between the Fla.
Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Serv., &
Fla. Dep't of Env't Prot.* 2 (Aug. 5, 2020),
https://floridadep.gov/sites/default/files/Appendix_2_FDEP_FWC_FW
S_404_MOU_Final_Full_Signatures.pdf ............................................. 18

Fla. Dep't of Env't Prot., *Guidance on Surveys for Submerged Aquatic
Vegetation Compensatory Mitigation Projects* 1, 4 (Dec. 8, 2020) ...... 20

Fla. Dep't of Env't Prot., *Protecting Florida's Springs*,

   https://floridadep.gov/springs/protect-restore/content/ ....................... 19

Fla. Dep't of Env't Prot., *Water Quality Standards*,

   https://floridadep.gov/dear/water-quality-standards (last visited Oct.

   1, 2025) .................................................................................................. 19

Fla. Fish & Wildlife Conservation Comm'n, Fla. Manatee Mgmt. Plan

   (2007) ...................................................................................................... 18

Fla. Fish & Wildlife Conservation Comm'n, *Florida Manatee Warm-*

   *Water Habitat Action Plan* (2020) ...................................................... 20

Fla. Fish & Wildlife Conservation Comm'n, *Manatee Protection Plans –*

   *MPPs*, https://myfwc.com/wildlifehabitats/wildlife/manatee/protection

   ................................................................................................................ 20

FWS & FWCC, Cooperative Agreement between the U.S. DOI FWS &

   Fla. FWCC for the Conservation of Endangered & Threatened Fish &

   Wildlife (2018) ...................................................................................... 17

Jaclyn Lopez, *Diminished Access to Judicial Review is an Unacceptable*

   *Consequence of EPA's Delegation of its Responsibilities to States*, 53

   Env. L. Rev. 571 (2023) ........................................................................ 16

Jude Binkley, *Idaho Limits Wolf Trapping Again to Protect Endangered Grizzly Bears*, KTVB7 (Feb. 11, 2025), https://www.ktvb.com/article/tech/science/environment/federal-judge-upholds-idaho-wolf-trapping-snaring-restrictions-protect-grizzlies/277-c56f79c2-7e69-45e2-a6c8-0cee2e9ce91c..........................27

Kaush Arha & Barton H. Thompson, Jr., eds., *The Endangered Species Act and Federalism* 11 (2011)..............................................17

Lucy Ackerman, *Tenth Amendment: The United States' Defining Compromise*, 20 Federalism-E 44 (2019)..........................................15

S. Rep. No. 93-307 (1973).......................................................14

U.S. FWS, *Cooperative Endangered Species Conservation Fund Grants*, https://www.fws.gov/sites/default/files/documents/2024-07/section-6-fact-sheet-july-2024.pdf (July 2024)....................................12

## Regulations

Critical Habitat Designations for Florida Manatee and Antillean Manatee, 89 FR 78134 (Sep. 24, 2024)................................................19

Endangered Species, 32 Fed. Reg. 4001 (Mar. 11, 1967). ......................18

Fla. Admin. Code Ann. r. 62-330.301(1)(d)............................................20

Fla. Admin. Code Ann. r. 62-330.302(1)(a)2 ..........................................20

## INTERESTS OF THE AMICI CURIAE

Amici-Law Professors are American law professors and scholars of environmental and constitutional law. They have taught, written, and litigated extensively on cooperative federalism, the Endangered Species Act, and judicial enforcement of environmental statutes. Amici-Law Professors have an interest in preserving the judicial power of federal courts to enjoin state conduct that violates the Endangered Species Act. Amici-Law Professors submit this brief to elucidate why the district court's injunction against the Florida Department of Environmental Protection (FDEP) is consistent with cooperative federalism principles, the Tenth Amendment, and the anti-commandeering doctrine.

Hope Babcock is a professor at Georgetown Law, where she teaches the Endangered Species Act in courses like environmental law, natural resources law, and environmental conflicts resolution. She served as general counsel to the National Audubon Society and as deputy general counsel and Director of Audubon's Public Lands and Water Program. Prior to that role, she worked on environmental and energy issues as a partner with Blum, Nash, & Railsback, and she served as Deputy Assistant Secretary of Energy and Minerals in the

1

U.S. Department of the Interior.

Paul Boudreaux is a professor at Stetson University College of Law, where he teaches courses in environmental law, natural resources law, property, and land use. He also teaches and studies the law of legislation, including methods of statutory interpretation. For more than a decade, he litigated civil environmental cases in federal courts across the nation on behalf of the Department of Justice.

Christophe Courchesne is a professor, the Associate Dean of Environmental and Experiential Programs, Director of the Environmental Law Center, and Director of the Environmental Advocacy Clinic at Vermont Law and Graduate School. He has litigated environmental cases for more than two decades and has led work on federal environmental law and policy, natural resource protection, environmental justice, land use, and clean energy. Before joining Vermont Law and Graduate School, he was Deputy Chief of the Energy and Environment Bureau and Assistant Attorney General at the Massachusetts Attorney General's Office, where he oversaw its affirmative and defensive environmental docket, including federal and state endangered species cases.

Holly Doremus is the James H. House and Hiram H. Hurd Professor of Environmental Regulation and Associate Dean for Faculty Development and Research at the University of California, Berkeley School of Law. Conservation and the Endangered Species Act have been at the center of her scholarship for more than 30 years.

Oliver Houck is an emeritus professor and the David Boies Chair in Public Interest Law at Tulane University Law School. His specialties involve environmental, natural resources, and criminal law. He is active in legal proceedings involving wildlife, wetlands, coastal, and pollution issues and publishes regularly on these and related topics, including the books, *Taking Back Eden* (on environmental lawsuits abroad), *Down on the Batture* (on the Lower Mississippi River), *The Clean Water Act TMDL Program* (on pollution control), and most recently, *Downstream Toward Home* (on rivers of North America). He also has written extensively for academic journals and general interest publications. Prior to joining the Tulane law faculty in 1981, Houck served as a federal prosecutor in Washington, D.C., and as National Wildlife Federation general counsel and vice president. He has since served on the boards of Defenders of Wildlife, the Environmental Law Institute,

and the Environmental Defense Fund, an advisory board of the U.S. Army Corps of Engineers, and two committees of the National Science Foundation. He has been recognized as Louisiana's Conservationist of the Year, *Gambit* magazine's New Orleanian of the Year, and the New Orleans Young Leadership Council's Role Model of the Year.

Michelle Nowlin is a clinical professor and co-director of the Environmental Law and Policy Clinic at Duke University. Prior to joining Duke's faculty in 2008, she worked as a senior attorney with the Southern Environmental Law Center in Chapel Hill. During her career, Nowlin has litigated cases pursuant to the Endangered Species Act, Clean Water Act, Coastal Area Management Act, National Environmental Policy Act, and Administrative Procedure Act. She has also taught classes on environmental law, food and agricultural law, migratory marine species, and legal considerations on the use of drones for monitoring ecosystems and populations of endangered and threatened species. Nowlin has served a term as chair of the Environment, Energy and Natural Resources Law Section of the North Carolina Bar Association and currently chairs the Environmental Law Section Council for the Association of American Law Schools.

Patrick Parenteau is an emeritus professor and Senior Fellow for Climate Policy in the Environmental Law Center at Vermont Law and Graduate School. He has over five decades of experience in environmental and natural resources law in various positions, including Vice President for Conservation at the National Wildlife Federation, Regional Counsel to the U.S. EPA's New England Regional Office, Commissioner of the Vermont Department of Environmental Conservation, and Senior Counsel at Perkins Coie. He has been recognized with awards such as the American Bar Association Section on Natural Resources, Energy, and Environmental Law Lifetime Achievement Award and the Kerry Rydberg Award for public interest environmental law. In 1992 he served as Special Counsel to the U.S. Fish and Wildlife Service in the Endangered Species Act Exemption Proceedings on the Northern Spotted Owl.

Zygmunt Plater is an emeritus professor at Boston College Law School. He has taught administrative law, environmental protection law, property, and land use law on eight law faculties domestically and abroad since 1968 and is the senior author of a national environmental law coursebook, *Environmental Law & Policy: Nature, Law & Society*

(Carolina Academic Press, 5th ed. 2016, 6th ed. forthcoming 2025).

Professor Plater successfully argued *TVA v. Hill*, 439 US 153 (1978)

before the Supreme Court, its first case under the Endangered Species

Act. He also served as Chair of the State of Alaska's Exxon-Valdez Oil

Spill Commission's Legal Task Force.

Daniel Rohlf is a professor at Lewis & Clark Law School, teaching

courses on wildlife law; public lands; law, science, and the environment;

sustainability in law and business; and other courses in the

environmental and natural resources program. He cofounded the

Earthrise Law Center, the school's environmental law clinic, and has

conducted work protecting endangered species and their habitat,

particularly efforts to protect salmon and steelhead in the Columbia

River Basin. Professor Rohlf's expertise is centered around the

conservation of biological diversity and management of endangered

species and their habitat.

William J. Snape, III is a professor and assistant dean at

American University's Washington College of Law where he directs the

law school's program on environmental and energy law. Professor

Snape is the author and editor of Biodiversity and the Law (Island

Press, 1st ed. 1996) and writes regularly on endangered species and wildlife habitat issues.

Delcianna Winders is a professor and director of the Animal Law and Policy Institute at Vermont Law and Graduate School, where she teaches the Endangered Species Act in her animal law and natural resources law courses. She has litigated numerous Endangered Species Act cases and authored a chapter in *Endangered Species Act: Law, Policy, and Perspectives* (Donald C. Baur & Ya-Wei Li eds., Am. Bar Ass'n, 3d ed. 2021). Professor Winders' work has appeared in the Denver Law Review, Florida State Law Review, Ohio State Law Journal, NYU Law Review, and the Animal Law Review.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money for the brief's preparation or submission. No other person, other than Amici-Law Professors or their counsel, contributed money intended to fund preparing or submitting the brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all

7

parties consented to the filing of Amici-Law Professors' October 2nd brief. Plaintiff-Appellees do not oppose this motion. Defendant-Appellants take no position on this motion.

## STATEMENT OF THE ISSUES

Whether the district court's injunction requiring FDEP to cease Endangered Species Act-violating conduct, obtain an incidental take permit before it continues with the conduct, and implement reasonable protective measures violates principles of cooperative federalism, the Tenth Amendment, or the anti-commandeering doctrine.

## SUMMARY OF THE ARGUMENT

The district court's injunction does not commandeer the state of Florida. It enforces the Endangered Species Act, a statute that prohibits all persons, explicitly including state agencies, from causing unlawful "take" of endangered species. Appellant and Appellant-Amici argue the order improperly requires FDEP to regulate in ways that intrude on state sovereignty in violation of the Tenth Amendment and anti-commandeering principles. This argument is fundamentally flawed for three reasons.

First, the injunctive relief respects the Endangered Species Act's

cooperative federalism model. Section 6 of the Endangered Species Act invites states to participate in conserving species through cooperative agreements and funding, but always on federal terms. Under Section 6, states may administer programs only if consistent with federal standards. Far from insulating states, the Endangered Species Act requires states to obtain an incidental take permit when their activities could result in a prohibited take. Nothing about the injunctive relief offends Congress' carefully crafted approach to protecting species from extinction.

Second, federal courts are empowered to enjoin state and local governments whose actions cause take. These nationwide precedents, including from this circuit, hold that states are not exempt from the prohibition on take and that mandating that FDEP comply with this federal statutory requirement does not run afoul of the Tenth Amendment. The district court's injunction requiring FDEP to apply for an incidental take permit reinforces the Endangered Species Act's mandate to hold all actors accountable.

Third, the anti-commandeering doctrine is simply inapplicable. The doctrine bars Congress from conscripting state legislatures or

executives to implement federal programs, but it does not prevent federal courts from restraining state violations of federal law where Congress has enacted generally applicable laws. Indeed, the Supremacy Clause and *Ex parte Young* establish the opposite—state officials are subject to injunctions preventing them from violating federal laws and regulations.

The injunction here simply requires FDEP to stop issuing permits that foreseeably harm manatees, to apply for an incidental take permit, and to take minimal steps to monitor and mitigate FDEP's prior, ongoing, and foreseeable future take. The lower court properly found the monitoring and feeding requirements necessary to avoid further manatee mortality that irreparably harms the species and plaintiff. That relief does not conscript the state; it enforces compliance with federal law. The district court's relief is consistent with the constitutional design of the Endangered Species Act's cooperative federalism framework and decades of judicial precedent.

## ARGUMENT

The plain language of the Endangered Species Act required the district court to enforce the Endangered Species Act against FDEP

where its otherwise lawful activity of permitting discharges from septic systems, wastewater treatment plants, and stormwater facilities caused serious water quality degradation in the manatee's habitat, resulting in the unlawful take of Endangered Species Act-protected manatees. The Endangered Species Act's undeniable, explicit terms mandated the district court to impose injunctive relief to remedy that violation. In accord with the express purposes of the Endangered Species Act to prevent unauthorized injury of protected species, the remedy quite naturally prohibited FDEP from continuing the action that caused the take, conditioned resumption of that take-causing activity on receiving an incidental take permit and required the agency to monitor and mitigate the take already put into motion by its actions.

Congress has long expressed a preference for cooperation between the states and federal government when it comes to the protection of our shared natural resources, like plants and animals. The reasons are manifold, but during the 1960s it became clear that "states alone were inadequate" to prevent biodiversity loss. John Copeland Nagle, *The Original Role of the States in the Endangered Species Act*, 53 Idaho L. Rev. 385, 392 (2018). As Congress developed the Endangered Species

11

Act, it created the option for states to enter into cooperative agreements to promote greater state involvement in the Endangered Species Act process. *Id.* at 395. Congress overwhelmingly supported this cooperative regulatory approach when it passed the Endangered Species Act into law with the Senate voting in favor 92-0 and the House approving 355-4. Cong. Rsch. Serv., *A Legislative History of the Endangered Species Act Of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980*, 410, 483 (1982).

Cooperative agreements come with federal funding to support state conservation programs. In 2024, Congress authorized, and the U.S. Fish & Wildlife Service (FWS) awarded, more than $62 million in federal funding for states with cooperative agreements. U.S. FWS, *Cooperative Endangered Species Conservation Fund Grants*, https://www.fws.gov/sites/default/files/documents/2024-07/section-6-fact-sheet-july-2024.pdf (July 2024). While the Endangered Species Act offers this carrot, it also threatens a stick. Courts must hold all persons, state agencies included, accountable when their actions violate the Endangered Species Act. Caselaw is well-established on this point. District courts have the discretion to afford equitable relief to remedy a

12

defendant's violation of law. Here the district court's commonsense injunctive relief requiring the agency to stop taking Florida manatees without a permit is consistent with the Endangered Species Act and the body of caselaw on-point. Nothing about the district court's injunctive relief infringes on powers otherwise reserved for the states under the Tenth Amendment or violates the anti-commandeering doctrine.

I.    **The Endangered Species Act's cooperative federalism framework supports the scope of the district court's injunctive relief.**

The district court's injunction is consistent with the Endangered Species Act's cooperative federalism design. Appellant-Amicus argues the injunction subverts the Endangered Species Act's cooperative federalism design. Doc. 31 at 20. But cooperative federalism under the Endangered Species Act does not mean states are immune from its core requirements. When Congress enacted the Endangered Species Act in 1973, it declared the prevention of species extinction a matter of overriding national importance. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173–84 (1978). To address the growing concern that species were becoming imperiled as a consequence of human activity, Congress made it unlawful for "any person subject to the jurisdiction of the United

13

States" to "take" an endangered species. 16 U.S.C. § 1538(a). The statutory definition of a "person" includes "any State, municipality, or political subdivision of a State," 16 U.S.C. § 1532, including departments of those entities like state agencies. The Endangered Species Act's broadly inclusive language reflects Congress' intent to ensure that no actor—governmental or otherwise—escapes liability for contributing to the peril of threatened species. *See People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1148–9 (11th Cir. 2018).

At the same time, Congress recognized states share an interest in conserving species and provided incentives for cooperative federalism through Section 6, which authorizes cooperative agreements with states and helps fund programs "consistent with the purposes and policies" of the Endangered Species Act. 16 U.S.C. § 1535(c)(1)(B). These agreements were intended as "mechanisms through which the Federal government and the governments of the States can work fruitfully together toward the mutually accepted goal of protection of endangered and threatened species." S. Rep. No. 93-307, at 8 (1973).

Since its enactment, the Endangered Species Act has achieved

14

great success in preventing extinctions and aiding the recovery of

multiple species. Two such examples call Florida home: the American

alligator and the bald eagle. *Endangered Species: 6 Stories of Success*,

Nat'l Wildlife Fed., https://www.nwf.org/Educational-

Resources/Wildlife-Guide/Understanding-Conservation/endangered-

species-success-stories (last visited Sep. 19, 2025). These successes were

achieved through a system of cooperative implementation by both

federal and state governments and by upholding the prohibitions

against unlawful take.

Not only is cooperative federalism a hallmark of modern

environmental law in the U.S., but it has its roots in the Tenth

Amendment. By reserving powers not enumerated to the federal

government to the states, the Tenth Amendment reflects a compromise

between federalists in support of a strong central government and anti-

federalists who advocated for greater state autonomy. Lucy Ackerman,

*Tenth Amendment: The United States' Defining Compromise*, 20

Federalism-E 44, 46–7 (2019). In ratifying the Tenth Amendment, the

states struck a balance between the two interests. Indeed, the United

States Supreme Court has interpreted the Tenth Amendment as "a

truism that all is retained which has not been surrendered" and that "[t]here is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments." *U.S. v. Darby*, 312 U.S. 100, 124 (1941).

Thus, in the context of environmental law, cooperative federalism operates "to take advantage of the strengths of states and local governments in implementing the day-to-day operations and the [federal] agency's leadership, frameworks, and national standards." Jaclyn Lopez, *Diminished Access to Judicial Review is an Unacceptable Consequence of EPA's Delegation of its Responsibilities to States*, 53 Env. L. Rev. 571, 576 (2023). Under this model, federal environmental statutes establish baseline standards while giving states discretion to implement these standards within their own regulatory programs. *See, e.g.,* 42 U.S.C. § 7409. The Endangered Species Act is no different. It allows for states and the federal government to enter into cooperative agreements and calls for the federal government to "cooperate to the maximum extent practicable with the States." 16 U.S.C. § 1535(a).

FWS uses such "Section 6" cooperative agreements to integrate state programs into Endangered Species Act enforcement providing

16

substantial federal funding to incentivize state participation, covering

up to 75 percent of program costs. *Id.* § 1535(d)(2). All fifty states,

including Florida, have accepted Section 6 funds. *See* Kaush Arha &

Barton H. Thompson, Jr., eds., *The Endangered Species Act and

Federalism* 11 (2011). In fact, Florida has maintained a Section 6

agreement with FWS for nearly fifty years. *See* FWS & FWCC,

Cooperative Agreement between the U.S. DOI FWS & Fla. FWCC for

the Conservation of Endangered & Threatened Fish & Wildlife (2018).

This agreement acknowledges that Endangered Species Act-listed

plants and animals are "of aesthetic, ecological, educational, scientific,

economic, and other value," and yet are in danger of extinction. *Id.* It

explains that conservation programs through cooperative agreements

are "key to fulfilling the Nation's international commitments and to

better safeguarding the Nation's heritage in its fish and wildlife

resources." *Id.* at 2. As such, the agreement memorializes that FWS and

Florida agree that "programs of the State of Florida are designed to

assist [Endangered Species Act-listed species]; and acknowledge their

mutual desire to work in harmony for the common purpose of planning,

developing and conducting programs to protect, manage and enhance

17

the populations of all such species within the State of Florida." *Id.*

Florida's Section 6 agreement has supported manatee
conservation efforts. The manatee is one of the first endangered species
ever protected by the FWS, which first listed the Florida manatee in
1967 under the Endangered Species Preservation Act of 1966, the
predecessor to the Endangered Species Act. Endangered Species, 32
Fed. Reg. 4001 (Mar. 11, 1967). For decades prior to the creation of the
Florida Fish and Wildlife Conservation Commission (FWC) in the
1990s, FDEP "retained powers regarding endangered and threatened
marine life, such as manatees." Fla. Fish & Wildlife Conservation
Comm'n, Fla. Manatee Mgmt. Plan 199 (2007). Even to this day, as
noted in a memorandum of understanding between the FDEP, FWC,
and FWS regarding FDEP's attempted assumption of Clean Water Act
404 permitting, "FDEP has historically coordinated protection and
conservation of aquatic and terrestrial fish and wildlife species with the
FWS. FDEP, FWC, & FWS, *Memorandum of Understanding Between
the Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife
Serv., & Fla. Dep't of Env't Prot.* 2 (Aug. 5, 2020),
https://floridadep.gov/sites/default/files/Appendix_2_FDEP_FWC_FWS_

404_MOU_Final_Full_Signatures.pdf.

Even with the creation of FWC, FDEP remains heavily involved in managing Florida manatee habitat. For example, FDEP operates the Springs and Watershed Restoration Program and creates Basin Management Action Plans, both of which are designed to reduce nutrient pollution and mitigate eutrophication and degradation of water quality in manatee habitat, some of which is proposed as critical habitat for manatees, including the northern Indian Lagoon. Fla. Dep't of Env't Prot., *Protecting Florida's Springs*,

https://floridadep.gov/springs/protect-restore/content/ protecting-floridas-springs (last visited Sep. 25, 2025); *see also* Critical Habitat Designations for Florida Manatee and Antillean Manatee, 89 FR 78134 (Sep. 24, 2024) (proposing critical habitat designation in, among other areas, the northern Indian River Lagoon). FDEP also establishes, reviews, and revises water quality standards as directed by the Clean Water Act for surface waters that fish and wildlife, including manatees, depend on. Fla. Dep't of Env't Prot., *Water Quality Standards*, https://floridadep.gov/dear/water-quality-standards (last visited Oct. 1, 2025). FDEP is also a member of the Warm-Water Task

Force, created in 2000 to examine preserving Florida manatees' winter use of warm water refuges, including the Indian River Lagoon. Fla. Fish & Wildlife Conservation Comm'n, *Florida Manatee Warm-Water Habitat Action Plan*, app. C, at 34 (2020).

FDEP provides also guidance on monitoring protocols for compensatory mitigation projects to offset impacts to submerged aquatic vegetation, which are an essential part of the manatee's diet. Fla. Dep't of Env't Prot., *Guidance on Surveys for Submerged Aquatic Vegetation Compensatory Mitigation Projects* 1, 4 (Dec. 8, 2020). In accordance with Florida law, FDEP requires reasonable reassurance that permitted activities will not adversely affect Florida wildlife, Endangered Species Act-listed species, or their habitats, including submerged aquatic vegetation habitats. Fla. Stat. § 373.414(1)(a)2; Fla. Admin. Code Ann. r. 62-330.301(1)(d), r. 62-330.302(1)(a)2; ERP Applicant's Handbook Vol. I, § 10.2.2(a).

Under the Florida Manatee Sanctuary Act and through county-level Manatee Protection Plans, Florida and its counties have coordinated with FWS to regulate boat speeds, habitat zones, and development in manatee habitat. Fla. Stat. § 379.2431(2); *see also* Fla.

Fish & Wildlife Conservation Comm'n, *Manatee Protection Plans –*

*MPPs*, https://myfwc.com/wildlifehabitats/wildlife/manatee/protection-

plans/ (last visited Sep. 23, 2025).

This cooperative structure is not a license for noncompliance,

however. For these efforts to be successful in meeting the federal

statutes' purposes, states must still meet the minimum standards

imposed by the federal statutes. Here, the Endangered Species Act's

language is absolute: if a person, including a state, engages in an

activity that could incidentally take an endangered species, they must

refrain from the conduct or obtain an incidental take permit. 16 U.S.C.

§ 1539(a)(1)(B).

**II.    The district court's injunctive relief is consistent with
the body of caselaw that upholds enforcement of the
Endangered Species Act against state actors as
compatible with the Tenth Amendment.**

The district court's injunction falls squarely within the body of

cases in which courts have enjoined state actions that violate the

Endangered Species Act. Congress envisioned broad application of the

Endangered Species Act that prioritizes precaution when *any* person

engages in an activity that may result in taking a species. *TVA*, 437

U.S. at 194 ("Congress has spoken in the plainest of words, making it

abundantly clear that the balance has been struck in favor of affording

endangered species the highest of priorities, thereby adopting a policy

which it described as 'institutionalized caution.'"). In enacting a statute

with such a wide-sweeping purpose, Congress set the floor for

endangered species regulation. While it is true that the federal

government may not generally regulate states' conduct, a valid federal

law enacted under Congress's Commerce Clause powers is "the supreme

Law of the Land." U.S. Const. art. VI, cl. 2. To carve out a state-actor

exception that exists neither in the language nor the intent of the

statute would strip the Endangered Species Act of its very purpose.

Courts routinely enforce the Endangered Species Act's take

prohibition with injunctions against state agencies found to be in

violation. *See, e.g.,* R*ed Wolf Coal. v. N.C. Wildlife Res. Comm'n,* No.

2:13-CV-60-BO, 2014 U.S. Dist. LEXIS 65601, 2014 WL 1922234

(E.D.N.C. May 13, 2014) (granting a preliminary injunction against the

North Carolina Wildlife Resources Commission enjoining coyote

hunting permitting in the red wolf recovery area); *Loggerhead Turtle v.*

*Cty. Council of Volusia Cty.*, 148 F.3d 1231, 1249 (11th Cir. 1998)

(finding that Volusia County's incidental take permit for vehicular

access to beaches did not authorize it to take sea turtles associated with its "inadequate regulation of artificial beachfront lighting."); *Palila v. Haw. Dep't of Land & Natural Res.*, 649 F. Supp. 1070, 1083 (D. Haw. 1986), *aff'd,* 852 F.2d 1106 (9th Cir. 1988) (requiring the Hawaii Department of Land and Natural Resources to remove the feral and mouflon sheep populations it maintained in Palila critical habitat).

Appellant claims the injunction is overbroad because it requires FDEP to implement feeding and monitoring programs. Appellant's Brief, Doc. 14 at 16. But the scope of the court's injunction is consistent with caselaw requiring defendants to remediate or mitigate the injury caused by the take. In *Strahan v. Coxe*, the First Circuit Court of Appeals affirmed a district court's preliminary injunction ordering the Commonwealth of Massachusetts to apply for an incidental take permit, develop proposals "to restrict, modify or eliminate the use of fixed-fishing gear in coastal waters of Massachusetts listed as critical habitat for Northern Right whales," and convene an Endangered Whale Working group to discuss with plaintiff and other interested parties regarding modifications of fishing gear and other efforts to minimize harm to the whale. 127 F.3d 155, 158 (1st Cir. 1997). The court held

that the state's licensing of gillnet and lobster pot fishing—activities regulated by the state but carried out by private parties—resulted in the take of endangered Northern Right whales in violation of the Endangered Species Act. *Id.*

In *Strahan*, the injunctive relief required the state to take affirmative action beyond just ceasing to issue new permits. The First Circuit rejected the state's argument that the district court's ability to issue injunctive relief ordering the Commonwealth to affirmatively "form a working group and engage in substantive discussions toward rectifying their statutory violation" was limited by the Tenth Amendment. *Id.* at 168. The court found that, while the Tenth Amendment does generally restrict the federal government from regulating the conduct of states, "a valid act of Congress, enacted pursuant to its Commerce Clause powers, seeking to regulate a particular area . . . preempts state laws or regulations that conflict with the act." *Id.* at 167. In affirming the scope of the district court's injunctive relief, the court emphasized that "[b]y including the states in the group of actors subject to the Act's prohibitions, Congress implicitly intended to preempt *any* action of a state inconsistent with and in

violation of the [Endangered Species Act]," and that any state regulatory scheme cannot operate to the extent it is inconsistent with the Endangered Species Act. *Id.* (emphasis added). The court's relief resulted in the state taking affirmative action for "several years . . . with additional protective measures developed by the Commonwealth in consultation with various interested parties. . . ." Memorandum and Order, 2, *Strahan v. Durand*, No. 95-10927-DPW (D. Mass. 2001). The district court here likewise directs FDEP to develop the minimum additional protective measures necessary to prevent continuing harm to manatees.

When a state licenses an activity "in specifically the manner that is likely to result in a violation of federal law," *id.* at 164, that scheme "cannot continue insofar as its operation is inconsistent" with that law. *Id.* at 168. Like in *Strahan*, where Massachusetts' permit terms authorized gillnet and lobster pot use in a manner that exacted a taking, *id.* at 164, based on evidence presented at trial, the district court found that FDEP's permit terms allowed discharges that resulted in unusual mortality of manatees. The very act of issuing the permit is the triggering event under the Endangered Species Act, not merely the

later construction or operation of the septic system. An injunction requiring FDEP to apply for an incidental take permit before issuing additional permits under this regulatory scheme does not compel the State to regulate its own citizens but rather requires FDEP to adapt its regulations to comply with the Endangered Species Act's terms.

Similarly, in *Ctr. for Biological Diversity v. Little*, plaintiffs challenged the State of Idaho's issuance of licenses to set wolf snares due to a reasonable likelihood that they would ensnare threatened grizzly bears. 724 F. Supp. 3d 1113, 1119 (D. Idaho 2024). The court held Idaho's authorization of year-round wolf trapping to be reasonably likely to result in future take of grizzly bears in violation of the Endangered Species Act, and issued an injunction "eliminat[ing] year-round trapping and snaring on private land . . . [and] shorten[ing] the trapping and snaring season on both public and private land by approximately 6 weeks, *id.* at 1141, requiring Idaho to obtain an incidental take permit "if it desires to authorize trapping and snaring on private land year round." *Id.* at 1141. The court's injunction required Idaho to adjust its regulatory scheme to come into compliance with the Endangered Species Act. Jude Binkley, *Idaho Limits Wolf Trapping*

*Again to Protect Endangered Grizzly Bears*, KTVB7 (Feb. 11, 2025),

https://www.ktvb.com/article/tech/science/environment/federal-judge-upholds-idaho-wolf-trapping-snaring-restrictions-protect-grizzlies/277-c56f79c2-7e69-45e2-a6c8-0cee2e9ce91c (Idaho Fish and Game

restricting wolf trapping and snaring across Idaho in the spring

following the court's decision).

Finally, in *Animal Welfare Inst. v. Martin*, the court held Maine's

regulation of Conibear trapping resulted in take of the Canada lynx and

posed a threat of future take, ordering the state to take all actions

necessary to prevent trapping Canada lynx in Conibear traps, including

by promulgating emergency regulations if necessary. 588 F. Supp. 2d

70, 110 (D. Me. 2008). In response, the state promulgated emergency

regulations restricting the manner in which Conibear traps could be

set. *Id.*

In each of these cases, the scope of the injunctive relief ordered

reflects the necessary actions to prevent or mitigate future harm to

endangered species from the actions the state had already undertaken

that were likely to result in future unlawful take. They are designed to

minimize and mitigate take, incidentally, what an incidental take

27

permit is also designed to do. The court's order here is of the same
scope—it imposes minimal obligations on the state to monitor and
mitigate imminent unlawful take from the harm it has set in motion
while it waits for FWS to issue it an incidental take permit.

### III. The district court's injunction does not violate the anti-commandeering doctrine.

The Supreme Court's anti-commandeering cases do not apply here
because the Endangered Species Act does not force states to pass
legislation, prevent states from passing legislation, or force the state to
enforce federal law against individuals. The anti-commandeering
doctrine first emerged as a particular interpretation of the Tenth
Amendment in 1992 in *New York v. United States*, 505 U.S. 144 (1992).
There, the Supreme Court struck down a federal statute that required
states to either regulate radioactive waste or take title to it, finding that
this take-title provision mandated state regulation. *Id*. at 180. Even so,
the Court was careful to sustain the balance between state and federal
powers, affirming that "Congress has substantial power under the
Constitution to encourage the States" provided it does not amount to
compulsion, *id*. at 149, and that the "Constitution enables the Federal
Government to pre-empt state regulation contrary to federal interests."

*Id.* at 188.

In *Reno v. Condon*, the Supreme Court distinguished the impermissible commandeering in *New York* from justifiable regulation of a state when it acts as a participant. 528 U.S. 141, 151 (2000). There, the court upheld the Driver's Privacy Protection Act of 1994, which required states to obtain individuals' consent before selling their data to private entities, finding that where a generally applicable law governs a state that chooses to engage in an action as a participant, anti-commandeering concerns are not implicated. *Id.* Indeed, state officials have long been held liable for engaging in acts that violate federal law. *See Ex Parte Young*, 209 U.S. 123, 152 (1908).

Appellant-Amici raise three additional cases in support of its argument that the injunction offends the anti-commandeering doctrine. Doc. 31 at 8-9, citing *Murphy v. NCAA*, 584 U.S. 453 (2018); *Printz v. U.S.*, 521 U.S. 898 (1997); *Burban v. City of Neptune Beach, Fla.*, 920 F.3d 1274 (11th Cir. 2019). These cases are inapplicable here; each involved federal statutes that explicitly compelled state legislatures to pass (or not pass) laws or executive agencies to enforce federal law against third parties. *Printz*, 521 U.S. at 937 (invalidating a federal law

29

directly conscripting state officers to conduct federal background
checks); *Murphy*, 584 U.S. at 481 (invalidated a law ordering states to
refrain from enacting laws licensing sports-betting); *Burban*, 920 F.3d
at 1283 (holding that the Law Enforcement Officers Safety Act
(LEOSA) did not impose a binding obligation on states to issue LEOSA-
compliant identification).

The Endangered Species Act does not fit into the judge-made,
anti-commandeering mold for another reason: it is a generally
applicable law that applies equally to states and private parties. As the
Court explained in *Reno*, federal laws that apply to states are valid so
long as they regulate states as participants, not as sovereigns. 528 U.S.
at 151. Section 9's prohibition on take applies to "any person," including
state agencies and officials. "The anticommandeering doctrine does not
apply when Congress evenhandedly regulates an activity in which both
States and private actors engage." *Murphy*, 584 U.S. at 475–76. Here,
the state engaged as any private actor could: it undertook an activity
that resulted in taking an endangered species. The trial court held a
multiday evidentiary hearing and determined that FDEP issues septic
permits that result in water quality degradation which take Florida

manatees. Requiring an incidental take permit to engage in this action imposes no obligation on the State that is not also imposed on private individuals—to assert otherwise would be to ignore the plain language of the statute. 16 U.S.C. § 1538(a) ("[I]t is unlawful for *any person* subject to the jurisdiction of the United States to . . . take any such species." (*emphasis added*)).

The Endangered Species Act does not commandeer states into regulating the conduct of its citizens; "[t]he question, then, is not whether the state has an obligation to undertake an affirmative act, but whether, when it undertakes an affirmative act by authorizing [an activity], it is violating the Endangered Species Act." *Animal Welfare Inst.*, 588 F. Supp. 2d at 99. By requiring compliance by all actors and imposing the prohibition of take on states, "Congress implicitly intended to preempt any action of a state inconsistent with and in violation of the Endangered Species Act," *Strahan*, 127 F.3d at 168, creating standards states must meet if they wish to regulate in an "otherwise pre-empted field." *Printz*, 521 U.S. at 926. "That a state wishing to engage in certain activity must take administrative . . . action to comply with federal standards . . . is a commonplace that

31

presents no constitutional defect." *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988). The anti-commandeering doctrine is meant to protect the public from federal statutes that disguise responsibility. *Printz*, 521 U.S. at 930. Put plainly, this is not commandeering, it is compliance.

While Amici-Law Professors maintain the district court's injunctive relief is properly tailored to address the take of manatees due to FDEP's regulatory program in the context of the long history of FWS and Florida's partnership to recover the Florida manatee, Amici-Law Professors acknowledge this Court retains the authority to remand to the trial court should it conclude that the injunctive relief goes too far. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1197 (9th Cir. 2024) (upholding the trial court's injunction but remanding to the lower court to address the geographic scope and application to state research activities). Amici Law Professors would simply note that here, the trial court found a "definitive causal link" between the state's wastewater regulations and take of manatees in 2021. Amici Law Professors respectfully submit that the order requiring monitoring and feeding is consistent with caselaw and an appropriate

remedy in light of FDEP's prior conduct.

## CONCLUSION

The district court's injunction is a valid application of the Endangered Species Act's take prohibition on FDEP's violative actions. The Endangered Species Act requires that federal courts enjoin state actions that cause take and compel state actors to seek incidental take permits and remediate harms where necessary. The district court's injunction upholds the integrity of a statute that has, for over fifty years, required *all* who engage in incidental take to be held accountable under the Endangered Species Act. For these reasons, this Court should affirm the district court's injunctive relief.

Respectfully submitted,

Dated:   October 9, 2025

/s/ *Alyssa Huffman*
ALYSSA HUFFMAN
Florida Bar No. 1068484
(813) 773-6810
ahuffman3@law.stetson.edu


/s/ *Jaclyn Lopez*
JACLYN LOPEZ
Florida Bar No. 96445
(727) 490-9190
jmlopez@law.stetson.edu


/s/ *Rachael Curran*
RACHAEL CURRAN
Florida Bar No. 1002221
(727) 537-0802
rcurran1@law.stetson.edu

Jacobs Public Interest Law Clinic
for Democracy and the Environment
Stetson University College of Law
1401 61st St. S.
Gulfport, FL 33707

*Counsel for Amici-Law Professors*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g):

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) because it contains 6,017 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated:    October 9, 2025          */s/ Alyssa Huffman*
                                   ALYSSA HUFFMAN
                                   *Counsel for Amici-Law Professors*