Nos. 25-11612 & 25-11821

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

BEAR WARRIORS UNITED, INC.,
*Plaintiff-Appellee,*

v.

SECRETARY of the
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Defendant-Appellant.*

Appeal from the U.S. District Court for the
Middle District of Florida, No. 6:22-cv-2048 (Mendoza, J.)

## REPLY BRIEF OF APPELLANT

Jeffrey Brown
Department of Environmental Protection
390 Commonwealth Blvd., MS 35
Tallahassee, Florida 32399-3000
Telephone: (850) 245-2242
Jeffrey.Brown@FloridaDEP.gov

Jeffrey M. Harris
Bryan Weir
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Defendant-Appellant*

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 and 26.1-2, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.  Babcock, Hope – Amicus Curiae

2.  Bear Warriors United, Inc. – Appellee

3.  Blackner, Lesley G. – Counsel for Appellee Bear Warriors United

4.  Blackner, Stone & Associates – Counsel for Appellee Bear Warriors United

5.  Blome, Jessica L. – Counsel for Appellee Bear Warriors United

6.  Boudreaux, Paul – Amicus Curiae

7.  Bradford, Susann M. – Counsel for Appellee Bear Warriors United

8.  Brown, Jeffrey – Counsel for Appellant Secretary Lambert

9.  Brown, Karma B. – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

10. Center for Biological Diversity – Amicus Curiae and Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

11. Clements, Elizabeth Carter Chandler – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

12. Colton, Bryan E. – Counsel for Appellee Bear Warriors United

13. Consovoy McCarthy PLLC – Counsel for Appellant Secretary Lambert

14. Corbari, Kelley F. – Counsel for Appellant Secretary Lambert

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

15. Courchesne, Christophe – Amicus Curiae

16. Curran, Rachael – Counsel for Amici Curiae Law Professors

17. Defenders of Wildlife – Amicus Curiae

18. Doremus, Holly – Amicus Curiae

19. Earthjustice – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

20. Florida Home Builders Association – Amicus Curiae

21. Florida Onsite Wastewater Association – Amicus Curiae

22. Florida Springs Council – Amicus Curiae

23. Flynn, Caroline A. – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

24. Greenfire Law, PC – Counsel for Appellee Bear Warriors United

25. Harris, Jeffrey M. – Counsel for Appellant Secretary Lambert

26. Houck, Oliver – Amicus Curiae

27. Huffman, Alyssa –Counsel for Amici Curiae Law Professors

28. Hunton Andrews Kurth, LLP – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

29. Indian Riverkeeper – Amicus Curiae

30. Jennings, Jeffrey D. – Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

31. Kissimmee Waterkeeper – Amicus Curiae

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

32. Lambert, Alexis, in her official capacity as Secretary of the Florida Department of Environmental Protection – Appellant

33. Leopold, Matthew Z. – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

34. Lopez, Jaclyn – Counsel for Amici Curiae Law Professors

35. Matanzas Riverkeeper – Amicus Curiae

36. Mendoza, Honorable Carlos E. – Judge for the United States District Court for the Middle District of Florida

37. Miami Waterkeeper – Amicus Curiae

38. Miller, Mark – Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

39. Molyneaux, Victoria – Counsel for Amicus Curiae Defenders of Wildlife

40. National Onsite Wastewater Recycling Association – Amicus Curiae

41. Nowlin, Michelle – Amicus Curiae

42. Pacific Legal Foundation – Amicus Curiae

43. Parenteau, Patrick – Amicus Curiae

44. Peterson, Erica N. – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

45. Plater, Zygmunt – Amicus Curiae

46. Price, Honorable Leslie H. – Magistrate Judge for the United States District Court for the Middle District of Florida

47. Property and Environment Research Center (PERC) – Amicus Curiae

48. Rohlf, Daniel – Amicus Curiae

Nos. 25-11612 & 25-11821, *Bear Warriors United v. Lambert*

49. Rivo, Lily A. – Counsel for Appellee Bear Warriors United

50. Save Crystal River – Amicus Curiae

51. Save the Manatee Club – Amicus Curiae

52. Sierra Club – Amicus Curiae

53. Snape, William J., III – Amicus Curiae

54. Soares, Dylan P. – Counsel for Amicus Curiae PERC

55. Stetson University College of Law's Jacobs Public Interest Law Clinic for Democracy and the Environment – Counsel for Amici Curiae Law Professors

56. Turner, Andrew J. – Counsel for Amici Curiae Florida Home Builders Association, Florida Onsite Wastewater Association, and National Onsite Wastewater Recycling Association

57. Venable, Nicholas B. – Counsel for Appellant Secretary Lambert

58. Waterkeepers Florida – Amicus Curiae

59. Weaver, Sierra B. – Counsel for Amicus Curiae Defenders of Wildlife

60. Weir, Bryan – Counsel for Appellant Secretary Lambert

61. Whitlock, Ragan – Counsel for Amici Curiae Center for Biological Diversity, Florida Springs Council, Indian Riverkeeper, Kissimmee Waterkeeper, Matanzas Riverkeeper, Miami Waterkeeper, Save the Manatee Club, Sierra Club, and Waterkeepers Florida

62. Winders, Delcianna – Amicus Curiae

63. Wood, Jonathan – Counsel for Amicus Curiae PERC

64. Yates, Charles T. – Counsel for Amici Curiae Save Crystal River and Pacific Legal Foundation

Dated: October 17, 2025                    /s/ Jeffrey M. Harris
                                            Counsel for Defendant-Appellant

# TABLE OF CONTENTS

Certificate of Interested Persons ....................................................................C-1

Table of Citations..............................................................................................ii

Introduction ......................................................................................................1

Argument...........................................................................................................4

    I.  Plaintiff cannot satisfy the injury, causation, or redressability requirements of Article III standing to secure a prospective injunction. .......................................4

    II. DEP did not violate the ESA. ...............................................................13

        A.  Plaintiff failed to establish proximate causation. ............................13

        B.  The USFWS's proposed rule would foreclose any finding of ESA liability..........................................................................................17

    III. The district court erred by invoking preemption doctrine to ignore Tenth Amendment anti-commandeering principles........................................20

    IV. The district court's injunction is overbroad and disregards important federalism interests. ...........................................................................................23

Conclusion ......................................................................................................26

Certificate of Compliance ..............................................................................27

Certificate of Service.......................................................................................27

# TABLE OF CITATIONS

## Cases

*Allen v. Wright*, 468 U.S. 737 (1984) ..................................................................11

*Am. Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993) .........................................15

*Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) ..........7

*Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014)................................. 16, 22

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
    515 U.S. 687 (1995) ...............................................................................15, 18, 19

*BBX Cap. v. FDIC*, 956 F.3d 1304 (11th Cir. 2020) ...............................................8

*Burban v. City of Neptune Beach*, 920 F.3d 1274 (11th Cir. 2019) .....................22

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..................................................4

*Clark v. Coye*, 60 F.3d 600 (9th Cir. 1995).........................................................24

*Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008) ..................... 24, 25

*Gill v. Whitford*, 585 U.S. 48 (2018)......................................................................5

*Haaland v. Brackeen*, 599 U.S. 255 (2023)..........................................................22

*Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325 (11th Cir. 2005) ...........13

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)...........................12

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*,
    148 F.3d 1231 (11th Cir. 1998)........................................................2, 8, 14, 16

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..........................................................9

*Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020) ..................12

*Murphy v. NCAA*, 584 U.S. 453 (2018) .......................................................... 20, 21

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................18

*Nat'l R.R. Passenger Corp. v. Florida*, 929 F.2d 1532 (11th Cir. 1991) ...............20

*Reno v. Condon*, 528 U.S. 141 (2000) ............................................................ 20, 21

*Stanley v. City of Sanford*, 83 F.4th 1333 (11th Cir. 2023) ..................................15

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997)......................................................24

*TVA v. Hill*, 437 U.S. 153 (1978) .........................................................................25

*United States v. Hayashi*, 22 F.3d 859 (9th Cir. 1993).........................................19

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) .......................................15

**Statutes**

16 U.S.C. §1539 ....................................................................................12

Fla. Stat. §373.469 .................................................................................21

**Other Authorities**

*American Heritage Dictionary of the English Language* (1969) ...................................19

Jonathan H. Adler, *Judicial Federalism and the Future of Environmental Regulation*, 90 Iowa L. Rev. 377 (2005)...................................................................................23

Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102 (Apr. 16, 2025)................................................................... 17, 19

Valerie J.M. Brader, *Shell Games: Vicarious Liability of State and Local Governments for Insufficiently Protective Regulations Under the ESA*, 45 Nat. Resources J. 103 (2005) .....23

# INTRODUCTION

The heart of this appeal is whether this Court should establish an entirely new form of liability under the Endangered Species Act: one that imposes vicarious liability on government regulators even when there is no actor that commits a "take." Plaintiff's response brief fails to address DEP's core legal arguments, which go to the heart of this appeal. Instead, it repeats the conclusions of the district court and attempts to portray this case as entirely fact-based. But this Court reviews the district court's legal holdings de novo, and DEP has identified case-dispositive legal infirmities in each of them.

I.     Plaintiff responds to DEP's standing arguments by shifting its theory of injury on appeal. Recognizing that the unusual mortality event for manatees ended three years ago, Plaintiff now asserts that its injuries stem from changes to manatee diet that are outwardly imperceptible but *might* cause long-term health problems. Plaintiff then contends in conclusory fashion that its injuries will be redressed simply by bringing DEP into compliance with the ESA. But Plaintiff's claimed injury is not based on mere noncompliance with the ESA; instead, it is based on alleged aesthetic and economic harm to its members that Plaintiff must show are likely to recur and would be redressed by the prospective injunction it received here.

Plaintiff's causation arguments fare no better. Plaintiff concedes that individual landowners and municipalities around the Lagoon are not releasing nitrogen in a manner that would violate the ESA. This concession breaks the causal chain of Plaintiff's theory of vicarious ESA liability, which requires a "'governmental third party pursuant

1

to whose authority an actor *directly exacts a taking* of an endangered species.'" Red-Br. at 29 (emphasis added) (quoting *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1253 (11th Cir. 1998)). And Plaintiff does not help its case by asking this Court to focus on wastewater treatment plants instead of septic tanks, because Plaintiff made septic tanks the focus of this case through the relief that it obtained in its requested injunction. Regardless, the proceedings below failed to substantiate any of Plaintiff's allegations of DEP failing to bring enforcement actions against municipalities for wastewater treatment failures.

II.　　The district court further erred in concluding that DEP violated the ESA. Plaintiff's theory of vicarious liability depends on DEP authorizing a regulated party to *directly* take an endangered animal. Plaintiff's concession that individual landowners and municipalities did not foreseeably violate the ESA thus means that DEP did not foreseeably violate the ESA either. Plaintiff's theory of liability is also legally flawed because it rests on a chain of causation that is far too attenuated. The causal chain here includes natural disasters, legacy pollutants outside of DEP's control, the unpredictable choices of third parties, and broader changes in weather and natural conditions.

The U.S. Fish and Wildlife Service has also proposed changes to its regulations that would vitiate Plaintiff's entire case. Plaintiff asserts that the *Sweet Home* decision would still sustain its understanding of "harm" under the ESA, but the Supreme Court decided *Sweet Home* based on *Chevron*'s second step, under which the agency interpreta-

tion received deference because the law was ambiguous. That holding in no way precludes the current agency leadership from making a different choice about how to act in the face of statutory ambiguity. If the USFWS finalizes the proposed rule during the pendency of this appeal, this Court must vacate the district court's judgment and injunction.

III.     Plaintiff fails entirely to respond to DEP's argument that preemption does not allow it to escape the anti-commandeering problems with vicarious ESA liability lawsuits. The Supreme Court held in *Murphy v. NCAA* that the effects of preemption operate only on regulated entities as private parties, not on states as sovereigns. Accordingly, federal law may impose higher standards for the release of nitrogen and other nutrients on landowners and municipalities around the Lagoon, but the Tenth Amendment prohibits federal authorities from coopting Florida state agencies to police those higher standards. At the very least, constitutional avoidance requires that this Court adopt an interpretation of the ESA that does not violate the anti-commandeering principles of the Tenth Amendment.

IV.     Finally, even setting jurisdiction and liability aside, the permanent injunction is overbroad and violates core federalism principles by imposing unnecessary conditions beyond what is needed to ensure compliance with the ESA. Plaintiff fails to respond to DEP's argument that even the vicarious liability case Plaintiff invokes as its model did not adopt remedies as drastic and far-reaching as what the district court imposed here. Instead, Plaintiff cites only this Court's *Florida Key Deer* decision, which is

3

inapt because it involved a federal agency, and thus does not implicate the federalism concerns at stake here. *Florida Key Deer* also concerned activity that represented an existential threat to a more-endangered species, so the fact that a drastic injunction was warranted there does not control whether one is appropriate here. Even if this Court does not reverse in full, narrowing the injunction is essential to protecting important federalism interests that were brushed aside in the proceedings below.

## ARGUMENT

### I.    Plaintiff cannot satisfy the injury, causation, or redressability requirements of Article III standing to secure a prospective injunction.

Plaintiff has not established Article III standing either as a general matter or for the specific injunction it obtained, and the district court erred by concluding otherwise. *See* Blue-Br. at 17-29. On injury, the district court did not find facts suggesting that Plaintiff's members likely will "again be wronged in a similar way" by being emotionally or financially impacted by encountering dead manatees, as required by *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). On causation, the link between DEP's challenged actions and Plaintiff's injury is too attenuated and depends on the intervening acts of third parties not before this Court. Blue-Br. at 19-21. And on redressability, Plaintiff has failed to demonstrate that the injunction's provisions will remedy its members' alleged injury given the prevalence of "legacy pollutants" in the Lagoon and other sources of eutrophication outside DEP's control.

4

Further, for Article III standing, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). The sweeping injunction the district court entered here fails that test. The requirement that DEP apply for a take permit is aimed at an asserted interest in forcing the agency to comply with the ESA, not at the specific injuries Plaintiff pressed below. And DEP lacks statutory authority to implement many of the injunction's provisions because, under state law and existing federal permits, authority to feed and monitor wildlife is vested in a different Florida agency, the Florida Fish & Wildlife Conservation Commission (FWC). Blue-Br. at 25-29.

Plaintiff's arguments to the contrary cannot salvage its standing.

**A.** On injury, Plaintiff discusses its members' alleged aesthetic and financial injuries. Red-Br. at 24-26. But, as to the likelihood of those injuries *recurring*, it relies solely on the district court's unelaborated assertion that "'evidence presented at trial established that Plaintiff's members are likely to encounter dead manatees again.'" *Id.* at 26 (quoting R.172 at 8). As DEP explained, Blue-Br. at 18, the end of the manatee unusual mortality event *in 2022*, and the lack of any proven manatee deaths from emaciation since then, casts serious doubt on that conclusory assertion.

Perhaps recognizing as much, Plaintiff attempts to shift its theory of injury on appeal, arguing that dietary changes for manatees represent an ongoing take "separate and apart from the mass starvation documented by the UME during 2020-2022." Red-Br. at 20-21. But trial testimony concerning whether this dietary shift would be evident

to Plaintiffs' members was inconclusive at best. Dr. Martine de Wit testified that the state veterinarians at the Wildlife Commission "have seen that manatees can adapt to algae," that it was only "possible" some manatees would die from a primary diet of microalgae, and that "the condition of the animals has much improved." R.187 at 50, 68.

This Court should accordingly decline Plaintiff's invitation to "accept" its declarations about its members' *past* aesthetic and economic harms as proof that Plaintiffs will be injured again in a similar manner in the future. Red-Br. at 27. Plaintiff further contends that its members are being injured by encountering manatees that "appear outwardly healthy," because some of those manatees may eventually die from infections associated with changes in their diet. Red-Br. at 20. But any factual support for *that* distinct type of injury was totally lacking below.

Plaintiff's amici inject yet another novel theory of injury-in-fact by arguing that it is not necessary to show Plaintiff's members are likely to encounter a dead manatee, but that an increased "'risk of loss'" suffices. Environmental-Orgs-Br. at 6-7. But this argument ignores that the district court assessed likelihood of future injury based on whether "Plaintiff's members are like[ly] to encounter dead manatees again," R.172 at 8. All the cases amici cite are about injury-in-fact generally, *see* Environmental-Orgs-Br. at 6-8, and none examined the *Lyons* requirement of likelihood of future injury to justify a prospective injunction.

**B.**    On causation, Plaintiff starts by misquoting the U.S. Supreme Court. Plaintiff offers a quotation that it attributes to *Simon v. Eastern Kentucky Welfare Rights Organization*, Red-Br. at 27, but that quotation appears nowhere in that opinion. The quotation actually comes from a D.C. Circuit case, and Plaintiff omits an important qualifier at the end: "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, *if that conduct would allegedly be illegal otherwise.*" *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (emphasis added). So, under the complete statement of the rule, causation is satisfied if DEP authorized *illegal activity* by a third party that subsequently caused Plaintiff's injuries.

Later in its standing argument, Plaintiff concedes that property owners and municipalities do *not* violate the ESA merely by releasing nitrogen from a septic tank into the Lagoon and that "it would be factually impossible to pin the eutrophication of the North IRL on a single plant or septic tank owner, and it would be equally impossible to sue them all." Red-Br. at 37. That concession is fatal to Plaintiff's causation argument because the theory of vicarious ESA liability that Plaintiff advances *requires* a predicate taking of manatees by landowners or municipalities that DEP has authorized. Indeed, the very next citation in Plaintiff's brief quotes *Loggerhead Turtle* regarding this theory of liability: a "'governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species'" may be deemed to have violated the ESA. *Id.*

7

at 37-38 (quoting *Loggerhead Turtle*, 148 F.3d at 1253). Here, DEP is the "governmental third party," so if there is no "actor" (such as a landowner or municipality) who "directly exacts a taking," then Plaintiff's entire theory of causation falls apart.

Plaintiff's concession also distinguishes this case from *Loggerhead Turtle*. There, the County was responsible for "allowing landowners to use lights all day and all night" on the beachfront, and those lights directly caused the death of sea turtles that were attracted to the lights. 148 F.3d at 1251. In other words, individual landowners' use of lights directly caused the taking of sea turtles. Here, however, Plaintiff acknowledges that individual landowners or municipalities are *not* violating the ESA, so *Loggerhead Turtle*'s conclusions about causation do not control.

This case is also distinguishable from *Loggerhead Turtle* on the ground that the County there "had 'absolute authority to issue environmental ordinances that would … prevent plaintiffs' injuries.'" *BBX Cap. v. FDIC*, 956 F.3d 1304, 1313 (11th Cir. 2020). In other words, the County could change its lighting ordinances and immediately prevent homeowners from causing more turtle deaths through rigorous enforcement.

Here, by contrast, Plaintiff's own expert testified that even if all nutrients ceased to enter the Lagoon today, "seagrasses would only return after at least a decade" due to legacy nutrients present in the Lagoon, many of which stem from septic tanks permitted long ago by another agency or from other causes of eutrophication. R.172 at 16. *Massachusetts v. EPA* is similarly distinguishable because there the Supreme Court explained that just the emissions at stake in that case would make the United States "the third-

8

largest emitter of carbon dioxide in the world." 549 U.S. 497, 524 (2007). In contrast, the nutrient runoff in this case is dwarfed by the magnitude of legacy pollutants over which DEP has no control. Under Plaintiff's account of the facts, and similar to the Federal Reserve's position in *BBX Capital*, DEP lacks the ability to do anything that would give Plaintiff's members prospective relief within the next 10 years. Red-Br. at 32 (citing R.172 at 16).

Finally, Plaintiff faults DEP for focusing on septic tanks over wastewater treatment plants, *see* Blue.Br. at 2-5, but neglects to mention that the specific relief Plaintiff sought and obtained below focused overwhelmingly on septic tanks. Plaintiff's proposed injunction, which the district court adopted essentially unchanged, requested a "temporary moratorium on new residential and commercial construction that use onsite sewage treatment and disposal systems (OSTDS) within the watershed." R.174 at 3. Plaintiff sought to justify this request by arguing that this particular provision would "serve the important function of *stopping the addition of new sources of nitrogen that load into the North IRL* while the ITP application is processed." R.174-1 at 6. Plaintiff cannot blame DEP for "mak[ing] this appeal about septic tanks," Red-Br. at 30, when a moratorium on new septic tanks has been the primary focus of the prospective relief that Plaintiff sought and obtained.

Plaintiff cites portions of its complaint that refer to wastewater treatment plants, Red-Br. at 4, but DEP sharply contested those allegations and the district court never made any factual findings about treatment plant underenforcement. Plaintiff's operative

complaint alleged that "DEP's consistent failure to penalize wastewater plants for un-authorized discharges of untreated sewage contributes to the hyper eutrophication of the North IRL." R.59 at 20. In response, DEP submitted a sworn declaration at summary judgment explaining that for each of these alleged failures to enforce, DEP already undertook an enforcement action and levied fines, including a $200,000 fine for an unauthorized discharge by the City of Titusville in 2020. R.96 at 4-10. Plaintiff never rebutted this evidence, and none of the district court's orders endorses Plaintiff's allegations regarding alleged underenforcement.

Plaintiff now asserts that "[t]he trial [sic] reasonably inferred that it is more cost efficient for Cape Canaveral to use the North IRL as a wastewater treatment lagoon than upgrade its plant to guard against future FDEP enforcement efforts," Red-Br. at 33, but Plaintiff provides no citation to substantiate that contention. That is because it lacks merit: At trial, DEP presented uncontested testimony that all wastewater treatment facilities that feed into the Lagoon will have either upgraded to advanced wastewater treatment systems that provide enhanced removal of nutrients or ceased discharging wastewater by July 1, 2025. R.188 at 106-07.

**C.**    On redressability, Plaintiff asserts that its injuries will be redressed when DEP fulfills its "ESA compliance obligations." Red-Br. at 37. But the injury Plaintiff claimed in this lawsuit was not DEP's alleged failure to comply with the law. For good reason, because "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*,

468 U.S. 737, 754 (1984). Instead, Plaintiff alleged an injury based on emotional and financial harm of its members. The limits of DEP's statutory authority and the take permit process mean that the district court's injunction will not redress those injuries, so Article III standing is not satisfied here.

As to statutory authority, DEP lacks the power under Florida law or federal regulations to implement several provisions of the district court's injunction. These responsibilities are instead vested in the Florida Fish & Wildlife Commission (FWC). Plaintiff asserts that there is "no substantive or procedural mechanism FWC could use to restore seagrasses in the North IRL," Red-Br. at 35, but this glosses over the reality that Plaintiff asked for and received an injunction requiring *DEP* to feed and monitor manatees, both activities squarely within FWC's statutory responsibilities.

The course of DEP's injunction compliance before the district court has borne out this lack of statutory authority. When DEP formally requested FWC's assistance in implementing the injunction's manatee feeding and monitoring provisions, FWC responded that while it had "exclusive jurisdiction to regulate all wild animal life, freshwater aquatic life, and marine life in Florida," it determined "[b]ased on a review of available data and environmental conditions, additional biomedical assessments or temporary supplemental feeding of manatees in the IRL are not necessary at this time." R.214 at 11-12. FWC further cautioned DEP that "[n]on-essential feeding or capturing manatees poses an unnecessary risk and is not scientifically justified." *Id.* at 12.

Moreover, for DEP to implement the injunction's feeding and monitoring provisions, it must apply for a separate permit from the federal Fish and Wildlife Service. 16 U.S.C. §1539(a)(1)(A). DEP has done so, but the federal agency has not yet acted on its application. R.214 at 2-3. Where a defendant cannot effectuate the plaintiff's proposed remedy, the plaintiff's injury is neither traceable to, nor redressable by, the defendant for purposes of Article III standing. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-56 (11th Cir. 2020).

As to the take permit, Plaintiff attempts to show redressability by once again changing the nature of its alleged injury. Plaintiff asserts that "[b]ringing FDEP into compliance with the ESA would redress Bear Warrior's members' injuries," Red-Br. at 38, but that would be true only if Plaintiff's members could claim a mere violation of the ESA as their injury-in-fact, which Article III does not allow. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) ("alleging a statutory violation is not enough to show injury in fact"). The injury Plaintiff asserted below was its members' alleged emotional and economic harm stemming from encountering dead manatees. Even if a take permit requires any takings to be mitigated, *see* Red-Br. at 38, the permit would still *authorize* DEP to take manatees. The mere fact that Plaintiff asks in its complaint for DEP to obtain a take permit does not satisfy Article III standing if the permit would not necessarily redress its members' alleged injuries.

12

## II.    DEP did not violate the ESA.

### A.    Plaintiff failed to establish proximate causation.

Reversal is independently warranted because the district court's finding that DEP proximately caused an ESA violation was legally flawed and depended on too attenuated a causal chain. A district court clearly errs where its finding "'is based on an erroneous view of the law.'" *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005). And there were significant legal flaws in the district court's proximate cause holding.

The district court found proximate cause here even though it concluded that homeowners and municipalities did not violate the ESA, which runs counter to the vicarious liability theory that Plaintiff has relied upon. The district court conceded that individual property owners are not foreseeably violating the ESA, concluding that "proximate causation does not attach" to "private parties operating septic tanks." R.201 at 11-12. Yet the court concluded that "FDEP's role is not so attenuated." *Id.* at 12. As DEP explained, this conclusion is legally unsupportable since Plaintiff's vicarious ESA liability theory depends on DEP authorizing a direct taking by a regulated party. Where homeowners and municipalities are not violating the ESA because any down-the-road take is unforeseeable, DEP is not foreseeably violating the ESA either. Blue-Br. at 30-32.

Plaintiff doubles down on this legal error, conceding that homeowners and municipalities are not "independently liable for take of manatees in the North IRL." Red-

13

Br. at 37. But where foreseeability is lacking for landowners and municipalities because Plaintiff cannot "pin the eutrophication of the North IRL on a single plant or septic tank owner," Red-Br. at 37, it is also lacking for DEP itself. Plaintiff quotes *Loggerhead Turtle*'s description of an ESA vicarious liability claim in support of its proximate causation argument, asserting that ESA vicarious liability is established where "'the regulatory entity purports to make lawful an activity that allegedly violates the ESA.'" Red-Br. at 40 (quoting *Loggerhead Turtle*, 148 F.3d at 1251). But both Plaintiff and the district court agree that the parties actually releasing nitrogen into the IRL—landowners and municipalities—did *not* foreseeably violate the ESA, which defeats foreseeability for DEP as well.

Plaintiff's amici contend that the description of vicarious ESA liability articulated in *Strahan* and *Loggerhead Turtle*— "'a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the [ESA]'" —was merely "describing the fact pattern" of those cases and did not hold that "liability could attach *only* in such a scenario." Environmental-Orgs-Br. at 24-25. But that is both wrong and irrelevant. Plaintiff enthusiastically embraced *Strahan*'s "pursuant to whose authority an actor directly exacts a taking" theory of liability below and on appeal. Red-Br. at 29, 38 (quoting this language to explain how indirect liability works under the ESA). Even if Plaintiff's amici could conjure up a form of vicarious ESA liability that would not require a direct taking by a regulated party, that is not the type of claim Plaintiff advanced here or won on below. *See United States v.*

*Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").

In all events, this Court does not "consider arguments raised only by amici." *Stanley v. City of Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023). And if this Court were to endorse amici's expansion of ESA vicarious liability, it would only worsen the anti-commandeering problems, see Blue-Br. at 37-42; *infra* 20-23, because it would bless a form of ESA liability that can only be secured against states regulating as sovereigns and not against the regulated individuals.

The finding of ESA liability must also be reversed for the independent reason that the causal chain is too attenuated to satisfy proximate causation. Justice O'Connor's concurrence in *Sweet Home* provides an example for when a causal chain is too attenu-ated: "'a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby [injures] protected fish.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 713 (1995) (O'Connor, J., concur-ring). If anything, the chain of causation here is even more attenuated than that example.

As DEP explained, Blue-Br. at 32-34, and as the Home Builders' amicus brief ably elaborates, the causal chain here is simply too attenuated to sustain ESA liability for DEP. The problems with the district court's causation finding start with its failure to identify a specific take that violated the ESA. *See* Home-Builders-Br. at 9-14; *see also Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 165 (1st Cir. 1993) ("numerical probability of harm" insufficient to show take under the ESA). After failing to identify the death or injury of

a specific manatee, Plaintiff also failed to explain how DEP exercised control over the action that directly caused the take, a requirement that cases like *Loggerhead Turtle* insisted on. 148 F.3d at 1251. The causal chain here was too attenuated and involved too many intervening steps, which undermines any basis for holding that DEP could have foreseen the alleged harm to manatees.

Like the district court, Plaintiff argues *Aransas Project* is distinguishable due to "[e]xtraordinary circumstances" in that case. Red-Br. at 41. But that argument ignores important similarities between the facts here and facts that were important to the Fifth Circuit's analysis. *Aransas Project* also involved the licensed activities of a large number of landowners, which in turn affected the conditions in a body of water, which in turn affected the food sources of an endangered species, which the Fifth Circuit concluded was not "reasonably foreseeable" for the state agency. *Aransas Project v. Shaw*, 775 F.3d 641, 660 (5th Cir. 2014). Here, nitrogen loading in the Lagoon is also caused by extraordinary circumstances like hurricanes and damage to sewer mains. *See* Blue-Br. at 33-34; Home-Builders-Br. at 18 & n.8. And both Plaintiff and the district court have conceded that the alleged takings of manatees were not foreseeable for landowners and municipalities around the Lagoon. Red-Br. at 37; R.201 at 11-12.

Given this lack of foreseeability for intervening actors, the district court's decision represents the kind of "per-se proximate cause rule" that *Aransas Project* rejected because it lacks the necessary "close connection" between the "regulatory acts" and the "killing of endangered species." 775 F.3d at 659; Home-Builders-Br. at 20. This Court

16

should reverse the district court's proximate cause determination because it erred by finding a causal chain that was too attenuated and lacked the requisite foreseeability for DEP.

### B. The USFWS's proposed rule would foreclose any finding of ESA liability.

The U.S. Fish and Wildlife Service and National Marine Fisheries Service's proposed rule would excise the expansive definition of "harm" under the ESA that Plaintiff relied upon before the district court. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102, 16105 (Apr. 16, 2025). If this rule is finalized while this litigation is pending, then Plaintiff will have no avenue for demonstrating that DEP committed any "'affirmative act directed immediately and intentionally against a particular animal,'" as would be required for an ESA taking. *Id.* at 16103 (cleaned up); *see* Pacific-Legal-Br. at 6-13.

In trying to escape the effect of the proposed rule change, Plaintiff misconstrues *Sweet Home*'s holding. Plaintiff asserts that "the Supreme Court has already found that the ESA's statutory text and context strongly support reading 'harm' to encompass significant habitat modification." Red-Br. at 43. Not so. *Sweet Home* reached its holding based on *Chevron*'s second step—that is, it found USFWS's interpretation of harm as including habitat modification to be reasonable in light of statutory ambiguity. Blue-Br. at 36; Pacific-Legal-Br. at 24-26. The majority was explicit about this holding: "We need

not decide whether the statutory definition of 'take' compels the Secretary's interpretation of 'harm' because our conclusions that Congress did not unambiguously manifest its intent to adopt respondents' view and that the Secretary's interpretation is reasonable suffice to decide this case." *Sweet Home*, 515 U.S. at 703. Even Plaintiff's amici acknowledge that *Sweet Home* was a *Chevron*-step-two case. *See* Environmental-Orgs-Br. at 12-13.

USFWS would have been free to reconsider its regulations even when *Chevron* was still in force. Under *Brand X*, "the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005). Plaintiff's contrary interpretation runs counter to *Sweet Home*'s explicit reasoning that "[t]he proper interpretation of a term such as 'harm' involves a complex policy choice. When Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his." *Sweet Home*, 515 U.S. at 708. Under the *Chevron* framework that *Sweet Home* was decided under, the Court's decision merely holds that the rule at issue was *permissible*, not that it was *compelled* by statute. And *Sweet Home* surely does not prevent USFWS from changing its mind.

Plaintiff also quotes the district court's observation that "the proposed change says nothing of 'harassment.'" Red-Br. at 42 (cleaned up). But this would not save the judgment below if the proposed rule is finalized. The proposed rule explains how "the

definition of 'harm,' *like the other nine verbs in the definition*, should be construed to require an 'affirmative act directed immediately and intentionally against a particular animal.'" 90 Fed. Reg. at 16103 (emphasis added) (cleaned up). Interpreting "harm" according to its ordinary meaning would necessitate doing the same for "harass," especially since the latter term if anything carries an even stronger connotation of intentional action. *See American Heritage Dictionary of the English Language* 600 (1969) ("To disturb or irritate persistently….Harass implies systematic persecution by besetting with annoyances, threats, or demands.").

Indeed, even the *Sweet Home* decision casts doubt on the district court's passing suggestion that "harassment" might include indirect or accidental harm to animal populations. *See* R.172 at 13 (noting, without elaboration, that "'harassment' can nevertheless arise from *negligent* acts"). In *Sweet Home*, the Supreme Court reasoned that "harass" and related terms "refer to deliberate actions more frequently than does 'harm'" and "harass" describes "actions from which habitat modification does not usually result." *Sweet Home*, 515 U.S. at 698 n.11. And, as the Pacific Legal Foundation amicus brief explains, the Ninth Circuit in a similar context concluded that "grouping 'harass with hunt, capture, and kill as forms of prohibited taking' showed that 'harassment' must also 'entail a similar level of *direct* intrusion.'" Pacific-Legal-Br. at 18-20 (quoting *United States v. Hayashi*, 22 F.3d 859, 864 (9th Cir. 1993)).

In sum, if the proposed rule is finalized during this appeal, it would clearly qualify as a "change[] in fact or law occur[ing] during the pendency of a case on appeal" that

would justify a vacatur and "'remand to give the district court an opportunity to pass on the changed circumstances.'" *Nat'l R.R. Passenger Corp. v. Florida*, 929 F.2d 1532, 1538 (11th Cir. 1991). Plaintiff and its amici appear to agree that remand would be appropriate if the rule is finalized. Red-Br. at 46; Environmental-Orgs-Br. at 14-15.

## III.    The district court erred by invoking preemption doctrine to ignore Tenth Amendment anti-commandeering principles.

The injunction also violates anti-commandeering principles, by compelling DEP to use its sovereign authority to regulate Florida citizens. The injunction's requirements that DEP cease permitting any new septic tanks in particular "require[s] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000).

Plaintiff relies on the district court's reasoning, drawn from *Strahan*, that this case does not create anti-commandeering problems because "'FDEP regulations are inconsistent with the federal ESA, [so] they will be preempted.'" Red-Br. at 47. But Plaintiff fails to respond to DEP's argument that *Murphy v. NCAA* effectively overruled *Strahan* on this point. *See* Blue-Br. at 41; PERC-Br. at 13-16. The Supreme Court closely examined the relationship between commandeering and preemption: "regardless of the language sometimes used by Congress and this Court, every form of preemption is based on a federal law that *regulates the conduct of private actors, not the States.*" *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (emphasis added). Thus, for instance, "field preemption does not involve congressional commands to the States. Instead, like all other forms of

20

preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." *Id.* This means that private actors must obey federal law over conflicting state law, but it does not follow that federal law can commandeer state agencies to enforce federal requirements against individuals in any field with overlapping regulation. This is because the Constitution "'confers upon Congress the power to regulate individuals, not States.'" *Id.* at 472.

As the PERC amicus brief explains, no recognized form of preemption applies here. *See* PERC-Br. at 14-15. But even if the ESA did preempt Florida septic tank and wastewater treatment law, the legal effect of that preemption would not be to coopt Florida's agencies to enforce federal law, but to regulate landowners and municipalities directly under the ESA (with enforcement by federal officials).[1]

Plaintiff also misconstrues *Burban*, which states that the anti-commandeering doctrine does not apply to laws that merely regulate "'state activities.'" Red-Br. at 48. Read in its proper context, "state activities" refers to market participation and other activities that the state engages in on the same footing as individuals, such as the sale of personal information in *Reno*, 528 U.S. at 151, or the placement of adopted children in

---

[1] Neither the district court nor Plaintiff specified which Florida law or DEP regulation conflicts with the ESA. Because the district court enjoined installation of all new septic tanks, DEP surmises that it intended to preempt Fla. Stat. §373.469(d)(1), which prohibits "the installation of new" septic tanks in the Indian River Lagoon Basin *unless* they have "enhanced nutrient-reducing" technology. But preempting this provision cannot be squared with the district court's holding that "[i]t is not…private parties that are violating the ESA." R.201 at 10; *see* Blue-Br. at 41.

*Haaland v. Brackeen*, 599 U.S. 255, 285-86 (2023). *Burban*'s holding was crystal clear that the plaintiff's requested relief to "require states to issue identification plainly seeks to control how States regulate private parties, as opposed to regulating state activities" and thus was unconstitutional because it "require[d] state officials to assist in the enforcement of federal statutes regulating private individuals." *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1281-82 (11th Cir. 2019).[2] That is precisely what the injunction does here. It does not merely enjoin state officials from engaging in activities that directly harm manatees (like state officials themselves dumping sewage into the Lagoon) but instead coopts the state into enforcing the ESA by imposing and policing a ban on third parties building new septic tanks around the Lagoon.

All the cases Plaintiff cites as implementing this type of commandeering injunction pre-dated *Murphy*, Red-Br. at 50-51, so none had occasion to reconsider *Strahan*'s preemption argument in light of *Murphy*. Further, the Fifth Circuit in *Aransas Project* explained that of the federal courts of appeal, only the First Circuit in *Strahan* approved of vicarious ESA liability based on a state licensing scheme, and *Strahan*'s reasoning "is challenged by other appellate opinions maintaining that the state governments may not be commandeered into enforcing federal prohibitions." 775 F.3d at 656 n.9.

---

[2] Contrary to Plaintiff's amici's suggestion, *see* Professors-Br. at 29, *Burban* did not involve "federal statutes that explicitly compelled state legislatures to pass (or not pass) laws," but rather the precise situation we have here: a plaintiff pressing an interpretation of a federal statute that would have significant anti-commandeering implications, which this Court rejected on constitutional avoidance grounds.

The commandeering issues endemic to ESA vicarious liability cases have also been the subject of extensive scholarly criticism. *See, e.g.*, Jonathan H. Adler, *Judicial Federalism and the Future of Environmental Regulation*, 90 Iowa L. Rev. 377, 430 (2005) (explaining that in *Strahan* "state law was not preempted—that is, federal law did not displace state law by imposing different standards upon the regulated entities. Rather it acted directly upon the state entity itself in its sovereign capacity as the regulator of state waters."); Valerie J.M. Brader, *Shell Games: Vicarious Liability of State and Local Governments for Insufficiently Protective Regulations Under the ESA*, 45 Nat. Resources J. 103, 126 (2005) ("*Strahan* was not just telling the state where it was out of line and voiding that part of the regulation; it was requiring the State to regulate a specific outcome").

This Court should avoid these considerable constitutional problems by reversing the district court's holding of liability under Plaintiff's aggressive theory of vicarious ESA liability.

## IV.  The district court's injunction is overbroad and disregards important federalism interests.

Even apart from its legal errors on jurisdiction and liability, the district court abused its discretion by issuing an overly broad injunction. Narrowly drawn injunctions are particularly important in cases involving states, because "in reviewing a district court's injunction against an agency of state government, [courts] scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to

assure their compliance with federal law." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995). A district court whose injunction exceeds what is required by federal law "will be deemed to have committed an abuse of discretion." *Id.*

As DEP explained, even assuming jurisdiction and liability, the district court should have stopped at requiring DEP to apply for an incidental take permit. Blue-Br. at 43-46. The take permit process ensures that any incidental take is mitigated going forward. Given that reality, the district court's ban on new septic tanks and its affirmative requirements to adopt new feeding and monitoring programs unnecessarily impinged on state sovereignty. Indeed, even the ESA vicarious liability case the district court cited as its model rejected remedies as sweeping as the ones the court granted here, reasoning "[t]he district court was not required to go any farther than ensuring that any violation would end," which the take permit requirement accomplished. *Strahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997). The district court's decision to go beyond the remedies imposed even in its own cited cases violates important federalism concerns and was an abuse of discretion.

Plaintiff fails to respond to DEP's arguments that *Strahan* issued a more limited remedy than the one authorized here and that federalism concerns must be paramount in crafting the scope of an injunction. Instead, Plaintiff relies entirely on *Florida Key Deer v. Paulison*, an ESA Section 7 lawsuit brought against a federal agency. 522 F.3d 1133, 1136 (11th Cir. 2008). But to describe that case is to distinguish it: It was a lawsuit

against a federal agency under Section 7, which imposes unique consultation requirements on federal agencies, rather than a lawsuit against a state under Section 9, which imposes the more general restrictions on taking of endangered species. *Florida Key Deer* consequently involved none of the federalism concerns that should have limited the district court's injunction here. Indeed, the very passage Plaintiff cites is directed at circumstances "[w]here a *federal agency* fails to comply with the ESA." *Id.* at 1147 (emphasis added).

*Florida Key Deer* is also distinguishable on other grounds: That case involved development that would have caused the total extinction of the remaining 300 members of an endangered species of deer. *Id.* at 1139. That case is more similar to the *TVA* decision, which similarly involved activity that would have totally eradicated the snail darter. *TVA v. Hill*, 437 U.S. 153, 171 (1978). Such dire circumstances may go farther towards justifying a more drastic injunction.

Here, by contrast, Plaintiff concedes that the unusual mortality event for manatees ended in 2022, and now rests its theory for a taking not on any mass mortality but on the idea that "when manatees shift their diet from seagrass to toxic macroalgae, they may appear outwardly healthy but still suffer and ultimately die from a gut infection caused by consuming the wrong forage." Red-Br. at 20. Given the significant factual differences between this case and *Florida Key Deer*, this Court can conclude that the injunction restricting development was proper there while holding that the district court abused its discretion here in coopting the State to ban any new septic tanks.

# CONCLUSION

This Court should reverse the judgment of the district court and vacate the permanent injunction.

Dated: October 17, 2025

Respectfully submitted,

Jeffrey Brown
Department of Environmental Protection
390 Commonwealth Blvd., MS 35
Tallahassee, Florida 32399-3000
Telephone: (850) 245-2242
Jeffrey.Brown@FloridaDEP.gov

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Bryan Weir
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*\*Supervised by principals of the firm admitted to practice in Virginia*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 6,497 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font (with 16-point and 15-point headings).

Dated: October 17, 2025                    /s/ *Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I e-filed this brief, which will email everyone requiring notice.

Dated: October 17, 2025                    /s/ *Jeffrey M. Harris*